**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JEAN OLIVER,**

                             **Plaintiff,**

**v.**                                                      **1:15-cv-444 (BKS/DJS)**

**NEW YORK STATE POLICE; JOSEPH D'AMICO,**
**in his individual and official capacity; FRANCIS**
**CHRISTENSEN, in his individual and official capacity;**
**MICHAEL CERRETTO, in his individual and official**
**capacity; WAYNE OLSON, in his individual and official**
**capacity; STEVEN NIGRELLI, in his individual and**
**official capacity; MARTIN MCKEE, in his individual**
**and official capacity; TIMOTHY OWENS, in his**
**individual and official capacity; PAUL KELLY, in his**
**individual and official capacity; TIMOTHY BOUR, in his**
**individual and official capacity; and GARY KOPACZ, in**
**his individual and official capacity,**

                             **Defendants.**
_____

**Appearances:**

Harvey P. Sanders
Sanders & Sanders
401 Maryvale Drive
Cheektowaga, New York 14225
For Plaintiff

Eric T. Schneiderman
Attorney General of the State of New York
Joshua Farrell
John. F. Moore
Assistant Attorney General
The Capitol
Albany, New York 12224-0341
For Defendants

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff Jean Oliver brings this employment discrimination action against Defendant New York State Police ("NYSP"), and Defendant NYSP employees Superintendent Joseph D'Amico, Colonel Francis Christensen, Major Michael Cerretto, Major Wayne Olson, Major Steven Nigrelli, Lieutenant Martin McKee, Lieutenant Timothy Owens, Senior Investigator Paul Kelly, Senior Investigator Timothy Bour, and Senior Investigator Gary Kopacz. (Dkt. No. 37). Plaintiff alleges that during her employment with the NYSP, she was subject to gender discrimination, a hostile work environment based on sex, retaliation, disability discrimination, and conspiracy. The Amended Complaint advances causes of action under: Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq. (First–Third Causes of Action); the Rehabilitation Act, 29 U.S.C. § 701 et seq. (Fourth Cause of Action); the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. § 1983, 42 U.S.C. § 1986 (Fifth–Sixteenth Causes of Action); and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq. (Seventeenth–Twentieth Causes of Action). Defendant NYSP moves under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the Fourth Cause of Action: disability discrimination under the Rehabilitation Act. (Dkt. No. 41). The individual defendants move to dismiss the Equal Protection and NYSHRL claims (the Fifth–Twentieth Causes of Action). (Dkt. No. 57). Plaintiff opposes Defendants' motions. For the reasons that follow Defendant NYSP's motion to dismiss is denied and the individual Defendants' motion to dismiss is granted in part and denied in part.

## II.    AMENDED COMPLAINT[1]

Plaintiff began working for the NYSP as a Trooper in 1997. (Dkt. No. 37, ¶ 27). In 2008, the NYSP assigned Plaintiff to the Community Narcotics Enforcement Team ("CNET West"), a drug investigation unit in Batavia, New York. (*Id*. at ¶ 29). As a member of CNET West, Plaintiff participated in and initiated drug investigations, including undercover operations, wrote and executed search warrants, and worked with confidential informants and other police agencies. (*Id*. at ¶ 30).

There was "a 'boys club' atmosphere" at CNET West, and during her time there, Plaintiff was sexually harassed by NYSP Investigator Jeremy Peterson and her supervisor, Defendant Paul Kelly, a NYSP senior investigator. (Dkt. No. 37, ¶¶ 31–32, 42). Peterson inappropriately touched and grabbed Plaintiff on multiple occasions and made lewd gestures and "countless sexual comments concerning Plaintiff's body with sexual innuendos." (*Id*. at ¶¶ 31–38). Plaintiff welcomed none of this behavior "but it was accepted from within the office," and "most employees and supervisors in CNET West and the Batavia office knew what Investigator Peterson did to Plaintiff and many employees witnessed this inappropriate conduct." (*Id*. at ¶¶ 39–40).

In 2013, Defendant Kelly became Plaintiff's supervisor. (Dkt. No. 37, ¶ 41). Defendant Kelly "was the leader of the 'boys club' at CNET West and the primary instigator for the sexually harassing behavior taken against Plaintiff." (*Id*. at ¶ 42). Defendant Kelly "made condescending and demeaning remarks about Plaintiff based on her sex on a frequent basis" and "made it clear what he really wanted from Plaintiff and what he saw her as to the point that other employees told Plaintiff to just have sex with Senior Investigator Kelly." (*Id*. at ¶ 44). On

---

[1]The facts are taken from the Amended Complaint and the documents attached to the Amended Complaint and assumed to be true for the purposes of this decision. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

multiple occasions, Defendant Kelly "stood uncomfortably close to Plaintiff . . . to the point his body was touching hers and she was so intimidated . . . she was afraid to move." (*Id*. at ¶ 46). He "positioned himself in such a way to put himself in close proximity to Plaintiff's private areas" and asked her "to review files outside the presence of others . . . in order to exert his dominance over her and position himself in sexually demeaning ways." (*Id*. at ¶ 48). Defendant Kelly's "loud and intimidating" behavior "caused others in the office to . . . go along with his treatment toward Plaintiff" and "encouraged other employees to engage in similar treatment." (*Id.* at ¶ 50).

Plaintiff's other supervisors, Defendants Martin McKee and Steven Nigrelli, "were aware of this conduct [by Peterson and Defendant Kelly] and let it continue." (Dkt. No. 37, ¶¶ 51, 56). Defendant Michael Cerretto, a NYSP major and Troop A commander, and Defendant Francis Christensen, "were the highest chain of command over Troop A other than" Defendant Joseph D'Amico, Superintendent of the NYSP. (*Id*. at ¶¶ 86, 10, 11). Defendants Cerretto and Christensen "created the 'boys club' atmosphere at Troop A and let it continue." (*Id*. at ¶ 87).

On October 26, 2013, Plaintiff filed an informal complaint with the NYSP Equal Employment Opportunity Office ("EEO") "setting forth the sex discrimination and harassment she was subjected to." (Dkt. No. 37, ¶ 59). On November 19, 2013, Plaintiff filed a formal complaint and "described in detail . . . an incident where Investigator Peterson approached [her] and began to swirl his tongue in a sexually implicit manner" in the complaint. (*Id*. at ¶¶ 60–61). Following the complaint, Defendant Peterson twice stepped into the middle of conversations Plaintiff was having with co-workers and stuck his tongue out at her "in a childlike manner." (*Id*.). Plaintiff reported this conduct to the EEO office. (*Id*. at ¶ 62).

While the EEO office was investigating her complaints, Defendant McKee "ordered some CNET employees to fabricate statements against Plaintiff in order to discredit her during

the investigation and told other employees . . . to keep quiet about the allegations." (Dkt. No. 37, ¶ 63).

Immediately after filing her complaint, Plaintiff "was transferred and reassigned" to the Eastern Region of CNET West; the transfer increased her commute by two or three hours. (Dkt. No. 37, ¶ 65). Defendants McKee, Wayne Olson (who was one of Plaintiff's supervisors), and Francis Christensen, Superintendent in Charge of Employee Relations, "were aware that by transferring Plaintiff they were actually putting Plaintiff on the same team" as Peterson, who she had complained was sexually harassing her. (*Id*. at ¶ 67). This was also where Defendant Kelly's primary office was located, and while there, Plaintiff "was subjected to even more time under his supervision, most of that time alone." (*Id*. at ¶ 65). Plaintiff was "subject to further harassment and retaliation" as a result of the transfer. (*Id*.). None of the individuals about whom Plaintiff were complained were reassigned. (*Id*. at ¶ 68).

Plaintiff claims that the NYSP did nothing to stop the discrimination, harassment, and retaliation, and that, to the extent it investigated Plaintiff's complaint, it placed "all of the investigative files on what is called the 'Share Drive,' which is accessible to all members of the State Police." (Dkt. No. 37, ¶ 69). "[A]ll of Plaintiff's supervisors," including Defendants Kelly and Timothy Bour, who became Plaintiff's official supervisor upon her reassignment, "monitored the statements submitted concerning Plaintiff's EEO complaints and steered the statements made by others" in order to cover their actions. (*Id*. at ¶ 70).

Defendant Bour "laughed" at Plaintiff "about the complaints she was making" and "excluded her from operations." (Dkt. No. 37, ¶ 71). Additionally, in one instance, Defendant Bour, "just minutes before Plaintiff was leaving for an undercover operations where she was the buyer" and with the intention of placing Plaintiff "in a wrong state of mind for the operation,"

gave Plaintiff "the first negative comments in a performance evaluation she had ever received from the State Police." (*Id*. at ¶ 73).

Subsequently, Defendant McKee "directed members of Plaintiff's team to falsify derogatory memoranda" about Plaintiff. (Dkt. No. 37, ¶ 75). "[A]t the same time," Defendants McKee and Bour informed Defendant Olson that Plaintiff suffered from post-traumatic stress disorder ("PTSD"). (*Id*.). Plaintiff has never suffered from or been treated for PTSD. (*Id.* at ¶ 80).

In January 2014, in an effort to substantiate his (and Defendant Bour's) claim that Plaintiff had PTSD, Defendant McKee "authorized false allegations made against Plaintiff relating to her activity during an undercover operation . . . with the Cheektowaga Police Department." (Dkt. No. 37, ¶ 72). Defendants McKee and Bour informed Defendant Olson that Plaintiff was suffering from PTSD. (*Id*. at ¶ 75). Defendant Olson removed Plaintiff from her undercover duties based on the claims Defendants Bour and McKee made about Plaintiff suffering from PTSD. (*Id*. at ¶ 78). [2]

Defendants McKee and Bour informed Plaintiff that they were going to advise her co-workers that Defendant Olson had taken away her undercover duties because she was suffering from PTSD. (Dkt. No. 37, ¶ 75). When Plaintiff asked Defendants McKee and Bour "why they would make such false allegations," they responded "that they didn't want to get into trouble for failing to report this to Major Olson if Plaintiff suddenly decided to commit suicide with her service weapon." (*Id*.). Defendant Bour told Defendant Olson "and other supervisors that Plaintiff was going to commit suicide in order to have her removed from CNET." (*Id*. at ¶ 76).

---

[2] Plaintiff is a captain in the United States Army Reserves and "had only recently returned from a tour of duty in Afghanistan when she was removed from undercover duties." (Dkt. No. 37, ¶¶ 79–80).

Plaintiff advised Defendant Olson that the allegations by Defendants McKee and Bour were false and asked him to "speak with the members of the Cheektowaga Police Department, who was also involved in the undercover operation." (*Id*. at ¶ 77). Plaintiff asserts that she believes no one from the NYSP spoke to the Cheektowaga Police Department. (*Id*.).

In March 2014, "Plaintiff was permitted to return to undercover work." (Dkt. No. 37, ¶ 81). Defendant Olson, however, required Plaintiff to work under Defendant McKee's supervision and never assigned any undercover duties. (*Id*.). Defendant McKee "and Plaintiff's other supervisors put Plaintiff in situations where she was set up to fail in order to sabotage her performance in the hopes they could bring disciplinary charges against her as a result." (*Id*. at ¶ 82).

On May 15, 2014, NYSP Investigator Scott Gilman notified Plaintiff that Defendant McKee had accused her of "stealing files," and that "unless she agreed to immediately transfer out of CNET West, a Personnel Complaint would be filed against her." (Dkt. No. 37, ¶ 83). Investigator Gilman "told her that the only way she could make the personnel complaint go away was to agree to transfer out of CNET." (*Id*.). Defendant Christensen "sided with Plaintiff's supervisors and spearheaded the movement to remove Plaintiff from CNET West based on these fabricated allegations." (*Id*. at ¶¶ 88, 11).

"As a result of this false allegation and pressure, Plaintiff submitted a transfer request and was immediately reassigned to the Counter Terrorism Intelligence Unit" ("CTIU") under Defendant Gary Kopacz, a NYSP senior investigator. (*Id*. at ¶ 84). On May 16, 2014, "Plaintiff was escorted to her desk, in the presence of her coworkers, to retrieve her personal belongings," and "forced to turn over her weapon and her deceased father's holster," which has not been returned to her. (*Id.*, ¶ 85).

Prior to Plaintiff's arrival at CTIU, Defendant Kopacz told CTIU members that "he was 'sick to his stomach' that Plaintiff was coming to CTIU and that 'they would get through this.'" (Dkt. No. 37, ¶ 104). Defendant Kopacz also told "others that Plaintiff was 'fucking crazy,'" which fueled the "idea around the State Police that Plaintiff was suffering from a disability related to PTSD." (*Id*. at ¶¶ 106–07). At CTIU, Plaintiff received few "job duties and spent most days at the office with almost no work to do;" she "was literally forced to be in her office most days staring at a wall." (*Id*. at ¶ 109).

On June 20, 2014, "Plaintiff was notified that she was the subject of a Level 4 personnel complaint, which is the highest level of complaint that can be made against a member of the State Police." (Dkt. No. 37, ¶ 89).

Plaintiff filed a grievance on September 8, 2014 "challenging the circumstances leading to her forced transfer." (Dkt. No. 37, ¶ 90). In September 2014, Defendant Nigrelli "twice threatened Plaintiff" that if she did not drop her complaints, she would receive "personnel complaints for the same conduct that male employees never received complaints for." (*Id*. at ¶ 91). On September 25, 2014, Plaintiff dual-filed charges of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights ("NYSDHR") alleging sex discrimination, harassment, and retaliation. (*Id*. at ¶ 23).

On October 21, 2014, without conducting an informal inquiry, as required by policy, the NYSP issued a Level 4 personnel complaint based on Defendant McKee's and Defendant Kelly's "false claims and . . . false documentation." (*Id*. at ¶ 93). Plaintiff claims that Defendants Nigrelli and Kopacz "created additional false documentation and lied in order to address obvious

inconsistencies from the initial complaint resulting from the lies that would have resulted in it being dismissed." (*Id*. at ¶ 94).

Although Plaintiff requested a hearing following the issuance of the complaint, "Defendant did nothing with respect to the complaint, violating its own policy requiring a hearing to be scheduled within 20 days of a request." (Dkt. No. 37, ¶ 96). Additionally, Defendant Timothy Owens, a NYSP lieutenant who was in charge of the investigation, "covered up evidence based on the direction of his supervisors and ignored the retaliatory motivations for bringing the charge against Plaintiff to begin with." (*Id*. at ¶ 97).

After her transfer to CTIU, Plaintiff repeatedly sought transfer back to CNET West. (Dkt. No. 37, ¶ 99). Defendant Christensen denied Plaintiff's transfer requests. (*Id*. at ¶ 100). Plaintiff also applied for promotions to senior investigator during the relevant time period, but Defendant Christensen twice denied her applications. (*Id*. at ¶ 110). On October 27, 2014, after the issuance of the complaint, and after "less senior [] investigators were transferred to CNET West," Plaintiff filed a second grievance. (*Id*. at ¶ 98). Defendant Christensen, despite his involvement in Plaintiff's transfer and complaint, "named himself the hearing officer . . . presided over Plaintiff's hearing into her two grievances," and denied both grievances. (*Id*. at ¶ 101).

On January 29, 2015, the EEOC issued a determination finding probable cause that gender discrimination and retaliation occurred. (Dkt. No. 37, ¶ 23). The United States Department of Justice made "review and conciliation efforts" with respect to the claims for which the EEOC found probable cause. (*Id*.).

On May 20, 2015, Plaintiff filed an EEOC charge "alleging continued discriminatory harassing and retaliatory action taken against her after her transfer to CTIU." (Dkt. No. 37 at ¶ 101). The EEOC issued a right to sue letter on or about May 22, 2015, informing Plaintiff that

the second charge was subsumed by her first EEOC charge. (*Id*.). On May 29, 2015, Plaintiff

received an "amended Level 4 personnel complaint," that included "additional false claims." (*Id*.

at ¶¶ 111, 112).

Though Plaintiff "was previously scheduled to be out serving active duty in the Army

reserves for two weeks during the month of June, which the [NYSP] knew about," her hearing

was scheduled for June 30 and July 1, 2015, "hindering her ability to prepare for the hearing."

(Dkt. No. 37, ¶ 114). At the June 30 and July 1, 2015 hearings, Defendants Nigrelli, McKee,

Bour, and Kopacz "lied about the events surrounding the charges against Plaintiff." (*Id*. at ¶¶

115–16). The hearing panel found Plaintiff guilty of the charges against her and recommended

termination. (*Id*. at ¶ 117). On July 14, 2015, Defendant D'Amico, "the ultimate appointing

authority" for the NYSP, adopted the recommendation and terminated Plaintiff's employment.[3]

(*Id*. at ¶¶ 117, 161).

Following her termination and without a warrant, the NYSP surrounded her home and

searched for "supposed pistols that she no longer had a permit for as a result of her termination."

(Dkt. No. 37, ¶ 118). Plaintiff did not possess such pistols, "which the [NYSP] had reason to

know even before the search." (*Id*.).

---

[3] The July 14, 2015, determination is attached to the Amended Complaint and states:

> I, Joseph A D'Amico, Superintendent of the New York State Police, having made an independent
> appraisal of the Amended Charges and Specifications dated May 28, 2015, and having reviewed
> the Findings and Recommendations of the Hearing Board submitted after a hearing held on June
> 30 and July 1, 2015, and the transcript of such hearing being made available to me, do hereby
> make the following determination:
>
> 1. The Findings and Recommendations of the hearing board are accepted.
> 2. Investigator Jean C. Oliver is found guilty of all Charges.
> 3. Investigator Jean C. Oliver is hereby DISMISSED from the Division of
>    State Police effective immediately.

(Dkt. No. 37, p. 69).

On July 16, 2015, Plaintiff dual filed a third charge alleging sex discrimination, harassment, disability discrimination, military discrimination, and retaliation. (Dkt. No. 37, ¶ 25). On September 23, 2015, the NYSDHR dismissed the complaint for administrative convenience. (*Id.*). The EEOC issued right to sue letters on October 7 and 23, 2015. (*Id.* at ¶¶ 23, 25).

## III.   STANDARD OF REVIEW

To survive a motion to dismiss, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

## IV.   DISCUSSION

### A.   Rehabilitation Act and NYSHRL – Disability Discrimination

Defendants argue that the Amended Complaint fails to allege that they regarded Plaintiff as disabled or that she suffered an adverse employment action. (Dkt. Nos. 41-2, pp. 9–11; 57-2, pp. 24, 26). Defendants D'Amico, Christensen, Cerretto, Nigrelli, and Owens argue that the Amended Complaint fails to state a claim of disability discrimination against them individually. (Dkt. No. 57-2, p. 26).

Section 504 of the Rehabilitation Act provides, in relevant part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his

disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The Rehabilitation Act and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq., "impose identical requirements," *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999); indeed, the Rehabilitation Act explicitly incorporates the ADA's standards: "standards used to determine whether this section has been violated in a complaint alleging employment discrimination . . . shall be the standards applied under [T]itle I" of the ADA. 29 U.S.C. § 794(d). The same standards apply to disability claims under the NYSHRL. *Kinneary v. City of New York*, 601 F.3d 151, 158 (2d Cir. 2010). Disability "discrimination may take the form of disparate treatment, disparate impact, or failure to make a reasonable accommodation." *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016). Here, Plaintiff proceeds under the disparate treatment theory of discrimination.

To establish a prima facie case of disability discrimination under the Rehabilitation Act, a plaintiff must show that: (1) plaintiff was disabled within the meaning of the Rehabilitation Act; (2) she "was otherwise qualified to perform the job in question;" (3) she was "excluded from the job solely because of [her] disability," and (4) her "employer received federal funding." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 135 (2d Cir. 1995). Thus, to state an employment discrimination claim under the Rehabilitation Act, a plaintiff must plead factual allegations supporting a plausible inference "that [s]he was terminated because of a qualifying disability." *Smith v. Hogan*, 794 F.3d 249, 253 (2d Cir. 2015), *cert. denied*, 137 S. Ct. 566, 196 L. Ed. 2d 444 (2016). *See Moore v. City of N.Y.*, No. 15-CV-6600, 2017 WL 35450, at *19, 2017 U.S. Dist. LEXIS 379, at *57 (S.D.N.Y. Jan. 3, 2017) ("As with a discrimination claim under Title VII, a plaintiff must plead factual allegations supporting a plausible inference that he was

discriminated against by reason of [his] disability in order to state a claim.") (internal quotation marks omitted).

### 1. Regarded as Disabled

The Rehabilitation Act, defines an "[i]ndividual with a disability" as one who (1) has "a physical or mental impairment that substantially limits one or more major life activities of such individual," (2) has "a record of such an impairment," or (3) is "regarded as having such an impairment." 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(1). In this case, Plaintiff claims that Defendants regarded her as disabled due to PTSD; she maintains that she does not, however, suffer from PTSD.

Defendants argue that if, as the Amended Complaint alleges, Defendants Bour, McKee, and Kopacz "made up the claim" that Plaintiff suffered from PTSD, Defendants could not have regarded her as disabled. (Dkt. No. 41-2, p. 10; Dkt. No. 57-2, p. 28). While that is one plausible reading of the Amended Complaint, another is that Defendants Bour, McKee, and Kopacz believed Plaintiff was suffering from PTSD, and that because Plaintiff maintains she was not, she posits that they must have made up the PTSD diagnosis. Further, there is no allegation that Defendant Olson "made up" the claim that Plaintiff was suffering from PTSD; the Amended Complaint alleges that Defendant Olson suspended Plaintiff's undercover duties upon learning from Defendants Bour and McKee that Plaintiff had PTSD. (Dkt. No. 37, ¶¶ 75–78). Thus, the Complaint adequately alleges that Defendants NYSP, Olson, Bour, McKee, and Kopacz regarded her as disabled.

### 2. Adverse Action

Defendants next argue that Plaintiff's allegation that she was removed temporarily from undercover duty is insufficient to show adverse action. (Dkt. No. 41-2, p. 11; Dkt. No. 57-2, p.

26). "To qualify as an adverse employment action, the employer's action toward the plaintiff must be 'materially adverse' with respect to 'the terms and conditions of employment.'" *Davis v. N.Y. City Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (ADA) (quoting *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004). It must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (citation omitted). Here, while there is no specific allegation of pecuniary repercussions,[4] Plaintiff alleges that she was removed from her undercover work and, even after she was permitted to return to it, was never given any more undercover duties. The claimed permanent removal of Plaintiff's undercover responsibilities, which had been part of her employment responsibilities as a member of a drug investigation unit since 2008, plausibly alleges, at the pleading stage, a materially adverse change in the terms and conditions of her employment.

### 3. NYSHRL Disability Discrimination Claims – Defendants D'Amico, Christensen, Cerretto, Nigrelli, Owens, and Kelly

Defendants D'Amico, Christensen, Cerretto, Nigrelli, Owens, and Kelly argue that any claim of disability discrimination against them must be dismissed as there are no allegations that they participated in the conduct giving rise to the claim. (Dkt. No. 57-2, p. 26). Plaintiff "concedes to the dismissal of her NYSHRL disability claims against" these Defendants. (Dkt. No. 58, p. 22 n. 6). Accordingly, the Twentieth Cause of Action, as alleged against Defendants D'Amico, Christensen, Cerretto, Nigrelli, Owens, and Kelly is dismissed.

### B. Fourteenth Amendment Equal Protection and NYSHRL – Gender Discrimination and Hostile Work Environment

---

[4] Plaintiff asserts, in response to the motion to dismiss, that the removal of her undercover duties resulted in the loss of overtime pay. (Dkt. No. 42, p. 10-11). The Amended Complaint is more general; it alleges a loss of "past and future wages and other employment benefits" as a result of the Defendants' disability discrimination. (Dkt. No. 37, ¶¶ 141, 292).

### 1.      Failure to State a Claim – Gender Discrimination

Defendants argue that Plaintiff failed "to plead a separate and distinct prima facie case for gender discrimination" or that any of the alleged adverse actions, transfer, elimination of undercover duties, denial of promotion, and termination "occurred on account of Plaintiff's gender." (Dkt. No. 57-2, p. 18). A gender discrimination claim under § 1983 "is subject to the burden-shifting evidentiary framework set forth in *McDonnell Douglas*." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 312 (2d Cir. 2015). As this motion is one to dismiss, however, the Court "focus[es] only on whether the allegations in the complaint give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a litigation." *Id.*

In order "to defeat a motion to dismiss . . . in a [§ 1983] discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against h[er], and (2) h[er] . . . sex . . . was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015). The Second Circuit has "long recognized, the 'ultimate issue in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an impermissible reason, i.e., a discriminatory reason.'" *Id.* (quoting *Stratton v. Dep't for the Aging for City of N.Y.*, 132 F.3d 869, 878 (2d Cir. 1997) (internal quotation marks omitted). Thus, the Court must assess whether the Amended Complaint alleges facts that "give plausible support to the conclusion that the [adverse actions] occurred under circumstances giving rise to [gender] discrimination." *Littlejohn*, 795 F.3d at 312. A plaintiff need not establish a *prima facie* case at the pleadings stage. *See Vega*, 801 F.3d at 84. Indeed, "at the initial stage of a litigation, the plaintiff's burden is 'minimal'—[s]he need only plausibly allege facts that provide 'at least

minimal support for the proposition that the employer was motivated by discriminatory intent.'"

*Id*. at 87 (quoting *Littlejohn*, 795 F.3d at 311).

### a.     Disparate Treatment

The Amended Complaint states that the State Police "created and maintained an atmosphere of hostility toward females," and discriminated against Plaintiff based on sex by "subjecting Plaintiff to disparate treatment, which included discriminatory terms and conditions of employment and adverse employment actions."  (Dkt.No. 37, ¶¶ 121–22).

"A plaintiff can meet [her] burden through direct evidence of intent to discriminate . . . or by indirectly showing circumstances giving rise to an inference of discrimination." *Vega*, 801 F.3d at 87 (internal citations omitted). "A showing of disparate treatment—that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003).

"To establish an inference of discrimination, [under a disparate treatment theory] a plaintiff must allege that she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (internal quotation marks omitted).  The Second Circuit has observed that "[w]hat will constitute 'all material respects' will vary from case to case," and that "the judgment rests on whether the plaintiff and those [she] maintains were similarly situated were subject to the same workplace standards." *Id*. (internal quotation marks omitted). "Ordinarily, whether two employees are similarly situated presents a question of fact, rather than a legal question to be resolved on a motion to dismiss." *Id*. (internal quotation marks and alteration omitted).

In *Brown*, the Second Circuit found that the plaintiff, who was white and of United States national origin, plausibly alleged that the defendant subjected him to disparate treatment based on race and national origin when it terminated his employment. *Id*. The Circuit explained that even though the plaintiff, "did not plead any facts about the Japanese employees' job function, experience, qualifications, or rate of pay," because the plaintiff alleged that "he worked in the New Business Development Group with three Japanese employees, two of whom reported to the same supervisor as he did," it was plausible to infer that "the Japanese employees in the Group" were "subject to the same performance evaluation and disciplinary standards" as the plaintiff, and that they were "therefore similarly situated in their employment circumstances." *Id*.

In this case, the Amended Complaint alleges that "Male employees were not subjected" to a hostile work environment and "were given more responsibility and put in charge of larger investigations than their female coworkers," (Dkt. No. 37, ¶¶ 52–53), female employees were not "asked to participate in training of other investigators, that went to male employees," (*id*. at ¶54), female employees "were excluded from decision-making and other higher-level functions," (*id*. at ¶ 55), and Defendant Nigrelli "twice threatened Plaintiff with personnel complaints for the same conduct that male employees never received complaints for." (*Id*. at ¶ 91). These allegations, however, contain no factual detail from which to infer, even minimally, that the male employees to whom Plaintiff refers, were similarly situated to Plaintiff. For example, although Plaintiff alleges that Defendant Nigrelli threatened to lodge a personnel complaint against her "for the same conduct that male employees never received complaints for," (*id*. at 91), Plaintiff does not allege that the male employees were similarly situated; there is no basis to even infer that they were, like Plaintiff, subject to Nigrelli's supervision. Thus, the Amended Complaint fails to allege disparate treatment. *See Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396,

409 (S.D.N.Y. 2014) (dismissing gender discrimination claim noting that the complaint failed to "allege that any similarly situated male employee received more favorable treatment than Henry—the [complaint] fails to identify, let alone describe, any purported comparator.").

### b. Inference of Discrimination

Disparate treatment, however, is not the only theory available in connection with a gender discrimination claim. "An inference of discrimination can [also] arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group . . . or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)). Accordingly, the Court must consider whether the Amended Complaint adequately alleges circumstances from which it is plausible to infer that Plaintiff suffered adverse actions because of her gender.

### i. Denial of Promotion

Here, as discussed below, the Amended Complaint adequately alleges that Plaintiff's gender played a role in Defendants' decision to eliminate her undercover duties, transfer her to the Eastern Region of CNET West and then to CITU, and file a complaint against her that led to the termination of her employment. It does not, however, succeed with respect to her denial of promotion claim. The only allegation in the Amended Complaint concerning this claim is the following: "Plaintiff also applied for promotions to Senior Investigator during the period in question, yet, she was twice denied promotions by Colonel Christensen." (Dkt. No. 37, ¶110). This allegation, without more factual detail, is insufficient to constitute a plausible claim that her promotion requests were denied because of her gender.

### ii. Removal of Undercover Duties

According to the Amended Complaint, Defendant McKee, one of Plaintiff's supervisors, was aware of the "boys club" atmosphere at CNET West as well as the sexual harassment Plaintiff was suffering. (Dkt. No. 37, ¶ 56). Defendant Bour, also a supervisor, monitored Plaintiff's EEO complaint, about the sex-based hostile work environment. (Dkt. No. 37, ¶ 71). After these two Defendants falsely claimed to Defendant Olson that Plaintiff suffered PTSD, Defendant Olson removed her undercover duties. (*Id.* at 78). From these allegations, it is plausible to infer that Defendants McKee and Bour falsified their claim that Plaintiff was suffering from PTSD in an effort to sabotage her career and that they acted with gender-based discriminatory intent.

### iii.    Transfers

With respect to Plaintiff's transfer to the Eastern Region of CNET West and then to CTIU, it is plausible to infer, when viewed in the context of the alleged hostile work environment, that these transfers stemmed from gender discrimination. According to the Amended Complaint, Defendants McKee, Olson, and Christensen orchestrated Plaintiff's transfer to the Eastern Region of CNET West, increasing her commute by two to three hours, and with full knowledge that they were placing her on the same team and in the primary office of Peterson and Defendant Kelly, who were sexually harassing her. It is plausible to infer from these allegations that Plaintiff was transferred because of her gender. The allegations concerning Plaintiff's transfer to CTIU, in which Defendants McKee and Christensen were also involved, (*Id.* at ¶¶ 83, 88, 11), likewise raise a plausible gender discrimination claim.

### iv.    Termination

Finally, when viewed in context of the allegations that Defendants created a "boys club" at CNET West, enabled and subjected Plaintiff to a hostile work environment, transferred

Plaintiff to the Eastern Region of CNET West, where they knew Plaintiff would suffer further sexual harassment because they were placing her on the same team and in the same office as her alleged harassers, falsified allegations that she stole files in an attempt to corrupt the NYSP's investigation into her hostile work environment complaints and in an effort to remove her from CNET, which they accomplished when she transferred to CTIU, and thereafter initiated a complaint based on false charges that led to her termination, it is plausible to infer that Defendants' actions were motivated by Plaintiff's gender.[5] In short, the allegations in the Amended Complaint suggest that a sex-based hostile work environment so pervaded the terms and conditions of Plaintiff's employment that the Court cannot say, at the pleading stage, that Plaintiff has failed to plead a hostile work environment claim, and "'separate and distinct'" claims of gender-based adverse actions "beyond the creation of a hostile work environment."[6] *Parra v. City of White Plains*, 48 F. Supp. 3d 542, 553 (S.D.N.Y. 2014) (quoting *Bethea v. City of New York*, 11 CV 2347, 2014 WL 2616897, at *6, 2014 U.S. Dist. LEXIS 80945, at *17 (E.D.N.Y. June 12, 2014)). Accordingly, Defendants' motion to dismiss Plaintiff's gender discrimination claims is granted with respect to failure to promote but is otherwise denied.

### 2. Personal Involvement – Gender Discrimination and Hostile Work Environment

Defendants contend that the Amended Complaint fails to allege the personal involvement or participation of Defendants D'Amico, Christensen, Cerretto, Olson, Owens, Bour, and Kopacz in the alleged gender discrimination and hostile work environment.[7] Defendants argue that the Amended Complaint fails to allege the involvement of Defendants Nigrelli, McKee, and Kelly in connection with the gender discrimination claims.

---

[6] A sex-based hostile work environment is, of course, "a form of gender-based discrimination." *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 585 (S.D.N.Y. 2011),

[7] Defendants do not challenge the sufficiency of the underlying hostile work environment claim.

"An individual may be held liable under . . . § 1983 only if that individual is 'personally involved in the alleged deprivation.'" *Littlejohn*, 795 F.3d at 314 (quoting *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004)).

> Personal involvement can be established by showing that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring. In addition to fulfilling one of these requirements, a plaintiff must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation. Finally, as with individual liability, in the § 1983 context, a plaintiff must establish that a supervisor's behavior constituted intentional discrimination on the basis of a protected characteristic.

*Id.* Similarly, to be liable under § 296(6), an individual employee need not have supervisory or hiring and firing power, but must have "actually participated in the conduct giving rise to the claim." *Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004); *see Naftchi v. N.Y. Univ.*, 14 F. Supp. 2d 473, 491 n.148 (S.D.N.Y. 1998) ("'[A] defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable under the [NYS]HRL.'") (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds*, *Burlington Ind. v. Ellerth*, 524 U.S. 742 (1998)).

### a. Defendant D'Amico – Hostile Work Environment and Gender Discrimination

According to the Amended Complaint, Defendant D'Amico, the Superintendent of the NYSP, was the "ultimate appointing authority" for the NYSP, (Dkt. No. 37, ¶ 161), found Plaintiff guilty of the charges against her, and signed her notice of dismissal. (*Id.* at ¶¶ 69, 64). As supervisory liability is unavailable under § 1983 and the NYSHRL, and there are no allegations that would allow a plausible inference that D'Amico was aware of or participated in

the alleged hostile work environment, or that Plaintiff's gender played a role in his decision to terminate her employment, Defendants' motion to dismiss the hostile work environment and gender discrimination claims alleged against Defendant D'Amico is granted.

**b.      Defendant Christensen –
Hostile Work Environment and Gender Discrimination**

Defendant Christensen was the Deputy Superintendent in Charge of Employee Relations for the NYSP, an "ultimate appointing authorit[y]," and was part of the "highest chain of command over Troop A." (Dkt. No. 37, ¶¶ 11, 181, 86). Defendant Christensen and others "created the 'boys club' atmosphere at Troop A." (*Id*. at ¶ 87). He was "aware that by transferring Plaintiff" to the Eastern Region of CNET West, he was "actually putting Plaintiff on the same team as one of the employees she complained about sexually harassing her, Jeremy Peterson, which caused Plaintiff to be subject to further harassment." (*Id*. at ¶ 67). The allegation that Defendant Christensen was aware that by transferring Plaintiff to the Eastern Region, he was transferring Plaintiff to the same team as Peterson, who was allegedly sexually harassing Plaintiff, is sufficient to permit an inference that he was personally involved in the alleged hostile work environment. Further, the Amended Complaint alleges that Defendant Christensen "spearheaded the movement to remove Plaintiff from CNET West based on . . . fabricated allegations" about Plaintiff "stealing files." (*Id*. at ¶¶ 88, 83). The allegation that Plaintiff had stolen files led to Plaintiff's transfer from CNET West to CTIU. (Dkt. No. 37, ¶ 67). Given Defendant Christensen's involvement in subjecting Plaintiff to a hostile work environment, it is not implausible to infer that gender motivated his actions in forcing her transfer to CTIU.

**c.      Defendant Cerretto –
Hostile Work Environment and Gender Discrimination**

Defendant Cerretto, a major with the NYSP, "oversaw the entirety of Troop A during the relevant period." (Dkt. No. 37, ¶ 12). The Amended Complaint alleges that he "created the 'boys club' atmosphere at Troop A" and "let it continue." (*Id*. at 86–87). He "pushed the complaint against Plaintiff even after the initial charges brought against her were clearly meritless by amending the charges to include additional false claims." (*Id*. at ¶ 112). Although borderline, given Defendant's Cerretto's alleged awareness and condonation of the sex-based hostile work environment, as well as his involvement in the events that led to Plaintiff's termination, the Amended Complaint plausibly alleges his personal involvement in both the hostile work environment and Plaintiff's termination.

### d. Defendant Olson –<br>Hostile Work Environment and Gender Discrimination

Defendant Olson was a detail commander for the NYSP and one of Plaintiff's supervisors during the relevant time period. (Dkt. No. 37, ¶ 13). According to the Amended Complaint, he was "aware that by transferring Plaintiff [he] was actually putting Plaintiff on the same team as one of the employees she complained about sexually harassing her, Jeremy Peterson, which caused Plaintiff to be subject to further harassment and retaliation as well." (*Id.* at ¶ 67). The allegation that Defendant Olson knowingly placed Plaintiff on the same team as Peterson, her alleged harasser, sufficiently alleges Defendant Olson's personal involvement in subjecting Plaintiff to a hostile work environment and in her transfer. It is also plausible to infer from these allegations that Plaintiff's gender motivated Defendant Olson's participation in Plaintiff's transfer.

### e. Defendant Owens –<br>Hostile Work Environment and Gender Discrimination

Defendant Owens, a lieutenant with the NYSP, "was the investigator into the allegations made against Plaintiff." (Dkt. No. 37, ¶ 16). He "covered up evidence based on the direction of his supervisors and ignored the retaliatory motivations for bringing the charge against Plaintiff to begin with." (*Id.* at ¶ 97). These allegations lack any detail concerning Defendant Owens' alleged actions. Thus they are insufficient to allege personal involvement or participation in a hostile work environment or in gender discrimination.

### f. Defendant Bour – Hostile Work Environment and Gender Discrimination

Defendant Bour, a senior investigator for the NYSP, was one of Plaintiff's supervisors during the relevant time period. (Dkt. No. 37, ¶ 18, 66). According to the Amended Complaint, Defendant Bour "monitored the statements submitted concerning Plaintiff's EEO complaints and steered the statements made by others accordingly in order to cover for the actions of themselves and others" and "belittled Plaintiff, laughed at her about the complaints she was making, excluded her from operations, and claimed she suffered from post-traumatic stress disorder." (*Id.*, ¶ 70–71). The Amended Complaint further alleges that after Defendant Bour informed Defendant Olson that Plaintiff was suffering from PTSD, her undercover duties were removed. These allegations allow a plausible inference that Defendant Bour was aware that Plaintiff was complaining of sexual harassment and that he enabled the harassment by monitoring her complaints and covering for Peterson and Defendant Kelly. Further, the allegation that Defendant Bour, as Plaintiff's supervisor, laughed at her "about the complaints she was making" concerning the sexual harassment, plausibly alleges his direct contribution to the hostile work environment. These allegations also allow a plausible inference that Defendant Bour was personally involved in the events that led to the removal of Plaintiff's undercover duties and that Plaintiff's gender played a role in his participation in these events.

24

### g.    Defendant Kopacz –
Hostile Work Environment and Gender Discrimination

Defendant Kopacz, a senior investigator with the NYSP, was one of Plaintiff's supervisors at the CTIU. (Dkt. No. 37, ¶¶ 19, 84). Defendant Kopacz and Nigrelli "created additional false documentation and lied in order to address obvious inconsistencies from the initial complaint resulting from the lies that would have resulted in it being dismissed." (*Id*. at ¶ 94). Defendant Kopacz, together with Defendant Nigrelli, "poisoned the members of CTIU before Plaintiff even arrived, and continued to do so during her entire time there." (*Id*. at ¶ 103). He "told other members he was 'sick to his stomach' that Plaintiff was coming to CTIU and that 'they would get through this.'" (*Id*. at ¶ 104). He "carr[ied] over the lies from her previous supervisors at CNET." (*Id*. at ¶ 105). Defendant Kopacz, together with Defendants Nigrelli, McKee, and Bour "lied about the events surrounding the charges against Plaintiff" during the hearing. (*Id*. at ¶ 116). These allegations are sufficient, at the pleading stage to show Defendant Kopacz's personal involvement in the alleged hostile work environment as well as in her alleged termination.

### h.    Defendant Nigrelli –
Gender Discrimination

According to the Amended Complaint, Defendant Nigrelli, Captain of the Troop A Criminal Investigation Bureau for the NYSP, was one of Plaintiff's supervisors and knew about Peterson's harassment. (Dkt. No. 37, ¶¶ 14, 56). In September 2014, Defendant Nigrelli threatened to file personnel complaints against Plaintiff "for the same conduct that male employees never received complaints for" if "she did not drop her complaints" about the circumstances leading to her transfer from CNET to CTIU. (*Id*. at ¶ 91). On October 21, 2014, Plaintiff received a "Level 4 personnel complaint – which is the highest level of complaint that

can be made against a member of the State Police." (*Id*. at ¶ 91). "Thereafter, Captain Nigrelli . . . created additional false documentation and lied in order to address obvious inconsistencies from the initial complaint resulting from the lies that would have resulted in it being dismissed." (*Id*. at ¶ 94). Finally, at the administrative hearing into the allegations against her, Defendant Nigrelli "lied about the events surrounding the charges against Plaintiff." (*Id*. at ¶¶ 115–16). Defendant Nigrelli's alleged awareness of the sexual harassment Plaintiff was experiencing, and participation in the complaint and hearing that led to her termination raise a plausible claim that that he was personally involved in her termination and intentionally discriminated against her based on her gender.

### i. Defendant McKee –<br>Gender Discrimination

The Amended Complaint alleges that Defendant McKee, who was one of Plaintiff's supervisors, was aware of the sexual harassment Plaintiff experienced at CNET West, and accepted it. (Dkt. No. 37, ¶¶ 15, 56–57). After Plaintiff reported the sexual harassment to the EEO office, Defendant McKee ordered certain CNET employees to fabricate statements against her in order to "discredit her" and told other employees to "keep quiet." (*Id*. at ¶ 63). When transferring Plaintiff to the Eastern Region of CNET West, Defendant McKee knew he, and the others involved in making the transfer, "were actually putting Plaintiff on the same team" as Peterson, who had been sexually harassing her. (*Id*. at ¶ 67). In January 2014, Defendant McKee, "authorized false allegations" to be made against Plaintiff regarding her activity during an undercover operation "in order to substantiate he and [Defendant] Bour's claim that Plaintiff suffered from PTSD." (*Id*. at ¶ 72). Defendant McKee's actions, according to the Amended Complaint, led to the removal of Plaintiff's undercover duties. (*Id*. at ¶ 78). The Amended Complaint further alleges that Defendant McKee: falsely accused Plaintiff of stealing files and

that this accusation led to her transfer from CNET West to CTIU, (*id*. at ¶¶ 82–84); and made "false claims and created false documentation" in order to support the October 21, 2014, Level 4 complaint that eventually led to her termination. (*Id*. at ¶¶ 92–93, 116). In view of Defendant McKee's alleged involvement in and perpetuation of the alleged hostile work environment, it is plausible to infer that his participation in her transfer and termination were motivated by Plaintiff's gender.

**j.  Defendant Kelly –
Gender Discrimination**

Defendant Kelly was one of Plaintiff's supervisors and, according to the Amended Complaint, the "leader of the 'boys club'" and sexually harassed Plaintiff at CNET West. (Dkt. No. 37, ¶ 42). Defendant Kelly "made false claims and created false documentation" in an effort to support the Level 4 complaint lodged against Plaintiff in October 2014. (*Id*. at ¶ 92). This complaint eventually led to Plaintiff's termination. (*Id*. at ¶¶ 115–17). Given Defendant Kelly's direct involvement in subjecting Plaintiff to a hostile work environment on the basis of sex, it is plausible to infer that his involvement in the termination of her employment was motivated by gender.

Accordingly, Defendants' motion to dismiss the gender discrimination claims, (Fifth and Seventeenth Causes of Action) is denied and Defendants' motion to dismiss the hostile work environment and gender discrimination claims against the individual Defendants is granted as to Defendants D'Amico and Owens, but is otherwise denied.

**C.  Fourteenth Amendment Equal Protection–Retaliation**

Defendants assert that "[r]etaliation claims under § 1983 are . . . not actionable as Fourteenth Amendment equal protection claims." (Dkt. No. 57-2, p. 19). The Second Circuit has acknowledged that in the past, "there has been considerable confusion surrounding the viability"

of a § 1983 retaliation claim under the Fourteenth Amendment, but recently "clarif[ied] that retaliation claims alleging an adverse action because of a complaint of discrimination are actionable under § 1983." *Vega*, 801 F.3d at 80. Accordingly, Defendants' motion to dismiss Plaintiff's § 1983 retaliation claim is denied.

### D. NYSHRL–Retaliation

Defendants seek dismissal of the claims of retaliation in violation of the NYSHRL against Defendants D'Amico, Cerretto, and Owens on the basis that the Amended Complaint fails to allege their participation. (Dkt. No. 57-2, p. 20).

#### 1. Defendant D'Amico

There are no allegations that would allow a plausible inference that D'Amico, whose sole alleged involvement in this case is the issuance of the determination to terminate Plaintiff's employment, was aware of the events leading to the allegedly retaliatory imposition of the personnel complaint against Plaintiff.

#### 2. Defendant Cerretto

According to the Amended Complaint, approximately nine days after Plaintiff filed a second EEOC charge, Defendant Cerretto, who "oversaw the entirety of Troop A during the relevant period," (Dkt. No. 37, ¶ 12), "pushed the [May 29, 2015 Level 4 personnel] complaint against Plaintiff even after the initial charges brought against her were clearly meritless by amending the charges to include additional false claims." (*Id*. at ¶ 112). These allegations, given the short time period between Plaintiff's EEOC charge and the personnel complaint, are sufficient to show Defendant Cerretto's participation.

### 3. Defendant Owens

Defendant Timothy Owens, a NYSP Lieutenant, was in charge of the investigation into the complaint filed against Plaintiff "and covered up evidence based on the direction of his supervisors and ignored the retaliatory motivations for bringing the charge against Plaintiff to begin with." (*Id*. at ¶ 97). These conclusory allegations fail to state a plausible claim that Defendant Owens retaliated against Plaintiff for engaging in protected activity.

Accordingly, Defendants' motion to dismiss the NYSHRL retaliation claims is denied as to Defendant Cerretto and granted as to Defendants D'Amico and Owens.

### E.     42 U.S.C. §§ 1983, 1985(3), and 1986–Conspiracy Claims

The Eighth through Thirteenth causes of action allege that Defendants conspired to commit sex discrimination, subject Plaintiff to a hostile work environment, and retaliate in violation of the equal protection clause of the Fourteenth Amendment. The Fourteenth through Sixteenth causes of action allege that Defendants failed to prevent a conspiracy to commit the aforementioned violations. Plaintiff brings these claims under 42 U.S.C. §§ 1983, 1985(3), and 1986.

### 1.     Meeting of the Minds

Defendants argue that the Amended Complaint fails to allege a "meeting of the minds" as required for a conspiracy claim. (Dkt. No. 57-2, p. 21). "In order to survive a motion to dismiss on [a] § 1983 conspiracy claim, [the plaintiff] must allege (1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002). "'[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional

rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct.'" *Id.* at 325 (quoting *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)).

"A conspiracy claim under Section 1985(3) requires a plaintiff to allege: '1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.'" *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015) (quoting *Britt v. Garcia*, 457 F.3d 264, 269 n.4 (2d Cir. 2006)); *see* 42 U.S.C. § 1985(3).

The course of harassment and retaliation alleged in the Amended Complaint, including the allegations that: there was a "boys club at CNET West;" Defendants were aware that Peterson and Defendant Kelly were sexually harassing her; Defendants transferred Plaintiff to the office where both Peterson and Defendant Kelly worked following her harassment complaint; Defendants monitored her complaints on the "Share Drive;" and Defendants fabricated claims that she stole files in order to force her to leave CNET West, allow a plausible inference that there was a meeting of the minds between the individual Defendants to not only to subject Plaintiff to a hostile work environment but to retaliate against her for complaints she made concerning that environment and discriminate against her because she is a woman. *Bertuglia v. City of N.Y.*, 839 F. Supp. 2d 703, 728 (S.D.N.Y. 2012) (denying motion to dismiss conspiracy claim, finding the "allegation that Schaffler and Ruzow together served coercive subpoenas, together visited Laro's clients in order to stigmatize his business, and together harassed potential witnesses are sufficient to suggest plausibly that there was a genuine meeting of the minds

between Schaffler and Ruzow" "to commit the underlying § 1983 violations . . . for the common

purpose of harassing, harming, and retaliating against the plaintiffs").

### 2. Intracorporate Conspiracy Doctrine

Defendants next argue that even if the Amended Complaint sufficiently alleges

conspiracy claims, they are barred by the intracorporate conspiracy doctrine. The Second Circuit

has "recognized that the defendants—officers and directors of a single corporation, and the

corporation itself—could not legally conspire with one another in violation of Section 1985(3)."

*Turkmen v. Hasty*, 789 F.3d 218, 263 (2d Cir. 2015), *cert. granted*, 137 S. Ct. 293, 196 L. Ed. 2d

211 (2016) (citing *Girard v. 94th Street & Fifth Avenue Corp.*, 530 F.2d 66, 70–72 (2d Cir.

1976)). Although the Second Circuit has not specifically addressed the applicability of the

intracorporate conspiracy doctrine to a § 1983 conspiracy claim, district courts within the Circuit

have applied the doctrine to such claims. *See Richard v. Dignean*, 126 F. Supp. 3d 334, 338–39

(W.D.N.Y. 2015) (applying intracorporate conspiracy doctrine to § 1983 conspiracy claim);

*Green v. Martin*, No. 3:15-CV-1553 (CSH), 2016 WL 7230500, at *17, 2016 U.S. Dist. LEXIS

172678, at *46–47 (D. Conn. Dec. 14, 2016) (finding that where the complaint alleged only "that

the prison officials have been acting in the normal course of their corporate duties," and there

were "no allegations that such officials have been acting pursuant to any personal interests

'wholly separate and apart' from CCI by denying grievances of the inmates," the intracorporate

conspiracy doctrine barred § 1983 conspiracy claim); *White v. Cty. of Dutchess*, No. 15 CV 8744

(VB), 2016 WL 4449720, at *9, 2016 U.S. Dist. LEXIS 112431, at *25 (S.D.N.Y. Aug. 23,

2016) (dismissing § 1983 conspiracy claim because, inter alia, there "can be no conspiracy

between any of the officer defendants because they are all employed by the City of

Poughkeepsie"); *Harrison v. Cty. of Nassau*, No. 15CV2712, 2016 WL 4083381, at *3, 2016

U.S. Dist. LEXIS 100394, at *9 (E.D.N.Y. Aug. 1, 2016) (finding "that the intracorporate conspiracy doctrine prevents a finding of liability of defendants for participation in a conspiracy to deny plaintiff his constitutional rights").

Even assuming it applies to both § 1983 and § 1985(3) conspiracy claims, there is an exception to the intracorporate conspiracy doctrine: the doctrine does not apply when the individuals are "pursuing personal interests wholly separate and apart from the entity." *Ali v. Connick*, 136 F. Supp. 3d 270, 282–83 (E.D.N.Y. 2015). For this "personal stake" exception to apply, a plaintiff must allege that the defendants "acted *other* than in the normal course of corporate duties.'" *Green*, 2016 WL 7230500, at *17, 2016 U.S. Dist. LEXIS 172678, at *46 (quoting *Girard*, 530 F.2d at 72) (emphasis added); *Chillemi v. Town of Southampton*, 943 F. Supp. 2d 365, 381 (E.D.N.Y. 2013) ("An exception to this doctrine exists, however, where a plaintiff alleges facts that tend to show the defendants were pursuing personal interests wholly separate and apart from the entity.") (internal quotation marks omitted); *Alvarez v. City of N.Y.*, No. 11 CIV. 5464 LAK, 2012 WL 6212612, at *3, 2012 U.S. Dist. LEXIS 176840, at *9 (S.D.N.Y. Dec. 12, 2012) ("[C]ourts have recognized an exception to this doctrine when the defendants were motivated by an independent personal stake in achieving the corporation's objective.") (internal quotation marks and alteration omitted). Personal bias, however, "does not constitute personal interest and is not sufficient to defeat the intracorporate conspiracy doctrine." *Bond v. Board. of Educ. of City of New York*, No. 97 CV 1337, 1999 WL 151702, at *2, 1999 U.S. Dist. LEXIS 3164, at *7 (E.D.N.Y. Mar.17, 1999).

Here, the Amended Complaint alleges that: Defendants created and maintained a "boys club" at CNET West, which was led by Defendant Kelly; the "boys club" enabled Peterson and Defendant Kelly to sexually harass Plaintiff; and, as part of the "boys club", Defendants,

including her own supervisors, allowed Plaintiff to be sexually harassed, and monitored her complaints to the EEO office in order to "cover" their actions and ultimately remove her from CNET West. These allegations are sufficient, at this stage of the litigation, to allege that Defendants acted in pursuit of their own personal interest—the furtherance of the "boys club" and the protection of its members—and "other than in the normal course of their duties" as NYSP officers. *See Alvarez*, 2012 WL 6212612, at *3, 2012 U.S. Dist. LEXIS 176840, at *11–12 ("Where, as here, a group of defendants allegedly maintained the pretense of serving the state while in fact pursuing their own ends to avoid liability, it is entirely consistent to conclude that they acted both under color of state law and with an independent personal stake barring application of the intracorporate conspiracy doctrine."); *Chillemi*, 943 F. Supp. 2d at 381 ("[T]he entire premise for this lawsuit is the Plaintiff's contention that the individual Defendants acted in concert to fabricate the charges in an attempt to end the relationship between him and Tara Tully. These allegations, if assumed to be true, plausibly suggest that the Defendants acted in their own personal interest, and not in the interest of the STPD, in fabricating the charges against the Plaintiff."). Thus, at this stage of the litigation, the Court cannot conclude that the intracorporate conspiracy doctrine, assuming it applies to § 1983 claims, bars Plaintiff's conspiracy claims.[8] Accordingly, Defendants' motion to dismiss the conspiracy claims based upon the intracorporate conspiracy doctrine is denied.

## V.    CONCLUSION

For these reasons, its

**ORDERED** that Defendant NYSP's motion to dismiss (Dkt. No. 41) is **DENIED** in its entirety; and it is further

---

[8] Since the Court has concluded that Plaintiff sufficiently stated a claim for relief under § 1985(3), it need not reach Defendants' argument with respect to § 1986, which assumed a finding that Plaintiff failed to state a § 1985(3) claim. (Dkt. No. 57-2, pp. 23–24)

**ORDERED** that the individual Defendants' motion to dismiss (Dkt. No. 57) is **GRANTED** in part and **DENIED** in part as follows:

It is **ORDERED** that the NYSHRL disability discrimination claim (Twentieth Cause of Action) is **DISMISSED** without prejudice as to Defendants D'Amico, Christensen, Cerretto, Nigrelli, Owens, and Kelly, and it is further

**ORDERED** that the hostile work environment, hostile work environment conspiracy claims, gender discrimination, and gender discrimination conspiracy claims (Fifth, Sixth, Eighth, Ninth, Eleventh, Twelfth, Fourteenth, Fifteenth, Seventeenth, and Eighteenth Causes of Action) are **DISMISSED** without prejudice as to Defendants D'Amico and Owens; and it is further

**ORDERED** that the NYSHRL retaliation claim (Nineteenth Cause of Action) is **DISMISSED** without prejudice as to Defendants D'Amico and Owens; and it is further

**ORDERED** that the individual Defendants' motion to dismiss (Dkt. No. 57) is otherwise **DENIED**.

**IT IS SO ORDERED.**

**Dated: March 24, 2017**

Brenda K. Sannes
U.S. District Judge