**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

───────────────────────────────

JEAN OLIVER,

                                  Plaintiff,                    1:15-cv-00444 (BKS/DJS)

v.

NEW YORK STATE POLICE; JOSEPH D'AMICO, in his
individual and official capacity; FRANCIS
CHRISTENSEN, in his individual and official capacity;
MICHAEL CERRETTO, in his individual and official
capacity; WAYNE OLSON, in his individual and official
capacity; STEVEN NIGRELLI, in his individual and
official capacity; MARTIN MCKEE, in his individual and
official capacity; TIMOTHY OWENS, in his individual
and official capacity; PAUL KELLY, in his individual and
official capacity; TIMOTHY BOUR, in his individual and
official capacity; and GARY KOPACZ, in his individual
and official capacity,

                                  Defendants.

───────────────────────────────

**Appearances:**

*For Plaintiff:*
Jean Oliver, pro se
Elma, NY

*For Defendants New York State Police, Joseph D'Amico, Francis Christensen, Michael Cerretto,*
*Wayne Olson, Steven Nigrelli, Timothy Owens, Paul Kelly, Timothy Bour, and Gary Kopacz:*
Daniel J. Moore
Joshua D. Steele
Harris Beach PLLC
99 Garnsey Road
Pittsford, NY 14534

*For Defendant Martin McKee:*
Lisa F. Joslin
Gleason, Dunn, Walsh & O'Shea
40 Beaver Street
Albany, NY 12207

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Jean Oliver brings this employment discrimination action against Defendant New York State Police ("NYSP") and Defendant NYSP employees Superintendent Joseph D'Amico, Colonel Francis Christensen, Major Michael Cerretto, Major Wayne Olson, Major Steven Nigrelli, Lieutenant Martin McKee, Lieutenant Timothy Owens, Senior Investigator Paul Kelly, Senior Investigator Timothy Bour, and Senior Investigator Gary Kopacz. (Dkt. No. 37). Plaintiff alleges that, during her employment with the NYSP, she was subject to gender discrimination, a hostile work environment based on sex, retaliation, disability discrimination, and conspiracy. The Amended Complaint advances causes of action under: Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e to 2000e-17  (First to Third Causes of Action); the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–797b (Fourth Cause of Action); the Equal Protection Clause of the Fourteenth Amendment via 42 U.S.C. §§ 1983, 1985(3), 1986 (Fifth to Sixteenth Causes of Action); and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290–301 (Seventeenth to Twentieth Causes of Action). (Dkt. No. 37).

On July 14, 2015, approximately three months after Plaintiff filed this action, the NYSP terminated her employment. (Dkt. No. 234-2, at 43). Presently before the Court is Plaintiff's motion, filed on March 28, 2019, for a preliminary injunction "requiring the defendants to reinstate her as an Investigator in the New York State Police, effective immediately pending a final determination of the merits of her lawsuit," (Dkt. No. 223-1, at 2), or "granting Plaintiff the fair and impartial administrative hearing and arbitration Plaintiff was denied," (Dkt. No. 223-2, ¶ 3). Defendants oppose Plaintiff's motion. (Dkt. Nos. 234, 235). The Court has considered the

parties' memoranda, documentary evidence, declarations, and affidavits.[1] On May 1, 2019, the

Court held oral argument on the pending motion. What follows are the Court's findings of fact

and conclusions of law in accordance with Rule 52(a)(2).

## II.    FINDINGS OF FACT[2]

### A.    Background

For the purposes of this motion, the Court has assumed the facts alleged by Plaintiff to be

true. Plaintiff began working for the NYSP as a Trooper in 1997. (Dkt. No. 37, ¶ 27). In 2008,

the NYSP assigned Plaintiff to the Community Narcotics Enforcement Team ("CNET West"), a

drug investigation unit in Batavia, New York. (*Id*. ¶ 29). As a member of CNET West, Plaintiff

participated in and initiated drug investigations, including undercover operations, wrote and

executed search warrants, and worked with confidential informants and other police agencies.

(*Id*. ¶ 30).

There was "a 'boys club' atmosphere" at CNET West, and during her time there Plaintiff

was sexually harassed by NYSP Investigator Jeremy Peterson and her supervisor, Defendant

Paul Kelly, a NYSP senior investigator. (*Id*. ¶¶ 31–32, 42). Peterson inappropriately touched and

grabbed Plaintiff on multiple occasions and made lewd gestures and "countless sexual comments

---

[1] "An evidentiary hearing is not required when the relevant facts either are not in dispute or have been clearly demonstrated at prior stages of the case." *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) (citing *Republic of the Phil. v. N.Y. Land Co.*, 852 F.2d 33, 37 (2d Cir. 1988)). In this case, the Court has considered Plaintiff's submissions and affidavit and finds an evidentiary hearing is not necessary because, even crediting Plaintiff's facts, she fails to show irreparable harm. *Hybred Int'l v. Thorne Legal, Inc.*, No. 08-cv-4343, 2008 WL 5068896, at *5, 2008 U.S. Dist. LEXIS 95330, at *12–13 (E.D.N.Y. Nov. 24, 2008) ("A [preliminary injunction evidentiary] hearing is not necessary, however, when a movant does not make a sufficient showing of irreparable harm, when credibility is at issue, when the right to a hearing has been waived, and when additional evidence will not change the court's finding . . . . In this case, even according plaintiffs' well-pleaded allegations in the complaint as true, they are not entitled to relief as a matter of law.").

[2] The facts are drawn from the Amended Complaint and the parties' documentary submissions. (Dkt. Nos. 37, 223, 234, 235, 238). The "findings are provisional in the sense that they are not binding on a motion for summary judgment or at trial and are subject to change as the litigation progresses." *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 721 (S.D.N.Y. 2017); *accord Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 364 (2d Cir. 2003).

concerning Plaintiff's body with sexual innuendos." (*Id*. ¶¶ 31–38). Plaintiff welcomed none of this behavior "but it was accepted from within the office," and "most employees and supervisors in CNET West and the Batavia office knew what Investigator Peterson did to Plaintiff and many employees witnessed this inappropriate conduct." (*Id*. ¶¶ 39–40).

In 2013, Defendant Kelly became Plaintiff's supervisor. (*Id*. ¶ 41). Defendant Kelly "was the leader of the 'boys club' at CNET West and the primary instigator for the sexually harassing behavior taken against Plaintiff." (*Id*. ¶ 42). Defendant Kelly "made condescending and demeaning remarks about Plaintiff based on her sex on a frequent basis" and "made it clear what he really wanted from Plaintiff and what he saw her as to the point that other employees told Plaintiff to just have sex with Senior Investigator Kelly." (*Id*. ¶ 44). On multiple occasions, Defendant Kelly "stood uncomfortably close to Plaintiff . . . to the point his body was touching hers and she was so intimidated . . . she was afraid to move." (*Id*. ¶ 46). He "positioned himself in such a way to put himself in close proximity to Plaintiff's private areas" and asked her "to review files outside the presence of others . . . in order to exert his dominance over her and position himself in sexually demeaning ways." (*Id*. ¶ 48). Defendant Kelly's "loud and intimidating" behavior "caused others in the office to . . . go along with his treatment toward Plaintiff" and "encouraged other employees to engage in similar treatment." (*Id.* ¶ 50).

Plaintiff's other supervisors, Defendants Martin McKee and Steven Nigrelli, "were aware of this conduct [by Peterson and Defendant Kelly] and let it continue." (*Id*. ¶¶ 51, 56). NYSP major and Troop A commander Defendant Michael Cerretto and Defendant Francis Christensen, "were the highest chain of command over Troop A other than" Defendant Joseph D'Amico, Superintendent of the NYSP. (*Id*. ¶¶ 86, 10, 11). Defendants Cerretto and Christensen "created the 'boys club' atmosphere at Troop A and let it continue." (*Id*. ¶ 87).

On October 26, 2013, Plaintiff filed an informal complaint with the NYSP Equal Employment Opportunity Office ("EEO") "setting forth the sex discrimination and harassment she was subjected to." (*Id.* ¶ 59). On November 19, 2013, Plaintiff filed a formal complaint that "described in detail . . . an incident where Investigator Peterson approached [her] and began to swirl his tongue in a sexually implicit manner." (*Id.* ¶¶ 60–61). Following the complaint, Defendant Peterson twice stepped into the middle of conversations Plaintiff was having with coworkers and stuck his tongue out at her "in a childlike manner." (*Id.*). Plaintiff reported this conduct to the EEO office. (*Id.* at ¶ 62).

Immediately after filing her complaint, Plaintiff "was transferred and reassigned" to the Eastern Region of CNET West; the transfer increased her commute by two or three hours. (*Id.* ¶ 65). Defendants McKee, Wayne Olson (who was one of Plaintiff's supervisors), and Francis Christensen, Superintendent in Charge of Employee Relations, "were aware that by transferring Plaintiff they were actually putting Plaintiff on the same team" as Peterson, who she had complained was sexually harassing her. (*Id.* ¶ 67). This was also where Defendant Kelly's primary office was located; while there, Plaintiff "was subjected to even more time under his supervision, most of that time alone." (*Id.* ¶ 65). Plaintiff was "subject to further harassment and retaliation" as a result of the transfer. (*Id.*). None of the individuals about whom Plaintiff complained were reassigned. (*Id.* ¶ 68).

Plaintiff claims that the NYSP did nothing to stop the discrimination, harassment, and retaliation, and that, to the extent it investigated Plaintiff's complaint, it placed "all of the investigative files on what is called the 'Share Drive,' which is accessible to all members of the State Police." (*Id.* ¶ 69). "[A]ll of Plaintiff's supervisors," including Defendants Kelly and Timothy Bour, who became Plaintiff's official supervisor upon her reassignment, "monitored the

statements submitted concerning Plaintiff's EEO complaints and steered the statements made by others" in order to cover their actions. (*Id*. ¶ 70).

Defendant Bour "laughed" at Plaintiff "about the complaints she was making" and "excluded her from operations." (*Id*. ¶ 71). Additionally, in one instance, Defendant Bour, "just minutes before Plaintiff was leaving for an undercover operations where she was the buyer" and with the intention of placing Plaintiff "in a wrong state of mind for the operation," gave Plaintiff "the first negative comments in a performance evaluation she had ever received from the State Police." (*Id*. ¶ 73).

Subsequently, Defendant McKee "directed members of Plaintiff's team to falsify derogatory memoranda" about Plaintiff. (*Id*. ¶ 75). At the same time, Defendants McKee and Bour informed Defendant Olson that Plaintiff suffered from post-traumatic stress disorder ("PTSD"). (*Id*.). Plaintiff has never suffered from or been treated for PTSD. (*Id*. ¶ 80).

In May 2014, following "false allegation[s]" by and pressure from her supervisors, "Plaintiff submitted a transfer request and was immediately reassigned to the Counter Terrorism Intelligence Unit" ("CTIU") under Defendant Gary Kopacz, a NYSP senior investigator. (*Id*. ¶ 84). On May 16, 2014, "Plaintiff was escorted to her desk, in the presence of her coworkers, to retrieve her personal belongings," and "forced to turn over her weapon and her deceased father's holster," which has not been returned to her. (*Id*. ¶ 85).

Before Plaintiff's arrival at the CTIU, Defendant Kopacz told the CTIU members that "he was 'sick to his stomach' that Plaintiff was coming to the CTIU and that 'they would get through this.'" (*Id*. ¶ 104). Defendant Kopacz also told "others that Plaintiff was 'fucking crazy,'" which fueled the "idea around the State Police that Plaintiff was suffering from a disability related to PTSD." (*Id*. ¶¶ 106–07). At the CTIU, Plaintiff received few "job duties and spent most days at

the office with almost no work to do"; she "was literally forced to be in her office most days staring at a wall." (*Id.* ¶ 109).

According to Defendants, upon Plaintiff's arrival in the CTIU, Defendant Nigrelli directed that she "not be involved in any CNET-related or narcotics-related activities." (Dkt. No. 223-1, at 6). On May 29, 2014, she and her former colleague, Trooper Michael Davis, transported a witness "to the DEA for a DEA investigation"; the witness was "a former CNET informant." (Dkt. No. 234-2, ¶¶ 126–27; *see also* Dkt. No. 223-1, at 5).

On June 20, 2014, "Plaintiff was notified that she was the subject of a Level 4 personnel complaint, which is the highest level of complaint that can be made against a member of the State Police." (Dkt. No. 37, ¶ 89).

Plaintiff filed a grievance on September 8, 2014 "challenging the circumstances leading to her forced transfer." (*Id.* ¶ 90). In September 2014, Defendant Nigrelli "twice threatened Plaintiff" that, if she did not drop her complaints, she would receive "personnel complaints for the same conduct that male employees never received complaints for." (*Id.* ¶ 91). On September 25, 2014, Plaintiff dual-filed charges of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights ("NYSDHR") alleging sex discrimination, harassment, and retaliation. (*Id.* ¶ 23).

On October 21, 2014, without conducting an informal inquiry, as required by policy, the NYSP issued a Level 4 personnel complaint based on Defendant McKee's and Defendant Kelly's "false claims and . . . false documentation." (*Id.* ¶ 93).

Although Plaintiff requested a hearing after the issuance of the complaint, "Defendant did nothing with respect to the complaint, violating its own policy requiring a hearing to be scheduled within 20 days of a request." (*Id.* ¶ 96). Additionally, Defendant Timothy Owens, a

NYSP lieutenant who was in charge of the investigation, "covered up evidence based on the direction of his supervisors and ignored the retaliatory motivations for bringing the charge against Plaintiff to begin with." (*Id*. ¶ 97).

On January 29, 2015, the EEOC issued a determination finding probable cause that gender discrimination and retaliation occurred. (*Id*. ¶ 23). The United States Department of Justice made "review and conciliation efforts" with respect to the claims for which the EEOC found probable cause. (*Id*.).

On May 20, 2015, Plaintiff filed an EEOC charge "alleging continued discriminatory harassing and retaliatory action taken against her after her transfer to CTIU." (*Id*. ¶ 101). The EEOC issued a right-to-sue letter on May 22, 2015 informing Plaintiff that the second charge was subsumed by her first EEOC charge. (*Id*.).

On May 29, 2015, Plaintiff received an "amended Level 4 personnel complaint." (*Id*. ¶¶ 111, 112). The charges included "Failing to obey lawful orders, Regulation 8A3, for 1) allegedly continuing to work CNET cases assigned to her while at CNET and 2) allegedly not keeping her supervisor, Senior Investigator Gary Kopacz, informed of all her cases, meetings, and assignments." (Dkt. No. 234-2, ¶ 23).

Though Plaintiff "was previously scheduled to be out serving active duty in the Army reserves for two weeks during the month of June, which the [NYSP] knew about," her hearing on the charges in the personnel complaint was scheduled for June 30 and July 1, 2015, "hindering her ability to prepare for the hearing." (Dkt. No. 37, ¶ 114). At the June 30 and July 1, 2015 hearings, Defendants Nigrelli, McKee, Bour, and Kopacz "lied about the events surrounding the charges against Plaintiff." (*Id*. ¶¶ 115–16). The hearing panel found Plaintiff guilty of the charges against her and recommended termination. (*Id*. ¶ 117). On July 14, 2015, Defendant

D'Amico, "the ultimate appointing authority" for the NYSP, adopted the recommendation and terminated Plaintiff's employment.[3] (*Id.* ¶¶ 117, 161).

Plaintiff contends that Defendant D'Amico "never made an independent appraisal of the Amended Charges and Specifications dated May 28, 2015, and admitted that he never reviewed the transcript in Plaintiff's administrative hearing and that no transcript was actually made available to him." (Dkt. No. 223-2, ¶ 10). Plaintiff therefore contends that Defendant D'Amico's determination is a "falsely filed instrument" that led to her termination and led to "published defamatory and derogatory case law against Plaintiff." (*Id.* ¶ 8).

On July 16, 2015, Plaintiff dual-filed a third charge alleging sex discrimination, harassment, disability discrimination, military discrimination, and retaliation. (Dkt. No. 37, ¶ 25). On September 23, 2015, the NYSDHR dismissed the complaint for administrative convenience. (*Id.*). The EEOC issued right-to-sue letters on October 7 and 23, 2015. (*Id.* at ¶¶ 23, 25).

**B.    Appellate Division Ruling in Plaintiff's Article 78 Proceeding Challenging Her Termination**

Plaintiff commenced an Article 78 proceeding seeking to "annul the determination finding her guilty of disciplinary charges or, in the alternative, to vacate the penalty of

---

[3] The July 14, 2015 determination is attached to the Amended Complaint and states:

> I, Joseph A D'Amico, Superintendent of the New York State Police, having made an independent appraisal of the Amended Charges and Specifications dated May 28, 2015, and having reviewed the Findings and Recommendations of the Hearing Board submitted after a hearing held on June 30 and July 1, 2015, and the transcript of such hearing being made available to me, do hereby make the following determination:
>
> 1.      The Findings and Recommendations of the hearing board are accepted.
>
> 2.      Investigator Jean C. Oliver is found guilty of all Charges.
>
> 3.      Investigator Jean C. Oliver is hereby DISMISSED from the Division of State Police effective immediately.

(Dkt. No. 37, at 69).

dismissal." *Oliver v. D'Amico*, 151 A.D.3d 1614, 1615 (4th Dep't 2017). Plaintiff had been found guilty of five charges: (1) violation of "a direct order to refrain from 'working on cases she was assigned while at CNET'"; (2) violation of "a direct order to be truthful in her IAB interview"; (3) causing "a false entry to be made in official records when she made untrue statements during her IAM interview"; (4) failing "to assume responsibility or exercise diligence in the performance of her duties"; and (5) knowingly making or causing "to be made a false entry in official records when she listed her supervisor as a backup on a contact sheet." *Id.* at 1615–16. In her Article 78 Petition, Plaintiff argued that the determination and the termination of her employment "was in violation of lawful procedure," "shocking to one's sense of fairness and against the weight of the evidence." (Dkt. No. 234-2, at 40). Plaintiff further argued that the length of time the NYSP took to investigate and charge her in connection with her May 2014 "involvement with the informant," which exceeded 30 days and culminated in charges in October 2014 and amended charges in May 2015, respectively, and the length of time it took to hold a hearing, which was not held until July 2015, violated internal administrative requirements. (Dkt. No. 234-2, ¶¶ 57–71). In addition, Plaintiff alleged that the hearing transcript was not completed as of July 14, 2015, the day the decision to terminate her employment was memorialized. (*Id.* ¶¶ 77–78).

The court concluded that the determination was "supported by substantial evidence" and that the "penalty of termination [was] not shocking to one's sense of fairness," explaining: "Given the conduct underlying the offenses, i.e., directly disobeying an order and making false statements in an IAB interview and on official police records, and petitioner's refusal to accept any responsibility for her conduct, we cannot say that the penalty of dismissal shocks our sense

of fairness." *Oliver*, 151 A.D.3d at 1616–17. It therefore confirmed the NYSP's determination. *Id.* at 1615.

## III.     STANDARD OF REVIEW – Fed. R. Civ. P. 65(a)

Rule 65 of the Federal Rules of Civil Procedure governs temporary restraining orders and preliminary injunctions. In the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction. *Fairfield Cty. Med. Ass'n v. United Healthcare of New Eng.*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), *aff'd*, 557 F. App'x 53 (2d Cir. 2014); *AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010) ("It is well established that the standard for an entry of a temporary restraining order is the same as for a preliminary injunction.").

"Courts refer to preliminary injunctions as prohibitory or mandatory"; a prohibitory injunction "maintains the status quo pending resolution of the case," while a mandatory injunction "alters it." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018). "A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *Id.* at 37. "Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" *Id.* (quoting *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)). "[T]he status quo . . . is, 'the last actual, peaceable uncontested status which preceded the pending controversy.'" *N. Am. Soccer League, LLC*, 883 F.3d at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)). Because Plaintiff seeks to be reinstated to the position of investigator, her position before the controversy arose, "an injunction

would technically only restore the status quo." *Blatt v. City of New York*, No. 19-cv-1227, 2019 WL 1367605, at *2, 2019 U.S. Dist. LEXIS 50308, at *4 (S.D.N.Y. Mar. 26, 2019).[4]

## IV.    CONCLUSIONS OF LAW

### A.    Irreparable Harm

"Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." *Citibank N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). The Second Circuit has explained that a party's "failure to act sooner 'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'" *Id.* at 277 (quoting *Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F. Supp. 602, 609 (S.D.N.Y. 1979)). "Though such delay may not warrant the denial of ultimate relief, it may, 'standing alone, . . . preclude the granting of preliminary injunctive relief.'" *Tough Traveler, Ltd. v. Outbound Prod.*, 60 F.3d 964, 968 (2d Cir. 1995) (quoting *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985)).

Defendants argue that Plaintiff's delay in seeking this injunction undercuts her claim of irreparable harm. (Dkt. No. 234-4, at 7).[5] Her employment was terminated on July 14, 2015.

---

[4] Defendants argue that, because both reinstatement and a hearing would require "an affirmative act," the results of any hearing could not be undone, and reinstatement would "provide [Plaintiff] with substantially all the relief sought," the Court should employ the heightened standard applicable to mandatory injunctions in evaluating Plaintiff's motion. (Dkt. No. 234-4, at 5). Because Plaintiff cannot satisfy the requirements of the lower standard, the Court need not resolve this issue.

[5] Defendants note that, on June 9, 2015, Plaintiff filed a letter motion to enjoin the ongoing disciplinary proceedings. (Dkt. No. 234, ¶ 7 (citing Dkt. No. 6)). The Court directed Plaintiff to file a memorandum of law and an affidavit, as required by the Local Rules, by June 18, 2015 and set Defendants' response deadline. (Dkt. No. 7 (citing N.D.N.Y. L.R. 7.1(a)(1) and (a)(2); 7.1(e)). The Court, at Plaintiff's request, extended the memorandum of law and affidavit filing deadline. (Dkt. Nos. 10, 11, 14, 15). The Court scheduled oral argument on, among other things, Plaintiff's request for injunctive relief for October 19, 2015. (Dkt. No. 17). On October 16, 2015, attorney David DeChellis filed a notice of appearance on Plaintiff's behalf and requested an adjournment of oral argument. (Dkt. Nos. 20, 21). The Court adjourned oral argument and subsequently scheduled a telephone conference for December 10, 2015.

(Dkt. No. 223-3, at 1). She filed the instant motion for a preliminary injunction on March 28, 2019, three years and eight months later. (Dkt. No. 223). Plaintiff explains that the reason for this delay is because she only recently (on October 23, 2018) acquired evidence showing that her termination was illegal. (Dkt. No. 238, at 2). The evidence Plaintiff relies on is Defendant D'Amico's deposition testimony, which allegedly shows that he failed to set a hearing date within 20 days of the original administrative charge on October 21, 2014 and failed to obtain or review a copy of the transcript from the administrative hearing. (*Id.* at 1). Plaintiff argues that, had Defendant D'Amico reviewed the transcript, "he would have immediately dismissed these administrative allegations, since there is direct evidence, documentation, and reporting which proves that these administrative charges cannot possibly be true." (*Id.* at 2). Even if this deposition testimony justified the long delay, Plaintiff offers no explanation for waiting more than four months to file this motion. *Hornig v. Trustees of Columbia Univ.*, No. 17-cv-3602, 2018 WL 5800801, at *7, 2018 U.S. Dist. LEXIS 189268, at *20 (S.D.N.Y. Nov. 5, 2018) (finding the plaintiff's two-and-a-half-month delay in bringing motion for preliminary injunction in employment discrimination case undermined "a finding if irreparability because 'courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months'" (quoting *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998)). Thus, Plaintiff's delay in bringing the motion provides a basis for denial. Moreover, Plaintiff fails to show irreparable harm.

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118

---

(Dkt. No. 22). At the telephone conference, Plaintiff, via counsel, withdrew her motion for injunctive relief. (Dkt. No. 25).

(2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). "Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (quoting *Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999)). "The relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010).

However, "the injuries that generally attend a discharge from employment—loss of reputation, loss of income and difficulty in finding other employment—do not constitute the irreparable harm necessary to obtain a preliminary injunction." *Guitard v. U.S. Sec'y of Navy*, 967 F.2d 737, 742 (2d Cir. 1992) (citing *Sampson v. Murray*, 415 U.S. 61, 89–92 (1974)); *see also Savage v. Gorski*, 850 F.2d 64, 68 (2d Cir. 1988). In *Savage v. Gorski*, the plaintiffs sought a preliminary injunction enjoining the defendant from terminating their employment "on the theory that firing them would violate their First and Fourteenth Amendment rights." 850 F.2d at 65. The Second Circuit found that the plaintiffs failed to show irreparable injury: "Since reinstatement and money damages could make [the plaintiffs] whole for any loss suffered during this period, their injury is plainly reparable and [they] have not demonstrated the type of harm entitling them to injunctive relief." *Id.* at 68.[6]

---

[6] "[E]xcept in a 'genuinely extraordinary situation,' irreparable harm is not shown in employee discharge cases simply by a showing of financial distress or difficulties in obtaining other employment." *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 766 F.2d 715, 721 (2d Cir. 1985) (quoting *Sampson*, 415 U.S. at 92 n.68). The Second Circuit has recognized, however, that: "retaliatory discharge carries with it the distinct risk that other employees may be deterred from protecting their rights . . . or from providing testimony for the plaintiff in her effort to protect her own rights" and that "[t]hese risks may be found to constitute irreparable injury." *Holt v. Cont'l Grp., Inc.*, 708 F.2d 87, 91 (2d Cir. 1983). There is no evidence in this case suggesting other employees may be deterred from protecting their rights or providing testimony in this case. Even if there were such evidence, the ongoing and serious discord between the parties, as was apparent at oral argument and has been apparent throughout the extensive litigation in this case, would likely weigh against ordering reinstatement at this juncture. *See id.* ("While we think that reinstatement, if otherwise warranted, could be accomplished on a basis that minimized these risks, we

Plaintiff acknowledges that "irreparable injury . . . requires more than a showing of an employee's loss of income, inability to find other employment, or financial distress since such injuries may be compensated by an award of monetary damages," but asserts that "the pecuniary and nonpecuniary losses suffered here may never be adequately compensated." (Dkt. No. 223-1, at 2–3). The nonpecuniary losses to which Plaintiff refers include the deprivation of her right "to Grievance hearings and arbitration in response to multiple New York State Grievances which were filed and which were approved and pending before the [NYSP] and the New York State Governor's Office of Employee Relations . . . at the time of plaintiff's wrongful termination." (*Id.* at 3). She also cites the "defamatory and derogatory case law erroneously published against plaintiff as a result of" Defendant D'Amico's filing of a "false instrument." (*Id.* at 1). The "false instrument" to which Plaintiff refers is Defendant D'Amico's statement in terminating Plaintiff's employment that the transcript of the hearing held before the Hearing Board on June 30 and July 1, 2015 had been "made available" to him, (*id.* at 1), when he never reviewed it, (*id.* at 4). Damage to Plaintiff's reputation as a law enforcement officer, however, is reparable through money damages. *See Bagley v. Yale Univ.*, No. 13-cv-1890, 2014 WL 7370021, at *10, 2014 U.S. Dist. LEXIS 177611, at *26–27 (D. Conn. Dec. 29, 2014) (explaining that "damage to a plaintiff's reputation in his or her chosen field does not constitute irreparable harm, in the sense that it cannot be compensated by money damages at trial," and noting that "for centuries, the common law of defamation has afforded plaintiffs damages for loss of reputation" (citing *Mattox v. News Syndicate Co., Inc.*, 176 F.2d 897, 901 (2d Cir. 1949))).

---

are not prepared to hold that at a preliminary stage of litigation, a district judge is precluded from according such considerations any weight at all. Such a view would be inconsistent with the traditional discretion accorded a district judge in deciding whether to grant or deny a preliminary injunction.").

In addition, Plaintiff asserts as irreparable harm: her inability to "secure employment in the field of law enforcement"; the "stigma of job loss"; her diminished "chances of employment even in the private labor market" given her obligation "to report her termination" from the NYSP; and her inability to "secure a civil service job, while being forced to live more than 400 miles from her home, on active duty military orders as a means of supplementing a portion of the earnings she continues to lose." (Dkt. No. 223-1, at 4). None of these losses, alone or in combination, constitute irreparable injury. In *Stewart v. United States Immigration and Naturalization Service*, the Second Circuit reversed the district court's entry of a preliminary injunction directing the defendant to pay the plaintiff's base salary following the plaintiff's suspension without pay, finding the plaintiff failed to show irreparable harm:

> According to appellee, the INS' action caused him irreparable harm by, inter alia, degrading and humiliating him in the eyes of his peers, family, and community, thereby damaging his reputation and self-esteem, by causing his family to suffer undue hardship, and by preventing him from adequately providing for his family. Such unfortunate effects either alone or in combination do not constitute irreparable harm sufficient to justify injunctive relief. Concerning injury to Stewart's reputation, the *Sampson* Court stated that damage to reputation "falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction." With regard to the hardship imposed on Stewart's family and his inability to financially provide for them, while we concede the harm resulting to individuals in this situation, it is exactly this type of harm which the Supreme Court in *Sampson* stated would be insufficient to demonstrate the irreparable harm required for injunctive relief.

762 F.2d 193, 199–200 (2d Cir. 1985) (citation omitted) (quoting *Sampson*, 415 U.S. at 91–92); *see Bagley*, 2014 WL 7370021, at *10, 2014 U.S. Dist. LEXIS 177611, at *19–20 (finding that the plaintiff's claims of discriminatory termination of employment, and "loss of reputation in the academic world," "stress and anxiety resulting from a possible relocation from her home," and the "chilling effect" that the employer's treatment of the plaintiff allegedly had "upon other . . .

employees" did not rise to the level of irreparable harm). Thus, Plaintiff has failed to establish irreparable harm.

## B.  Likelihood of Success

Defendants argue that Plaintiff's litigation of the "the propriety of her disciplinary hearing and termination" in an Article 78 proceeding collaterally estops her from raising the issues here and precludes a finding of likelihood of success on her procedural due process and retaliatory discharge claims. (Dkt. No. 234-4, at 8). "[C]laim preclusion generally does not operate to bar a § 1983 suit following the resolution of an Article 78 proceeding, since the full measure of relief available in the former action is not available in the latter." *Colon v. Coughlin*, 58 F.3d 865, 870 n.3 (2d Cir. 1995) (citing *Davis v. Halpern*, 813 F.2d 37, 39 (2d Cir. 1987)). Further, collateral estoppel applies only if "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Colon*, 58 F.3d at 869 "The party asserting [collateral estoppel] bears the burden of showing that the identical issue was previously decided, while the party against whom the doctrine is asserted bears the burden of showing the absence of a full and fair opportunity to litigate in the prior proceeding." *Id.*

### 1.  Procedural Due Process

As Defendants note, the Amended Complaint, while extensive, does not contain a procedural due process claim. (Dkt. No. 234-4, at 8; *see generally* Dkt. No. 37). Even if it did, it would be unlikely to succeed because Plaintiff challenged the lawfulness of the procedures used in terminating her employment in her Article 78 Petition and thus would likely be collaterally estopped from raising the issue in this case. (*See* Dkt. No. 234-2, at 40 (requesting that the court enter an order "declaring that the Superintendent's Decision and the hearing board's recommendation was in violation of lawful procedure")). Further, Plaintiff raised the issue

concerning the hearing transcript in her Article 78 Petition; she asserted that "Division Counsel" only had a portion of the transcript on July 14, 2015, (Dkt. No. 234-2, ¶ 77), the date Defendant D'Amico rendered his decision, (Dkt. No. 223-2, at 1). Plaintiff also raised the issue of the timing of the charges, amendment of the charges, and timing of the hearing in her Article 78 Petition—asserting that the NYSP "working with the hearing board , already had their minds made up they were going to terminate" Plaintiff. (Dkt. No. 234-3, ¶¶ 57–81). "To meet the identity-of-issues prong of collateral estoppel, it is not necessary that the issues be exactly identical; it is sufficient that 'the issues presented in [the earlier litigation] are substantially the same as those presented by the later action.'" *Zherka v. City of New York*, 459 F. App'x 10, 13 (2d Cir. 2012) (quoting *ITT Corp. v. United States*, 963 F.2d 561, 564 (2d Cir. 1992)).

Although the Appellate Division did not expressly address the timing of the charges and the hearing or the availability of the transcript, it reached the conclusion that Plaintiff was apprised of the charges against her and the NYSP "allow[ed] for the preparation of an adequate defense," that the charges were supported by substantial evidence, and that the penalty imposed, termination, was not an abuse of discretion or "shocking to one's sense of fairness." *Oliver*, 151 A.D.3d at 1616–17; *see also Postlewaite v. McGraw-Hill*, 333 F.3d 42, 48 (2d Cir. 2003) ("The prior decision of the issue need not have been explicit . . . . If the decision was implicitly necessary, it will be the basis for collateral estoppel." (internal quotation marks omitted)). The Appellate Division necessarily considered and rejected Plaintiff's arguments concerning the adequacy of the procedures the NYSP used because it found that the charges were supported by substantial evidence and the penalty was not an abuse of discretion of "shocking to one's sense of fairness," *Oliver*, 151 A.D. 3d at 1617; *see Dutrow v. N.Y. State Gaming Comm'n*, No. 13-cv-996, 2014 WL 11370355, at *5, 2014 U.S. Dist. LEXIS, at *14 (E.D.N.Y. July 29, 2014)

(finding that the plaintiff's procedural due process claim was barred by collateral estoppel because, "[a]t bottom, the issue in each litigation concerns whether Sabini's alleged bias and conflict unfairly tainted Plaintiff's administrative proceeding and led to a preordained outcome"), *aff'd*, 607 F. App'x 56 (2d Cir. 2015).

## 2.    Retaliatory Discharge

Here, the Appellate Division expressly declined to address Plaintiff's contention that the "Hearing Board failed to consider the retaliatory motive of the disciplinary charges," stating that it did "not consider the merits of that contention" in determining whether the decision to terminate Plaintiff's employment was supported by substantial evidence. *Oliver*, 151 A.D.3d at 1616–17; *see Vargas v. City of New York*, 377 F.3d 200, 206 (2d Cir. 2004) ("While it is true that the Article 78 court passed upon the propriety of Vargas's termination, this acknowledgment does not demonstrate that the court 'actually and necessarily' decided an issue that was never presented to it, even if that issue touched, in a general sense, on the propriety of the termination."); *Tyson v. Town of Ramapo*, No. 17-cv-4990, 2019 WL 1331913, at *10, 2019 U.S. Dist. LEXIS 48875, *23 (S.D.N.Y. Mar. 25, 2019) ("Because Plaintiff did not raise her discrimination claims in the state proceeding, and because there is no other indication that the state court considered and rejected these claims, collateral estoppel does not preclude Plaintiff from making a discrimination challenge in the instant case."). Thus, Plaintiff's retaliatory discharge claims are not precluded by the Article 78 proceeding.[7]

---

[7] Although reinstatement is an available equitable remedy in employment cases, *Reiter v. MTA N.Y.C. Transit Auth.*, 457 F.3d 224, 230 (2d Cir. 2006), it may not be appropriate in cases where "the employer-employee relationship may have been irreparably damaged," *Padilla v. Metro-N. Commuter R.R.*, 92 F.3d 117, 125 (2d Cir. 1996) (quoting *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 728 (2d Cir. 1984)); *see Greenbaum v. Svenska Handelsbanken, N.Y.*, 979 F. Supp. 973, 987 (S.D.N.Y. 1997) (denying the plaintiff's request for reinstatement, concurring with the "jury's conclusion that an award of back pay sufficiently makes plaintiff whole for injuries sustained as a result of defendant's discrimination," and concluding that, "given the highly sensitive nature of plaintiff's prospective position—where she would be dealing directly not only with defendant's clients, but also with vast amounts of their wealth—it would be unwise to grant reinstatement as an equitable remedy"), or where there were valid reasons for

Even assuming Plaintiff can show a likelihood—or clear likelihood—of success on her claim that Defendants retaliated against her for engaging in protected conduct, because she has not shown irreparable harm, her motion fails.

## V.     CONCLUSION

For these reasons, it is

**ORDERED** that Plaintiff's motion for a preliminary injunction (Dkt. No. 223) is

**DENIED**.

Dated: May 6, 2019
Syracuse, New York

*Brenda K. Sannes*
Brenda K. Sannes
U.S. District Judge

---

discharge, *cf. Miller v. City of Ithaca*, 914 F. Supp. 2d 242, 255 (N.D.N.Y. 2012) (denying back pay and reinstatement of the plaintiff, a former police officer, in a case decided prior to *Univ. Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013), finding that the evidence showed that the plaintiff "engaged in sufficient misconduct such that he would have been issued a notice of termination regardless of any retaliatory motive").