**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

JEAN OLIVER,

                                                        Plaintiff,                          1:15-cv-00444 (BKS/DJS)

v.

NEW YORK STATE POLICE; JOSEPH D'AMICO, in his
individual and official capacity; FRANCIS
CHRISTENSEN, in his individual and official capacity;
MICHAEL CERRETTO, in his individual and official
capacity; WAYNE OLSON, in his individual and official
capacity; STEVEN NIGRELLI, in his individual and
official capacity; MARTIN MCKEE, in his individual and
official capacity; TIMOTHY OWENS, in his individual
and official capacity; PAUL KELLY, in his individual and
official capacity; TIMOTHY BOUR, in his individual and
official capacity; and GARY KOPACZ, in his individual
and official capacity,

                                                        Defendants.

**Appearances:**

*Plaintiff pro se:*
Jean Oliver
Fort Belvoir, VA 22060

*For Defendants New York State Police,*
*D'Amico, Christensen, Cerretto, Olson,*
*Nigrelli, Owens, Kelly, Bour, and Kopacz:*
Daniel J. Moore
Joshua D. Steele
Harris Beach PLLC
99 Garnsey Road
Pittsford, NY 14534

*For Defendant McKee:*
Lisa F. Joslin
Daniel A. Jacobs
Gleason, Dunn, Walsh & O'Shea
40 Beaver Street
Albany, NY 12207

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.     INTRODUCTION

Plaintiff Jean Oliver brings this employment discrimination action against Defendant

New York State Police ("NYSP") and ten NYSP employees, including the Superintendent of the

NYSP and several of her former supervisors. (Dkt. No. 37). Plaintiff alleges that during her

employment with the NYSP, she was subject to gender discrimination, a hostile work

environment based on sex, retaliation, disability discrimination, and conspiracy. The Second

Amended Complaint advances claims under: Title VII of the Civil Rights Act of 1964 ("Title

VII"), as amended, 42 U.S.C. § 2000e et seq. (First–Third Causes of Action); the Rehabilitation

Act, 29 U.S.C. § 701 et seq. (Fourth Cause of Action); the Equal Protection Clause of the

Fourteenth Amendment, 42 U.S.C. § 1983 (Fifth–Tenth Causes of Action); 42 U.S.C. § 1985

(Eleventh–Thirteenth Causes of Action); 42 U.S.C. § 1986 (Fourteenth–Sixteenth Causes of

Action); and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et

seq. (Seventeenth–Twentieth Causes of Action). (Dkt. No. 37). Presently before the Court are

Defendants' motions for summary judgment under Rule 56 of the Federal Rules of Civil

Procedure, (Dkt. Nos. 256, 259), and Plaintiff's opposition, (Dkt. Nos. 289, 290, 293).

## II.    RECORD BEFORE THE COURT

Along with their motion for summary judgment Defendants—as required by Local Rule

56.2— provided Plaintiff with a copy of the Northern District of New York's "Notification of the

Consequences of Failing to Respond to a Summary Judgment Motion." (Dkt. Nos. 256-7; 259-

22). It advises that "[a] response to the defendants' statement of material facts" must "admit[]

and/or den[y] each of the defendants' assertions in matching numbered paragraphs," and

"support[] each denial with citations to record evidence." (*Id.*) (quoting N.D.N.Y. L.R.

7.1(a)(3)). Here, in accord with the Local Rules, Defendants filed Statements of Material Facts, with citations to the record for each. (Dkt. Nos. 256-1; 259-20). In her response to Defendants' Statements of Material Facts, Plaintiff often omitted any citations to the record. (*See, e.g.*, Dkt. No. 293-10, ¶ 42; Dkt. No. 293-1, ¶ 74).

Defendants argue that because Plaintiff's responses "make[] virtually no citations to record evidence and include improper arguments and personal attacks," (Dkt. No. 302, at 13; *see also* Dkt. No. 300, at 6–13), Defendants' facts "should be accepted as true." (Dkt. No. 302, at 14; Dkt. No. 300, at 6). Under these circumstances, the Court may "deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." Local Rule 7.1(a)(3). While the Court "is not required to consider what the parties fail to point out," in deference to Plaintiff's *pro se* status, the Court has nevertheless conducted "an assiduous review of the record" to determine whether evidence supports Plaintiff's claims. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). Therefore, the facts have been drawn from the Defendants' Statements of Material Facts and Plaintiff's responses, which are supported by record evidence, (Dkt. Nos. 256-1, 259-20, 293-1, 293-10), the verified Second Amended Complaint, (Dkt. No. 37), and the exhibits attached to the parties' submissions.[1] The facts are taken in the light most favorable to Plaintiff. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

## III.    FACTS

### A.    Plaintiff's Employment with the NYSP – Overview

Plaintiff began her employment with the NYSP in 1997. (Dkt. No. 256-1, ¶ 19). "After completing her training, [Plaintiff] served as a trooper on road patrol at various locations"

---

[1] The Court has made its best effort to extract the relevant facts from the extraordinarily dense factual record.

throughout the state from 1998 to 2005. (*Id.* ¶ 20). In 2005, Plaintiff "was promoted to the rank of Investigator and was assigned to the Video Lottery Unit at Batavia Downs." (*Id.* ¶ 23). In 2008, after the Video Lottery Unit closed, Plaintiff was assigned to the Community Narcotics Enforcement Team Western ("CNET Western" or "CNET West") in Batavia, New York, where she worked as an undercover narcotics investigator until 2014. (*Id.* ¶¶ 25, 170). From 2014 to 2015, she worked in the Counter-Terrorism Intelligence Unit ("CTIU") in Buffalo, New York. Throughout her employment, Plaintiff received numerous letters of appreciation and commendation, (Dkt. No. 289-6, at 11–14, 15, 22, 24–30, 34–41, 45–50, 57, 59–72, 74, 78–82, 84, 86–88, 90, 95, 99), an award for excellent police service, (*id.* at 75), recognition by the NYSP Superintendent for her investigative work, and performance evaluations and observations commending her "exceptional performance." (Dkt. No. 289-3, at 3, 4, 13–14; Dkt. No. 289-6, at 42–43, 85). In addition, Plaintiff's 1999 to 2014 performance appraisals reflect ratings of "satisfactory" and indicate that she met or exceeded all performance standards. (Dkt. No. 289-6, at 110–210). On July 14, 2015, following a disciplinary hearing on charges of, inter alia, failure to obey an order and being untruthful during an interrogation by the Internal Affairs Bureau ("IAB"), Plaintiff's employment was terminated.[2] (Dkt. No. 256-1, ¶ 231).

**B.    CNET West**

CNET West "covered a large geographical area in the western part of New York, including Rochester and Buffalo"; CNET West's main office was in Batavia, New York. (*Id.* ¶ 26). During the relevant time period, there were 7 "regionally aligned" teams: 3 in the western region (the Buffalo area), 3 in the eastern region (the Rochester area), and 1 in the Southern Tier.

---

[2] Throughout her NYSP employment, Plaintiff also served in the United States Army Reserves, where she is a military intelligence officer; she has served two decorated tours in Afghanistan. (Dkt. No. 289-5, at 2, 9–13, 14–16).

(Dkt. No. 289, at 6). Typically, each team was comprised of a senior investigator ("SI") and 4 investigators, and team assignments were "based on the individual's home of record." (*Id.* at 6–7).

In 2008, "[w]hen [Plaintiff] first joined CNET West, she was assigned" as an investigator "to SI Vern McMillen's team" in the western region. (Dkt. No. 256-1, ¶ 31; Dkt. No. 289, at 7). CNET Investigators were responsible for, among other things, initiating and developing narcotics-related investigations, participating in undercover operations, debriefings of persons in custody, complainants, and potential cooperating sources, and assisting in investigations throughout the region. (Dkt. No. 256-1, ¶ 30). CNET Investigators were also required to complete and maintain all paperwork, consistent with unit, detail, and Division policy, "for review by the administrative SI," in this case, Defendant SI Paul Kelly. (*Id.* ¶¶ 30, 39). "[E]ach of the teams worked out of satellite offices" in their region and returned to the "Batavia office every Tuesday to submit all administrative paperwork." (Dkt. No. 289, at 7).

### C.   2008 Sexual Harassment Complaint

In December 2008, Plaintiff informed SI Charles Torres that a captain assigned to Troop A had tried to kiss her. (Dkt. No. 256-1, ¶ 33). SI Torres reported Plaintiff's complaint to Human Resources, which assigned SI June Bradley—regional supervisor in charge of the NYSP's Equal Employment Opportunity ("EEO") program—"to work with [IAB] to investigate the claims." (Dkt. No. 256-1, ¶ 34; Dkt. No. 256-2, at 130). After reporting the captain, Plaintiff received a telephone call from Defendant Lieutenant Martin McKee, the Officer in Charge of CNET West, (Dkt. No. 256-1, ¶ 8; Dkt. No. 289, at 7), who told her they were "just talking about this whole case" and that they did not "think [Plaintiff was] lying about this." (Dkt. No. 256-2, at 138). The IAB deemed the allegations against the captain "founded" and the captain retired. (Dkt. No. 256-1, ¶ 35; Dkt. No. 256-2, at 125).

### D.    Alleged Harassment at CNET West

#### 1.    SI Kelly

Plaintiff alleges that while at CNET, SI Kelly sexually harassed her, "singled [her] out" and "ordered" her "to return to the office in Batavia at least one or two [days in addition to Tuesdays], in the absence of her supervisor and . . . her teammates," and targeted her with numerous written and verbal criticisms of her work because she is female. (Dkt. No. 289, at 7–10).

Plaintiff testified that following the 2008 IAB investigation into her allegations of sexual harassment, she was at a Christmas party and "everybody" was saying "Merry Christmas and hugging," and SI Kelly said to her: "Oh, Jean, I'd hug you but . . . that whole [captain] thing. I don't want to get fired. Ha, ha, ha." (Dkt. No. 256-2, at 137). Plaintiff found this "embarrassing" and testified that Kelly made "a big joke about it" and "kept planting" "that whole [captain] thing" in conversations.[3] (*Id.* at 139).

Plaintiff alleges that SI Kelly "jump[ed] the chain of command," bypassing her supervisors, and requiring her "to report directly to him . . . throughout the week." (Dkt. No. 289, at 10–11). If she did not report to SI Kelly, "she would be ordered to return to the Batavia office, only to receive a harsh verbal reprimand or some formal counseling session" from him. (*Id.*).

When she was in SI Kelly's office, she had to sit in his "massage chair."[4] (Dkt. No. 256-2, at 187). Plaintiff testified that as soon as she sat down, SI Kelly would "immediately get up" and "run over" to where she was sitting, saying "[l]et me fix that." (*Id.* at 570). "Multiple times,"

---

[3] Plaintiff could not recall what year this occurred. (Dkt. No. 256-2, at 140).

[4] Lt. McKee testified that he did not believe the massage chair "that vibrated on your shoulders and didn't work most of the time, including when [he] sat in it" had "any sexual connotation." (Dkt. No. 289-8, at 3–4). He never asked SI Kelly to remove it because it "was fine." (*Id.* at 4–5).

SI Kelly would "lay[] down on the floor" with his head next to Plaintiff's "rear end while he [was] playing with the components of the [massage] chair." (*Id.* at 570–71).

When going over files, SI Kelly would "get so close to [Plaintiff] that [they] were touching one another." (*Id.* at 222). At one point, when Plaintiff and SI Kelly "were in the car together" in connection with an operation, SI Kelly "reached over while he was driving the car and had his arm across [Plaintiff's] leg to grab the radio." (*Id.* at 190). Plaintiff perceived this as a "passive sexual advance." (*Id.*).

Plaintiff avers that SI Kelly also targeted her, based on her gender, with punitive formal and informal counseling.[5] Plaintiff recounts numerous counseling incidents, including the following. On December 23, 2008, SI Kelly issued a "Memorandum of Counsel" to Plaintiff regarding her late submission of a confidential informant personal history form. (Dkt. No. 256-2, at 764). SI Kelly noted that station policy "demand[s] submission of operating files . . . in a timely manner" and wrote that her submission of the "file roughly 52 days after activation is clearly not in a timely manner and is unacceptable." (*Id.*). SI Kelly also counseled her for her "failure to submit factually correct documentation regarding payment to a confidential informant." (*Id.* at 765). SI Kelly instructed Plaintiff to "familiarize" herself with "Division policy on the management of Confidential Informants." (*Id.*).

On April 6, 2010, SI Kelly sent an email to SI Torres and others regarding Plaintiff's paperwork, including a confidential informant file, "ALL of which have multiple issues." (*Id.* at

---

[5] In his affidavit, SI Kelly states he counseled Plaintiff "on several occasions regarding her failure to follow NYSP and CNET West policies and procedures." (Dkt. No. 256-2, at 694; *id.* at 763–74 (memoranda and email from SI Kelly to Plaintiff dated December 23, 2008 to August 15, 2013)). He also "occasionally" had "conversations with [Plaintiff] outside the presence of other employees regarding her paperwork." (*Id.* at 694).

767). SI Kelly indicated that they "needed to sit down with Inv. Oliver, and probably with Inv. [KR] . . . and clarify what is acceptable paperwork." (*Id.*).

On January 25, 2011, SI Kelly sent Plaintiff an email regarding "paperwork errors," noting that her "submitted paperwork continues to negatively plague both of us." (*Id.* at 771). On January 27, 2011, SI Kelly sent Plaintiff an email scheduling a "sit-down meeting" with himself and two other SIs to discuss the "on-going issue with your submitted paperwork." (*Id.* at 773).

On August 15, 2013, SI Kelly issued Plaintiff a "Memorandum of Counsel" counseling her "at station level for failing to submit required paperwork in a timely manner." (*Id.* at 775). SI Kelly remarked that Plaintiff's submission of "confidential source paperwork . . . eight months after activation of the source and execution of a controlled buy is unacceptable." (*Id.*). Plaintiff asserts that "more than half of the Investigators assigned to CNET West . . . had overdue reports but were not being forced to report to [SI] Kelly to be counseled."[6] (Dkt. No. 289, at 13).

Plaintiff testified that others at CNET observed SI Kelly's actions toward her, and that her supervisors warned her "to watch out for" SI Kelly because he was "out to get" her. (Dkt. No. 256-2, at 155). Inv. Toney Palmer, one of Plaintiff's teammates, would "laugh" and say: "You know what? Paul hasn't been with a woman for a while. Just take one for the team. Go have sex with him." (*Id.*). On November 18, 2013, a coworker joked with Plaintiff about having a "new boyfriend" named "Paul." (Dkt. No. 289-9, at 2).

### 2.    Inv. Peterson

Plaintiff avers that from 2008 to 2013, Investigator Jeremy Peterson, who was also assigned to CNET West, made "unwanted sexual advances" toward Plaintiff, in the presence of

---

[6] Plaintiff cites a November 5, 2008, email from SI Jimmie Phelps to CNET members directing them to submit their "delinquent" reports. (Dkt. No. 289-10, at 4).

her peers. (Dkt. No. 289, at 46). According to Plaintiff, Inv. Peterson would hug her whenever he saw her, and would hug her so closely that she "would have to step back." (Dkt. No. 256-2, at 220). He also poked Plaintiff "in the sides," making her jump, and grabbed her buttocks. (*Id.*). Inv. Peterson also "swirl[ed] his tongue around in a sexually explicit manner," "kissed [her] on the back of [her] neck," leaving saliva, and used a file to "slap[] her in the rear" while she was "trying to have a conversation with [a] coworker." (*Id.*). Plaintiff stated that this happened "frequently" but could not specify over what period of time these advances continued—whether it was six months, a year, or two years. (*Id.* at 221–22).

### E.    Assignment to SI Kelly's Team

On October 15, 2013, Plaintiff met with Lt. McKee and SI Kelly. (Dkt. No. 256-1, ¶ 52). They discussed an email that Plaintiff had sent, following a disagreement she had with her then-supervisor, SI Torres; Lt. McKee and SI Kelly informed her that they were "reorganizing the teams" and that she was going to be assigned to SI Kelly.[7] (Dkt. No. 256-2, at 170–72). After she was assigned to SI Kelly's team, he "forced Plaintiff to destroy" a confidential informant file that she had worked on and "turn the entire case folder over to her male colleague," who "would be taking over as the case manager in a wiretap case which Plaintiff was in the process of initiating." (Dkt. No. 293-10, ¶ 53; Dkt. No. 289, at 16–18; *see also* Dkt. No. 289-12 (records dated November–December 2013 related to investigation after new investigator took over case)).

---

[7] On October 11, 2013, Plaintiff sent an email to SI Torres, which she copied to all of CNET West, following a disagreement Plaintiff had with SI Torres about whether targets of one of her investigations were members of the Bloods gang. (Dkt. No. 256-2, at 159, 778). In the email, Plaintiff sought "to clear the air" regarding this "discussion." (Dkt. No. 256-2, at 158, 778). Plaintiff wrote that SI Torres's "attempt to marginalize [her] and [her] investigative work on such a great case with incorrect information in front of [her] peers was unnecessary and somewhat unprofessional." (*Id.* at 778). Lt. McKee and SI Kelly told her that she did not do anything wrong by sending the email but that she could have handled it better. (*Id.* at 170–71). Plaintiff acknowledged that she was "wrong" for sending the email to the entire office, and that she "didn't handle it properly." (*Id.* at 163–64).

**F.      Personnel Complaints against SI Kelly and Inv. Peterson**

**1.      SI Kelly**

On or about October 17, 2013, after (i) SI Kelly's "most recent act of gender discrimination"—assigning Plaintiff's case to a male colleague, and (ii) her assignment to SI Kelly's team, where Plaintiff would be "subjected to [SI Kelly] 24/7," Plaintiff notified SI June Bradley at the NYSP Office of Human Resources that she wanted to "request permission to file an [i]nformal EEO complaint" against SI Kelly. (Dkt. No. 256-2, at 156; Dkt. No. 289, at 5). Plaintiff asserts that SI Bradley directed her to provide "a written report in support of her request," and that SI Bradley, "would present [the report] to the former head of the EEO program," Defendant Colonel Francis Christensen, "who would make a decision as to whether he would authorize an EEO investigation on Plaintiff's behalf." (Dkt. No. 289, at 48–49).

On October 21, 2013, Plaintiff spoke to another officer about her situation with SI Kelly and told him she was going to file a complaint. (Dkt. No. 256-2, at 806). Plaintiff asserts that when he asked "what kind of complaint?" she "knew" from the "tone" he used, "that he was going to share what I had told him with everyone." (*Id.*). The next day,[8] at an office meeting, Lt. McKee gave "a speech on how personnel complaints were up and that Troopers were filing complaints in record numbers against their Sergeants," and that "the 'poison pen' was being used by Members against one another" for incidents including a "Member who reported on another for taking a photo of his 'pe-pe' and sending it over the internet; Lt. McKee then made some joke relative to instructing Members of CNET to avoid taking pictures of their 'pe-pes.'" (*Id.*). SI Kelly then gave a "speech on how we all 'live a charmed life' in CNET"; Kelly said "what

---

[8] In a document Plaintiff submitted to SI Bradley, she asserts this meeting took place on October 22, 2013. (Dkt. No. 256-2, at 806). In her affirmation, Plaintiff states that the meeting was on October 29, 2013. (Dkt. No. 289, at 49). The date is immaterial.

happens in CNET West stays in CNET West," and "unless everyone wanted to end up in a backroom working holidays and weekends someplace they would keep their mouths shut."' (*Id.* at 806; Dkt. No. 289, at 49).

On October 23, 2013, Plaintiff gave SI Bradley a 38-page, single-spaced report of her experience and the "hostile environment" at CNET West. (Dkt. No. 256-2, at 781–819). In the report, Plaintiff stated that she had "been constantly harassed, intimidated, minimized, and demoralized by the supervision in this Unit which has, over time, caused a trickle-down effect by certain non-supervisors within the Unit." (*Id.* at 781). Plaintiff referred to SI Kelly as "a tyrannical dictator" and stated that Lt. McKee, is "oblivious to what goes on" or "simply doesn't care." (*Id.*). Plaintiff asserted that SI Kelly targeted and isolated her, "continually forcing [her] to be the subject of some sort of a counseling, meeting, or inventory, usually in the presence of Lt. Martin McKee." (*Id.*). Plaintiff wrote that SI Kelly would tell her "and everyone in earshot how 'he is my biggest fan here' and how 'it's nothing personal' (even hugging [her] in the presence of other investigators/supervisors in a jokingly manner) and then loudly laughing and making some sort of reference" to the captain Plaintiff complained about in 2008, and "how he's now going to lose his job." (*Id.*). Plaintiff noted that she was "one of the only females left" at CNET, that she has "to constantly report to" SI Kelly, and that on October 17, 2013, after she was assigned to him, SI Kelly told another investigator that Plaintiff had "a big mouth and so 'she's now working for me.'" (*Id.* at 783). Plaintiff asserted that SI Kelly assigned investigators to "babysit" her and requires those individuals to call him "almost daily" to report on Plaintiff. (*Id.* at 795).

### 2.    Inv. Peterson

Plaintiff reported Inv. Peterson's conduct to SI Bradley on or about November 18, 2013. (Dkt. No. 289, at 56). The IAB deemed it a "Complaint Against Personnel"; assigned an

investigator; interviewed Plaintiff that day; and began an investigation. (Dkt. No. 289-31, at 3; Dkt. No. 256-8, at 2). On November 22, 2013, Plaintiff contacted SI Bradley to report that "someone must have disclosed what Plaintiff had just reported" regarding Inv. Peterson because he "stepped into the middle" of her conversation with another investigator and stuck "his tongue out at Plaintiff in a childlike manner before turning around and walking away." (Dkt. No. 289, at 57). Plaintiff explained that she concluded her complaint had been disclosed because "this was the first time in over three years" Inv. Peterson "had not approached Plaintiff to immediately put his hands all over her." (*Id.*). According to Plaintiff, SI Bradley responded: "Well at least he didn't put his hands on you right?" (*Id.*).

From November 18, 2013 to January 10, 2014, the IAB collected memoranda and statements from CNET West Investigators and SIs, and interviewed, among others, Plaintiff and Inv. Peterson. (*See generally* Dkt. No. 289-31). Plaintiff had reported that during the week of November 18, 2013, Inv. Peterson swirled his tongue around "like wanting to have . . . oral sex with somebody," (*id.* at 4), although she "could not recall dates or times when" the alleged behavior occurred. Plaintiff also reported that Inv. Peterson did not "hide the behavior and does it in the presence of others." (*Id.*). During the investigation, the IAB interviewed approximately 38 members of CNET West, all of whom stated that they had not "observed any physical contact or inappropriate gestures by Investigator Peterson" toward Plaintiff. (*Id.* at 3–7). During an interview, Inv. Peterson admitted that he "hugged" Plaintiff "on four occasions, with her approval" and "rubbed" Plaintiff's shoulders "on four occasions" "to relax her as they work in a stressful office." (*Id.* at 5). Inv. Peterson also admitted that he "had stuck his tongue out" at Plaintiff but said that he did so "to lighten the mood in the office" and in a "childish" manner— not with "any type of sexual connotation." (*Id.*).

In a report issued on January 10, 2014, the IAB determined Plaintiff's complaint was "founded" to the extent that Inv. Peterson subjected Plaintiff "to unwelcome and uninvited shoulder rubs on four occasions" and "stuck his tongue out" at Plaintiff "in what she perceives and reports as a sexual manner." (*Id.* at 8). The report concluded that "[t]his physical conduct of a sexual nature created an offensive work environment for" Plaintiff. (*Id.*).

A letter of censure was issued to Inv. Peterson; however, he was only censured for sticking his tongue out at Plaintiff on December 3, 2013. (Dkt. No. 256-2, at 1269). The letter stated: "you acted unprofessionally toward another member assigned to your unit when you stuck your tongue out at her. This member had previously complained about unfair treatment in the unit, an allegation about which you were aware." (*Id.*). The letter did not refer to the "physical conduct of a sexual nature" that "created an offensive work environment" for Plaintiff. (*Id.*; Dkt. No. 289-31, at 8). Inv. Peterson lost two days of annual leave and was required to complete a "Sensitivity Training Program." (Dkt. No. 256-2, at 1269).

### G.  Investigation of Plaintiff's Complaint against SI Kelly

On October 28, 2013, SI Bradley emailed Col. Christensen, summarizing Plaintiff's allegations of gender discrimination, attaching Plaintiff's written report, and asking how to proceed. (Dkt. No. 289-29, at 5). On November 13, 2013, Defendant Lieutenant Timothy Owens of the IAB was assigned to investigate Plaintiff's complaint that SI Kelly: (i) discriminated against her based on her gender, (ii) hugged Plaintiff and made inappropriate comments relating to a previous EEO investigation involving a retired NYSP captain, (iii) falsified documents in September 2012 relating to Plaintiff's "return to duty date from extended military deployment,"

and (iv) failed to include Plaintiff "in the annual leave selection process for the vacation schedule for CNET Western."[9] (Dkt. No. 256-2, at 686, 825).

SI Bradley directed Plaintiff to report to the IAB West office on November 18, 2013, to be interviewed. (Dkt. No. 289, at 50). At the interview, Plaintiff learned that her request to file an informal EEO complaint was being denied because the Governor "had recently abolished all Informal EEO processes and the only way Plaintiff could proceed . . . was to file a Formal EEO complaint which could **only** be investigated by members of IAB West as a Personnel Complaint against anyone Plaintiff named."[10] (*Id.* at 53; Dkt. No. 256-2, at 168).

### H.      Events During IAB's Investigation

#### 1.      Reassignment to SI Bour's Team

On November 18, 2013, Lt. McKee "directed [SI Kelly] to have no further supervisory contact with" Plaintiff, who was reassigned to SI Bour's team. (Dkt. No. 256-2, at 696, 703). The reassignment decision appears to have been made by Defendant Major Wayne Olson, Detail Commander of CNET West. (Dkt. No. 290-4, at 2). Plaintiff avers that Lt. McKee informed her of this reassignment on November 19, 2013, upon "returning to CNET West from her interview with IAB personnel" and SI Bradley. (Dkt. No. 289, at 68). In addition to separating Plaintiff from her "teammates in the western region (where she had been assigned for the past 5 1/2

---

[9] Plaintiff's complaint also included allegations against Lt. McKee and SI Torres. (Dkt. No. 256-2, at 788–90, 799, 825). She complained Lt. McKee wrongly denied her request for tuition reimbursement, (*id.* at 798), and that SI Torres: (i) contacted Plaintiff's military commander to persuade him to change Plaintiff's military leave dates, (ii) mandated Plaintiff "remain on an operation after she had requested to leave and after he allowed other [male] CNET members to depart" and acted in a "condescending" manner when explaining his reasons, (iii) accused Plaintiff "of sitting in his office chair resulting in a stain to the headrest" and attempting to "belittle" Plaintiff "in the presence of her peers," and (iv) attempted to "belittle or marginalize" Plaintiff "by speaking to her about late reports," investigative measures, and "misinformation regarding potential targets." (*Id.* at 825).

[10] The parties provided conflicting evidence as to whether the informal complaint process was available during this time period. (*Compare* Dkt. No. 256-2, at 751 (Chief Inspector of IAB, Daniel Penny, testifying that the informal process did not exist), *with* Dkt. No. 289-30, at 33–40 (informal investigation into complaint of gender discrimination and harassment); Dkt. No. 289-28, at 30 (NYSP document dated July 2014 describing formal and informal EEO processes)).

years)" this reassignment shifted her work to the "eastern region" of CNET West and to "the same team as" Inv. Peterson. (*Id.*). According to Plaintiff, Lt. McKee further informed her that because she had filed a complaint against SI Kelly and Inv. Peterson she "would no longer be permitted to participate in most of her newly-assigned team's operations since there was no way . . . to keep either [SI] Kelly or [Inv.] Peterson from showing up during any given operation that Plaintiff was allowed to participate in."[11] (*Id.* at 68–69).

Plaintiff initially reported that she was happy with this reassignment. (Dkt. No. 256-2, at 1276). Plaintiff, however, asserts that this greatly reduced her participation in narcotics investigations; specifically, in the six-month period between Plaintiff's filing of her formal complaint on November 18, 2013 and her transfer from CNET West on May 16, 2014, she was only allowed to participate in 9 operations. (Dkt. No. 289, at 72; Dkt. No. 290-4, at 27). In contrast, Inv. Bonafede participated in 9 undercover transactions in the two-week period between January 15, 2014 and January 29, 2014. (Dkt. No. 290-3, at 9–11, 13–15, 17–19).

### 2.   Plaintiff's Report of Inv. Peterson's conduct to SI Bour

On December 3, 2013, Inv. Peterson engaged "in a repeat performance" of his previous childlike conduct by sticking his tongue out at Plaintiff while she was in the middle of a conversation. (Dkt. No. 289, at 57–58). Plaintiff testified that it "wasn't sexual"—"[h]e was

---

[11] Major Olson later explained his actions toward Plaintiff in a memorandum to Assistant Deputy Superintendent Frank H. Koehler/BCI dated May 15, 2014, stating that the "reassignment of Investigator Oliver to the Rochester area was predicated on the lack of available supervisors in the Buffalo area" and that "[i]t was clear that supervisors assigned in and around the Buffalo [sic] either were, or potentially would be, listed as investigative targets in the IAB investigation." (Dkt. No. 290-4, at 2). Major Olson further explained that his decision to restrict the SIs Plaintiff "was assigned to work for . . . was based on her allegations of misconduct directed at selected supervisors in the regional office." (*Id.*). Plaintiff had, Major Olson explained, "leveled accusations" against SI Torres and SI Kelly, "which required the Internal Affairs Bureau to conduct an investigation." (*Id.*). Major Olson did not explain why he assigned Plaintiff to SI Bour's team, which included Inv. Peterson. Major Olson explained his later, February 2014 reassignment of Plaintiff from SI Bour to SI Davis, stating that this occurred after it was "determined that she accused Investigator Jeremy T. Peterson of degrading her by sticking out his tongue at her" and because "there was already information" that Plaintiff "was dissatisfied" with SI Bour "and his management style." (*Id.* at 3).

doing it like a kid." (Dkt. No. 256-2, at 235). Plaintiff immediately went SI Bour's office and reported Inv. Peterson's conduct. (Dkt. No. 289, at 58). Plaintiff stated that after "she basically broke down" and told SI Bour what Inv. Peterson "was doing" and "everything that is going on," SI Bour responded "that some people are too timid to be on this job." (Dkt. No. 256-2, at 1350). After December 3, 2013, Inv. Peterson did nothing offensive to Plaintiff. (*Id.* at 237).

### 3.    December 20, 2013 Counseling Memorandum

On December 12, 2013, while SI Kelly was at the Buffalo State Police ("Buffalo SP"), Trooper Michael Davis informed him "that they had an individual under arrest who had expressed knowledge of heroin and cocaine trafficking in Niagara and Erie County and a desire to talk." (*Id.* at 697). SI Kelly vetted the individual's "potential as a cooperating source and" gave the individual his phone number "if he chose to generate contact once he retained counsel." (*Id.*). Later that morning, Trooper Davis "approached" Plaintiff, who had worked with the individual before, and told her "this guy's got a lot of information" and that SI Kelly had been there. (*Id.* at 257). Plaintiff called SI Kelly and asked whether the individual "was going to be utilized as an informant." (*Id.* at 697). SI Kelly stated that he told Plaintiff "that CNET was not going to do anything with him in the short term given his pending charges." (*Id.* at 698). Plaintiff recounts the conversation somewhat differently, she stated that SI Kelly responded: "No, we're not doing nothing with that. We're going to slow this train down." (*Id.* at 258). Plaintiff "didn't think much of it" because SI Kelly "would always" tell her "no to anything I asked him." (*Id.*).

On December 12, 2013, Plaintiff drafted an email to Trooper Davis stating that "[i]t sounds like Paul's not in a hurry to do anything with this guy" and asking if he could "get a hold of [the CI] and see if we can arrange for a meeting" so that they could "at least sit down and talk to him." (*Id.* at 258, 1283). Plaintiff, however, inadvertently sent the email to *SI* Michael Davis at CNET, who forwarded it to Lt. McKee, SI Kelly, and SI Bour. (*Id.* at 260, 1285). Plaintiff also

"reached out to [SI] Bour and asked him" if she "could interview this individual," and "if he could speak with Paul on [her] behalf like [her] former supervisors used to have to do to tell [SI Kelly] to stop it." (*Id.* at 259, 275). Plaintiff stated that he responded by "screaming at" her. (*Id.* at 259, 275).[12] Plaintiff testified that SI Bour asked her why she was "so emotional" and remarked: "You know, you kind of remind me of the female investigator that committed suicide." (*Id.* at 255, 1351).

After SI Davis received the email (intended for Trooper Davis) from Plaintiff, he called SI Kelly to inform him of the email. (*Id.* at 698, 1281). On December 13, 2013, SI Kelly "drafted a memorandum concerning this incident" to Major Olson. (*Id.* at 698, 1280–81).

On December 20, 2013, Lt. McKee issued Plaintiff a counseling memorandum regarding her conduct on December 12, 2013. (*Id.* at 1082–83). Lt. McKee wrote that the email Plaintiff wrote to Trooper Davis, but inadvertently sent to SI Davis, showed her "complete disregard for the chain of command and the directive you received from Senior Investigator Kelly, who is a higher ranking officer than you." (Dkt. No. 256-2, at 1083). He further wrote: "Your intent to sign up [the individual] as a confidential informant and your failure to inform Senior Investigator Bour of Senior Investigator [Kelly's] directive further indicates your intent to disobey Senior Investigator Kelly's directive to you," that Plaintiff's email was "misleading and disparaged the reputation of Senior Investigator Kelly," and her "remarks brought discredit to our organization." (*Id.*). Plaintiff asserts that the counseling memorandum is inaccurate because she was not "asking

---

[12] In a narrative reporting this incident to SI Bradley, Plaintiff stated that before speaking to SI Bour she "pre-arranged . . . to meet with the potential informant . . . at SP-Buffalo." (Dkt. No. 256-2, at 1289).  Plaintiff did not tell SI Bour that SI Kelly "had initially told [her] no because [Plaintiff] hoped that if [SI] Bour asked [SI] Kelly and explained that Toney would be the Investigator running the case [SI Kelly] would agree." (*Id.*). After SI Bour expressed anger at Plaintiff's attempt to "go around" SI Kelly, Plaintiff "contacted the potential informant to cancel the meeting." (*Id.* at 1290).

to utilize this individual as a confidential informant" and only wanted "to talk with" him. (*Id.* at 270–71).

On December 26, 2013, Inv. Kevin Gallagher sent a memorandum to Major Olson regarding his interaction with Plaintiff on December 20, 2013, following her receipt of the counseling memorandum from Lt. McKee. (Dkt. No. 290-9, at 27). Inv. Gallagher reported that when Plaintiff came out of the meeting with Lt. McKee regarding the counseling memorandum, she was "visibly agitated" and "appeared to be mumbling under her breath" and he asked if she was "ok, is everything alright?" (*Id.*). Plaintiff showed him the memorandum, Inv. Gallagher read it, returned it to Plaintiff "and said something along the lines of 'That's messed up.'" (*Id.*). Inv. Gallagher stated that Plaintiff told him "this was nothing more than 'retribution'" and that "if you thought that was bad before, just wait. I'm going to go home and type all weekend," which Inv. Gallagher reported he "took to mean that she intended to make additional complaints against members of CNET Western to IAB." (*Id.*).

### 4.   Removal of Undercover Duties and PTSD Allegation

On January 2, 2014, Plaintiff "served as the undercover in an attempted crack cocaine purchase from a target in Buffalo" and used a "kel"[13] so the investigative team could hear her interaction with the target throughout the operation. (Dkt. No. 256-1, ¶ 105; Dkt. No. 293-10, ¶ 105; Dkt. No. 256-2, at 1316). CNET West members Acting SI Matthew Butts, and Investigators Toney Palmer, Theanial Thurman, and Jerry Miller, Jr. were also involved in the operation. (Dkt. No. 256-1, ¶ 106; Dkt. No. 293-10, ¶ 106). Just before 2:00 p.m. that day, "[t]he target arrived, parked next to [Plaintiff's] vehicle, and entered [Plaintiff's] vehicle." (Dkt. No. 256-1, ¶ 108; Dkt. No. 293-10, ¶ 108; Dkt. No. 256-2, at 1320). Plaintiff "noticed that the target had a

---

[13] A "kel" is a microphone. (Dkt. No. 256-2, at 300).

passenger in his vehicle," but Plaintiff "did not have the opportunity to call this information out" to the other CNET members. (Dkt. No. 256-1, ¶ 109; Dkt. No. 293-10, ¶ 109). In the middle of the "attempted narcotics purchase," the target told Plaintiff that "he didn't trust the guy who set this deal up because everybody already knew this guy worked as an Informant for the State Police." (Dkt. No. 289, at 82). The target attempted to get Plaintiff "to smoke crack in front of him, or . . . put a piece of crack cocaine in her mouth." (Dkt. No. 256-1, ¶ 111; Dkt. No. 293-10, ¶ 111). The target also opened Plaintiff's "glove box, which is where the police radio is stored," (Dkt. No. 256-1, ¶ 112; Dkt. No. 293-10, ¶ 112), and asked to see her driver's license and registration. (Dkt. No. 256-1, ¶ 114; Dkt. No. 293-10, ¶ 114).[14] Inv. Palmer then walked over to Plaintiff's vehicle, pounded on the window, and asked "Plaintiff if she was okay before walking away." (Dkt. No. 256-1, ¶ 109; Dkt. No. 293-10, ¶ 116). Plaintiff replied that she was fine. (Dkt. No. 256-1, ¶ 117; Dkt. No. 293-10, ¶ 117). Plaintiff asserted that this "jeopardized [her] safety," as she "then had to quickly come up with something to reassure the Target who was sitting in Plaintiff's car looking . . . confused."[15] (Dkt. No. 293-10, ¶ 116).

Plaintiff dismissed Inv. Palmer "as another crazy dude walking up on [her] car." (Dkt. No. 293-10, ¶ 116). The target exited Plaintiff's car, got back in his car with the passenger, and "the team comes pouring in . . . drawing guns" on the target and "yanking him out of his car." (Dkt. No. 256-2, at 292). "Finally, somebody" saw the passenger. (*Id.*). "A loaded gun was recovered from the area of the driver's seat in the target vehicle." (Dkt. No. 256-1, ¶ 120; Dkt.

---

[14] According to Inv. Palmer, following the argument, the target "exited [Plaintiff's] vehicle and returned to his vehicle." (Dkt. No. 256-2, at 1324). Inv. Palmer stated that, at that point, he expected Plaintiff to "leave the location," but that she waited and the target "returned to her car, with a crack stem." (*Id.*). Plaintiff maintains that the target did not get back into her vehicle following their discussion. (*Id.* at 1311).

[15] During her deposition, Plaintiff explained that if there is "an issue or concern" during an undercover operation, "[y]ou would simply get a phone call saying . . . just cut it." (*Id.* at 295). Plaintiff also asserted that Acting SI Butts was supervising the operation and that Inv. Palmer was "not in charge," and by approaching her in the vehicle, he improperly took "matters into his own hands." (*Id.*).

No. 293-10, ¶ 120). Plaintiff subsequently learned that one of the investigators who arranged the undercover purchase knew that the informant previously threatened the target with a gun. (Dkt. No. 289, at 83).

Following the operation, Acting SI Butts called Lt. McKee and gave him "some of the facts." (Dkt. No. 290-8, at 91). Lt. McKee then "relayed them" to Major Olson, who told Lt. McKee to "[g]ather up some memos and send them to him." (*Id.* at 91–92). Major Olson explained that the operation was brought to his "attention because participating members had concerns that [Plaintiff's] actions during the operation had risked her safety and the safety of her team." (Dkt. No. 256-2, at 655).

According to Inv. Thurman, on January 3, 2014—the day after the operation—Plaintiff asked if he knew what Acting SI Butts and Inv. Palmer, who "were in a closed door meeting," were meeting about.[16] (Dkt. No. 290-9, at 23). When Inv. Thurman replied that he did not know, Plaintiff "began to get emotional," "started crying" and told him that she knew "everyone is having [sic] closed door meeting and . . . talking about me." (*Id.*). Inv. Thurman told her to get some lunch and she left the office. (*Id.*). When Acting SI Butts and Inv. Palmer emerged from the meeting, Inv. Thurman "told them how emotional Inv. Oliver was" because she thought they were talking about her. (*Id.*). Acting SI Butts asked Invs. Thurman and Palmer if they thought "we should talk about the" January 2, 2014 narcotics operation "[a]s a group"; they "didn't think it would be a good ideal [sic] just base [sic] on her emotional state." (*Id.*).

On January 8, 2014, Lt. McKee sent an email to SI Bradley, Lt. Owens and Captain McEvoy, concerning Plaintiff's mental health, noting that on January 6, New York National

---

[16] Inv. Thurman detailed his conversation with Plaintiff in a memorandum to Major Olson dated January 13, 2014. (Dkt. No. 290-4, at 23).

Guard Staff Sgt. Paul Troccia approached Lt. McKee about concerns he had about a quote and a picture on a cork board next to Plaintiff's desk. (Dkt. No. 256-3, at 27, 1515). Lt. McKee wrote that Sgt. Troccia:

> was concerned that the quote, and the picture of prisoners chained to a wall were possible indicators of PTSD. Staff Sgt. Troccia stated that he has recently referred two members of his unit for counseling, and a third member went unnoticed until he recently killed himself. Consequently, Sgt. Troccia stated that he intends to contact Inv. Oliver, as a member of the armed forces, and suggest that she contact Army Chaplain.

(*Id.* at 27). Later that day, Lt. McKee sent a second email:

> Sgt. Troccia just called me. He stated that he contacted Inv. Oliver and asked her if she was alright. He stated that she is fine, and that the quote and picture were posted as a philosophical statement. She stated that she does not need to speak with a Chaplin, and that if she feels that things are getting to her, she has someone in whom she can confide.

(*Id.*).

On January 9, 2014, Acting SI Butts, Investigator Jordan Bonafede, and Investigators Miller Jr., Palmer, and Thurman submitted memoranda to Major Olson concerning the January 2, 2014 undercover operation.[17] (Dkt. No. 256-2, at 1315–27). In his memorandum, Investigator Bonafede wrote that on December 11, 2013, he told Plaintiff that the target was a neighbor of an informant he had worked with for many years. (Dkt. No. 290-8, at 3). Investigator Bonafede stated that he described the target to Plaintiff as "a bad dude," who sold crack and was "no joke." (*Id.*).

In his memorandum, Acting SI Butts wrote that during the operation, Plaintiff "was the only member" that noticed a passenger in the target's vehicle but did not transmit that

---

[17] Plaintiff testified that "[w]hen a team drafts a memorandum with regard to an incident, we do it all together," but that she "had to stay in the other room while" the team was "rewriting" their memoranda. (Dkt. No. 256-2, at 301).

information to the team, and that Plaintiff "was presented several non-typical high threat issues that should have ended [the] operation," including when the target "opened her glove box," "requested she smoke a crack pipe . . . and became extremely persistent to this," and told Plaintiff that the informant "was a snitch for the police." (Dkt. No. 256-2, at 1318). Acting SI Butts further wrote that by failing to react and exit the vehicle when Investigator Palmer's banged on the door and say "in sum and substance, lets [sic] go we're done," Plaintiff put Investigator Palmer "directly in harms [sic] way" as he "mildly" resembled the target. (*Id.* at 1317). In Acting SI Butts' opinion, Plaintiff's "failure to react to the situation or identify the situation that she was presented, posed a considerable safety risk for not only her but the other members on the detail and in this case Inv. Palmer." (*Id.* at 1318).

In his memorandum, Investigator Palmer wrote that he observed the target exit Plaintiff's vehicle following the argument and return to his own vehicle. (*Id.* at 1324). "[B]elieving that the [target] was not going to sell to her," and that they "were done," he waited for Plaintiff to leave the location. (*Id.*). "[T]o [his] surprise, [Plaintiff] didn't leave," but "waited," and the target returned to Plaintiff's vehicle. (*Id.*). Investigator Palmer stated that after he heard Plaintiff state that the target was making her nervous and ask the target if he was trying to rob her, "a decision was made to terminate the operation." (*Id.*). He approached Plaintiff's vehicle, and pounded on the window, and told Plaintiff to come with him. (*Id.*). She kept the operation going—a "pattern [he] has observed for years, where she pushes to make deals happen despite the potential risk to her safety." (*Id.*).

Inv. Thurman also criticized Plaintiff's actions:

> In my ten years of experience in the narcotics [sic] I have never heard of, nor have I been part of an operation where the undercover argued with a target for that long, without the undercover calling out the distress word or just getting away from the individual when the

> operation has surely taken a turn in a confrontational direction. In saying that I have been working with Inv. Oliver for approximately 3 years. Granted, she is a hard worker, but she continuously takes far too many risks, and is not cautions when it comes to her safety, or the safety of the members who are her immediate backup. She has been talked to by her coworkers countless times, with no positive results. Actually the opposite effect seems to have unfolded. She now seems hell bent on making the buy at any cost, and that is a risk that I don't think is acceptable. Inv. Oliver has been counseled by the various Senior Investigators, but she is not heeding the instructions. If I had one major criticism it would be that after 5 years Inv. Oliver continues to be willing to deviate from the operation plan.

(*Id.* at 1327).

Major Olson was concerned after reviewing the memoranda that Plaintiff's "failure to acknowledge the risks involved with a potentially violent target and cancel the operation after the target made it clear . . . that he thought [Plaintiff] was a law enforcement officer, had risked her safety and the safety of her team members." (*Id.* at 655).

On January 16, 2014, Major Olson and SI Theresa Temple met with Plaintiff to discuss these concerns. (*Id.*). According to Major Olson, Plaintiff "alleged that the problem with the operation was a lack of competent supervision and communication on the part of Acting [SI] Butts" and that Inv. Palmer "had created an unsafe situation when he attempted to extricate her from the operation." (*Id.* at 656). Major Olson observed that Plaintiff "seemed confused and was unable to elaborate on several specific incidents that occurred during the . . . operation." (*Id.*). During their meeting, when Plaintiff "attempt[ed] to discuss an equal employment opportunity complaint that was being investigated by the" IAB, Major Olson explained "that the sole purpose of the meeting was to discuss the January 2, 2014 operation." (*Id.*). Plaintiff testified that Major Olson told her during the meeting that SI Bour and Lt. McKee had gone to him and had informed him of their "grave concern over [her] having PTSD." (Dkt. No. 256-3, at 872).

23

"At the end of the meeting, [Olson] informed [Plaintiff] that she was temporarily restricted from serving as an undercover operative until [he] was able to conduct a thorough review of the incident," and requested a memorandum from Plaintiff "containing her recollections of the January 2, 2014 operation." (Dkt. No. 256-2, at 656). Major Olson did not indicate how long Plaintiff's undercover duties would remain revoked. (Dkt. No. 256-3, at 874). Plaintiff otherwise remained on full duty status. (Dkt. No. 256-2, at 656). Major Olson indicated to Plaintiff "that part of the review of this incident would include the completion of the case being conducted by the Internal Affairs Bureau." (Dkt. No. 256-3, at 75).[18] Major Olson has stated that his "decision with respect to her undercover duties was based solely on [his] review of the memorandums [he] had received and the information provided by [Plaintiff] during the January 16, 2014 meeting," which he believed "indicated a lack of focus on [Plaintiff's] part, as well as either a lack of awareness of the potential danger of the situation or a disregard of the potential danger . . . that placed her safety and the safety of her team at significant risk." (Dkt. No. 256-2, at 656–57). Plaintiff testified that she had been "doing narcotics for six years" and "been in hundreds of narcotics deals" but that she "[n]ever had an incident until after [she] filed an EEO complaint." (*Id.* at 298). Plaintiff, however, acknowledges that she was in "an incredibly dangerous situation," on January 2, 2014.[19] (Dkt. No. 289, at 82).

After Plaintiff's undercover duties were removed, SI Bour "informed the other investigators at CNET West . . . because it is an operational detail that other officers needed to know in order to plan investigations." (Dkt. No. 256-2, at 705). On or about January 17, 2014,

---

[18] Major Olson appears to be referring to the IAB investigation into SI Kelly, not the IAB investigation into Plaintiff's retaliation claims, which Plaintiff did not make until the next day—January 17, 2014. (Dkt. No. 256-2, at 688).

[19] Plaintiff blames the dangerous situation on the "gross negligence" of the two investigators who had previously worked with the informant, and knew that his identity had been compromised. (Dkt. No. 289, at 82). Plaintiff asserts that there was no investigation of or action taken regarding these investigators. (*Id.* at 83–84). Plaintiff cites no evidence to support her assertions.

after learning that "everyone" knew her undercover duties had been removed, Plaintiff went

directly to Lt. McKee, who was sitting with SI Bour to ask "why they would ever disclose that to

all of my coworkers." (*Id.* at 616; Dkt. No. 290-9, at 38). According to Plaintiff, they responded:

"Well . . . what are we going to do if, in fact, you have PTSD and you decide to commit suicide

with your service weapon and then we become liable for not saying anything." (Dkt. No. 256-2,

at 616; *id.* at 281). Plaintiff stated that she told them that she did not have PTSD. (*Id.* at 616).

SI Bour recalled this conversation differently. He stated that he was in his office talking

to Lt. McKee, when Plaintiff came in "very agitated, very upset and in an accusatory tone

accused [us] of telling everybody that she couldn't do undercovers anymore." (Dkt. No. 290-9, at

36). SI Bour stated that during that "same conversation," Plaintiff "complained about some other

things," and "she sat down" and "began to cry and sob, she was shaking, she seemed very upset,

very agitated." (*Id.* at 37). He "became very concerned, which I had been anyway overall, about

her general emotional state," and asked if she had someone "away from the office" "to advocate

for her" of if there was "some outlet," were she could "talk to somebody about these things."

(*Id.*). SI Bour told Plaintiff "there's only been two times where I've had an Investigator come in

and in such an emotional state crying, and it was her both times, the previous being the third of

December" and "[h]ere it is . . . a month later, [and] it seemed if anything," it had  "gotten

worse." (*Id.*). He told her that although he did not "know all the details of the ongoing

complaint," he was "certain that it must be very stressful for her and that this is evidence of it . . .

that here you are sitting in my office, an emotional wreck." (*Id.*). SI Bour also told her that "these

things can't go untreated or can't ignore what's going on and . . . referenced a female

investigator from CNET who . . . was involved in an investigation for simply allegedly taking a

little bottle of liquor from a search warrant and ultimately . . . was the victim of a suicide" and

that they were "not going to let that happen here . . . we're very worried about you." (*Id.*). SI Bour stated that he offered Plaintiff a self-help book called "How Full is Your Bucket" and that it "talked about work place stress." (*Id.*). "She agreed it would be a good idea." (*Id.*). SI Bour gave her the book on January 21, 2014.[20] (*Id.*).

### 5.     Plaintiff's Memoranda to Major Olson and Complaints of Retaliation

In a memorandum to Major Olson dated January 17, 2014, Plaintiff provided her account of the January 2, 2014 operation. (Dkt. No. 256-2, at 1308). Plaintiff explained that she did not notify the team that there was a passenger in the target's car, because "there really wasn't a good opportunity," once the target arrived, "to verbally call out this information." (*Id.* at 1309). Plaintiff further stated that she was "shocked" when Inv. Palmer "began pounding on the window," to ask if she "was okay," because "[t]his has NEVER happened during an operation and it is NOT the protocol we follow." (*Id.* at 1309–10). Following the arrest, Acting SI Butts told her "good job, but I decided to call it" and she responded that she had "no problem with that." (*Id.* at 1310).

Plaintiff wrote that following the operation, "there seemed to be a flurry of closed-door meetings and whispers . . . none of which I was asked to participate in." (*Id.*). Plaintiff stated that when she asked Investigators Palmer and Thurman "what was going on," they told her that Acting SI Butts "was just trying to cover himself because there was a gun involved and he didn't want to get into trouble." (*Id.*). Plaintiff indicated that she "suspected that the team was coordinating whatever story they were going to come up with and was worried (because I filed a

---

[20] SI Bour stated that Plaintiff returned the book on February 19, 2014, with a note saying "good read." (Dkt. No. 290-9, at 38).

formal complaint) that somehow their stories would lead to me looking like I was the one who had done something wrong as a means of retaliation." (*Id.*).

The same day, IAB received a copy of Plaintiff's memorandum to Major Olson. (Dkt. No. 256-2, at 688). Based on the allegations of retaliation in the memorandum, (*see, e.g.*, *id.* at 1311 ("I believed that this was, in fact, a means of retaliation against me."), IAB commenced an investigation into SI McKee, SI Bour, SI Torres, concerning Plaintiff's alleged acts of retaliation by supervisors at CNET. (*Id.* at 688 ).

On January 22, 2014, Plaintiff sent a second memorandum to Major Olson. (*Id.* at 1329). She wrote that since being assigned to SI Bour, she had "been directed to turn over just about every single case [she] received to someone else." (*Id.*).

### 6.     IAB Report on Plaintiff's Complaint against SI Kelly

As part of the investigation into Plaintiff's complaints against SI Kelly, the IAB conducted more than 40 interviews of "individuals that might have knowledge pertaining to [Plaintiff's] allegations." (*Id.* at 687). On January 17, 2014, Lt. Owens issued a report finding all of Plaintiff's allegations against SI Kelly and SI Torres unfounded, except for the allegation that SI Kelly "falsified business documents in September 2012 relating to the return to duty of Investigator Oliver from extended military deployment." [21] (Dkt. No. 289-13, at 4). In the report, Lt. Owens recounted Plaintiff's allegations and statements from her interview at the IAB, but concluded that while Plaintiff "was clearly unhappy with decisions that were made within the

---

[21] Plaintiff was on military deployment from August 19, 2011 to September 11, 2012. (Dkt. No. 256-2, at 179, 960). Though she was still under military orders, Plaintiff "worked all day" doing training with the NYSP on September 11, 2012. (*Id.* at 179). Plaintiff later realized that she had "made a mistake" and read the orders wrong—she "thought [she] was allowed to come back on the 11th." (*Id.* at 181). When SI Kelly learned that Plaintiff was under military orders that day, rather than having Plaintiff arrange for a pass day on her orders, he asked officers to change the date of the training records from September 11, 2012 to September 12, 2012. (*Id.* at 180).  Plaintiff claims that she thus did "not get paid for the day" she returned. (*Id.* at 799).

unit and how she was affected by those decisions," Plaintiff was "unable to elaborate on how [SI Kelly's] actions or management was discriminatory toward her gender" or "specify dates as to many of the incidents that were discussed." (*Id.* at 11). Lt. Owens noted that "[i]t was difficult at times to keep her focused on a topic and she spoke at length, becoming more emotional as she talked." (*Id.*).

In concluding that Plaintiff's allegations of sexual harassment and discrimination against SI Kelly were unfounded, Lt. Owens determined that the statement made by Inv. KR—a female and the only CNET member to corroborate Plaintiff's allegations concerning SI Kelly—lacked "veracity." (*Id.* at 12). Inv. KR stated during her IAB interview that she believed she was the subject of gender discrimination by SI Kelly when she was working in CNET West. (*Id.* at 85). When she was asked to provide a "specific instance[]," she cited being transferred from her team to SI Kelly's team after failing to answer a phone call from SI Kelly, explaining that when other (male) members of her team did not answer SI Kelly's phone calls, they were not transferred. (*Id.* at 85). She further stated that after being reassigned to SI Kelly, her duties changed from investigative work "in buys and operations" to "[a]nswering the phones" and while she would "do a deal here and there and backup sometimes," she was "mostly sitting in the office just being so [SI] Kelly could make sure [she] was in his . . . company." (*Id.* at 85, 92–93). Inv. KR felt underutilized in an investigative capacity, (*id.* at 92), and that the male investigators assigned to SI Kelly "were still out in the field doing" "their investigative work." (*Id.* at 92–93). Inv. KR further stated that SI Kelly would make the "females" "redo" their reports and "sit in the office and go over our reports thoroughly or drive with him to maybe a deal just so we can be in . . . his presence." (*Id.* at 88). Inv. KR stated that if there were issues with a male employee's paperwork, SI Kelly would put "the corrections on their desk and then they would take care of it," but with

females, he "wants us to sit in his office with him and go over the report or he'd actually help us type a report over again." (*Id.*). Inv. KR "never recall[ed] seeing . . . the guys sit in there and right next to him." (*Id.*). Inv. KR left CNET West because of the way SI Kelly was treating her and because she was not doing investigative work. (*Id.* at 93). Inv. JB, who was a member of CNET West, testified during her interview that it was "probably correct as far as probably [SI Kelly] ran" Inv. KR "out," and that she "wasn't happy having to come in the office everyday," though she noted that Inv. KR "was looking to do something different also." (*Id.* at 120).

In his investigation report, Lt. Owens discounted Inv. KR's examples of gender discrimination by SI Kelly because she "was unable to make the distinction between supervision based on performance and gender specific actions." (*Id.* at 12). He further found Inv. KR "was unable to substantiate her claims" of gender bias "when pressed for specific examples." (*Id.*).

## I.      Reassignment to SI Davis

Plaintiff asked to be removed from SI Bour's team and, on February 14, 2014, Lt. McKee informed SI Michael Davis that Plaintiff would be transferred to his group. (Dkt. No. 256-3, at 179; Dkt. No. 256-2, at 334).

## J.      Complaint of Ongoing Retaliation

On March 9, 2014, Plaintiff sent an email to Captain Aquilina and SI Bradley "regarding ongoing incidents at CNET West," and attached a document detailing alleged retaliation. (Dkt. No. 289-23, at 3). Plaintiff asserted that the retaliation included: being "involuntarily transferred out of the West," restricted from working for the West team supervisors, "repeated punitive counseling," restriction of undercover duties, isolation from her teammates, including being "left alone with no assignment, sitting [in the] office watching movies," being accused of having PTSD, notifying outside agencies not to have contact with Plaintiff, and supervisors who later

forced Plaintiff to close out of her cases or "give them away to other Investigators."[22] (*Id.* at 5).

Plaintiff asserted that she initiated two investigations "on cases which I have worked incredibly

hard to establish" but that her "Supervision" told her that she "will not be allowed to work"

them, and directed her "to hand them over to" SI Torres and his team. (*Id.* at 4). Plaintiff stated

that she was not asking to work as an undercover and that she "just want[ed] to be in charge of

MY CASES." (*Id.* at 11). Plaintiff indicated that she had applied for transfer but that she was

"contemplating rescinding this request" because she did not believe she could "transfer out of

this Unit under a cloud of speculation that [she] was somehow involved in . . . a wrongdoing . . .

or questionable act while assigned to CNET West due to false accusations . . . 'spun up' against"

her by CNET members "as part of an ongoing retaliation attack . . . for filing an EEO

complaint." (*Id.* at 4).

At some point during this time period, Plaintiff made copies of buy sheets to support her

claim that as an undercover, she might work "ten cases a week" and that the number of claims

she worked on had been reduced to where she had "one or two cases" a month. (Dkt. No. 256-2,

at 385). Lt. McKee took them from her and reported her conduct to Major Olson. (*Id.* at 386). In

---

[22] Between January 17, 2014 and March 31, 2014, Plaintiff wrote a number documents alleging the above-referenced incidents of retaliation as well as: "repeated punitive verbal and written counseling by" CNET West supervisors; "[s]upervisors at CNET Western have engaged in a pattern of activity to embarrass and humiliate her in front of her peers"; and "[s]upervisors of CNET Western shared personnel related information about [plaintiff] with members of outside agencies," (Dkt. No. 256-3, at 4, 31–36, 37–43, 53–61, 62–70, 71–72, 77–87, 89–96). In addition, in a January 26, 2014 email to Captain John Aquilina in IAB, attached a 4-page report regarding her belief that "Supervisors at CNET West may have taken certain measures throughout this interview process to attempt to discourage any potential witnesses from coming forward" during the investigation into her complaints against SI Kelly and Inv. Peterson. (*Id.* at 44–46). In support of her assertion, Plaintiff cited the public interview schedule and the saving of memoranda on the share drive (*Id.* at 47). Plaintiff also emailed Captain Aquilina to report that on January 24, 2014, she "found a picture of female Inv. KR on the wall of the CNET Buffalo office and wanted [him] to be aware of this." (*Id.*). Plaintiff explained that she "noticed that someone must have recently taken a row of pictures of acorn nuts and had placed them underneath and along the sides of [KR]'s pictures," and that she "couldn't help but think that . . . the Unit has probably caught wind of [KR]'s allegations [about SI Kelly] so, of course she must be 'nuts'!" (*Id.* at 47, 49).

an email to Matthew Renneman, McEvoy, and Theresa Temple on March 11, 2014, Major Olson

wrote:

> Attached are most of the buy sheets Inv. Oliver was copying today.
> During a subsequent meeting with the Lt. and S/I Mike Davis she
> admitted that NYSPIA did not ask her to copy anything. Her story
> now is that she was doing it to bolster her claims that she is making
> internally. She also stated that she has not been to see any attorney
> relative to this, although the word is that Paul Cambria is a fairly big
> time attorney in the Buffalo area and she sat down with him. We
> would not do so here, but it might be worth someone from counsel
> reaching out to the law firm to ascertain if they do, in fact, represent
> her.

(Dkt. No. 256-3, at 209).

In a memorandum to Major Olson dated March 25, 2014, Plaintiff requested that her

"ability to work in an undercover capacity be reinstated." (*Id.* at 71). Plaintiff outlined her recent

contact with the New York State Attorney General's Office ("NYAG") "relative their ongoing

investigation" and a "tentatively planned buy/operation for . . . March 26, 2014," and requested

permission to participate. (*Id.* at 72). In addition, Plaintiff requested permission to work with SIs

Torres, Butts, or Kelly "as operationally needed" in CNET's Batavia and Buffalo offices. (*Id.*).

Major Olson responded via memorandum dated March 27, 2014, and reiterated his

"concerns with the safety of the [January 2, 2014] undercover operation" and Plaintiff's "failure

to acknowledge the risks involved in a potentially violent target who perceived you as a law

enforcement officer compromised the safety of yourself and your backup team." (Dkt. No. 256-

3, at 75). Major Olson reminded Plaintiff that when they "spoke on January 16, 2014, [he]

indicated . . . that part of the review of the incident would include the completion of the case

being conducted by the Internal Affairs Bureau to determine if there is any nexus between them,"

and that "the IAB case has not been finalized at this point." (*Id.* at 75–76). Major Olson denied

Plaintiff's request to work with the NYAG, explaining that his contact with Plaintiff's

supervisors and others "disclose[d] that the investigative goals are being met, and that [her] participation as an undercover is not imperative." (*Id.* at 76). He also refused Plaintiff's request to work with SIs Kelly, Torres, and acting SI Butts because Kelly and Torres were targets in the IAB investigation, and she had criticized Butts. (*Id.*). Olson wrote:

> While there is no determination at this point on the conduct of members being investigated, it would be unwise to subject either you, or them to any potential offensive actions or conduct, whether real or perceived in nature. You will remain assigned to Senior Investigator Michael Davis and his group until further notice.

(*Id.*). Major Olson did not lift the undercover restriction but noted that Plaintiff was "not restricted from performing investigative actions in the field with the other members of [her] group." (*Id.*).

On March 28, 2014, Plaintiff responded to Major Olson's March 27 memorandum with a single-spaced, 7-page account of the January 2, 2014, operation and an explanation of "exactly what went wrong in this operation," including errors by other investigators and the SI involved in the operation, one of whom "lost his mind in the midst of this operation." (Dkt. No. 256-3, at 77–84). Plaintiff reiterated her belief that she had been "subjected to constant retaliation in the form of a multitude of disciplinary actions by the Supervision at CNET West" since filing her complaints against SI Kelly and Inv. Peterson and asked Major Olson to reconsider the restriction on her undercover duties. (*Id.* at 85).

On or about March 31, 2014, Plaintiff composed "a continuation" of her March 28, 2014 memorandum to Olson, which she had intended to send directly to him, but "concerned over the repercussions that all of this might cause," she asked Captain Aquilina to send the document to "Headquarters." (*Id.* at 89). In it, Plaintiff recounted her history at CNET West, assignments and reassignments, difficulties working on different teams, bullying by her teammates,

confrontations with teammates, and her belief that the other investigator involved in the January 2, 2014, operation, Toney Palmer, was "the one in need of some sort of Supervision in this Unit." (*Id.* at 96).

### K.    IAB's Update and Major Olson's Restoration of Undercover Duties

On April 2, 2014, Plaintiff "was directed to report to SP-Canadaigua" to meet with Major Olson. (Dkt. No. 289, at 96). When she arrived, she was notified that "IAB had finished the initial portion of their investigation into Plaintiff's EEO complaint [regarding SI Kelly] and had determined that one violation was founded, one violation was unsubstantiated and two violations were unfounded." (*Id.*). Plaintiff avers that "upon receiving this notification," Major Olson told her that "she was nothing but a liar who was lacking in integrity." (*Id.*). Major Olson then "reluctantly" informed Plaintiff that she would be permitted to return to undercover work. (*Id.*; Dkt. No. 256-2, at 657).

### L.    April 14, 2014 Performance Evaluation and Undercover Operation

On April 14, 2014, "just as Plaintiff was leaving the CNET West office . . . to conduct her first undercover assignment, since having her undercover duties reinstated," SI Davis advised her "that she could not leave until she reported" to SI Bour for her performance evaluation. (Dkt. No. 289, at 97). The performance evaluation covered August 1, 2013 to December 31, 2013. (Dkt. No. 256-3, at 234). SI Bour gave Plaintiff an overall rating of satisfactory and indicated "meets standard" for each of Plaintiff's job responsibilities. (*Id.* at 234–36). Under "Rater's Comments," SI Bour stated: "My personal observations of Investigator Oliver during this period revealed below standard performance in" the "Criminal/Non-Criminal Cases" category. (*Id.* at 237). SI Bour noted an investigation on November 19, 2013, when Plaintiff had "incorrectly identified the target and in fact the person she had named as the target had no connection at all to the actual target." (*Id.*). According to Plaintiff, this was "the first negative comments [she] ever

received in a performance evaluation." (Dkt. No. 289, at 97). Plaintiff noted on the evaluation

that she disagreed with SI Bour's "comments relative to this . . . evaluation . . . as it is not

accurate" and indicated that she wished "to appeal this rating." (Dkt. No. 256-3, at 234, 244).

### M.   IAB Interview and Plaintiff's Attempted Withdrawal of Retaliation Claims

On April 25, 2014, Lt. Owens and SI Bradley met with Plaintiff "for an interview after

she had indicated that she wanted to withdraw her claims of retaliation against the CNET

members." (Dkt. No. 256-2, at 689). Prior to the interview, Plaintiff had contacted her union

representative, SI Brian Meier and asked him to speak with Lt. Owens on her behalf about

withdrawing her retaliation claims, as "Plaintiff hoped" that if she withdrew them, "the

supervisors in CNET West might stop retaliating." (Dkt. No. 289, at 99–100). Her request was

denied, and she was ordered to report to IAB for the interview. (*Id.* at 100). At the interview, Lt.

Owens told Plaintiff: "You wanted IAB to investigate your retaliation claims, and so that's

exactly what we are going to do." (*Id.*). Lt. Owens and SI Bradley informed Plaintiff that despite

her request to withdraw her claims, the IAB "would still have to investigate." (Dkt. No. 256-2, at

689). During the interview, which Plaintiff asserts was scripted, Plaintiff responded to each

question by stating: "I do not wish to pursue these allegations." (Dkt. No. 289, at 100; Dkt. No.

256-2, at 411).

### N.   Plaintiff's Transfer from CNET West

On May 13, 2014,[23] Plaintiff reported to the Batavia office to meet with SI Davis and her

team "to conduct an investigation" that she and SI Davis "previously coordinated and planned to

take place in" Rochester. (Dkt. No. 289, at 100). Neither SI Davis, nor her team, however, were

at the office. (*Id.*). Plaintiff texted SI Davis to ask if she could be the undercover on the operation

---

[23] In her Affirmation, Plaintiff refers to May 13, 2015. (Dkt. No. 289, at 100). This appears to be a typographical error.

because the assigned undercover had been injured. (Dkt. No. 256-3, at 266). SI Davis responded

that "someone else should be the [undercover] since [Plaintiff was] the case agent," and that if

they needed a female undercover, he would see who was available. (Dkt. No. 290-12, at 2–7).

Plaintiff knew "something was not right" because they "would never be able to get someone that

quickly." (Dkt. No. 256-2, at 266). Plaintiff "decided to ask Inv. Bruggman," who was in the

office at the time, "if he would be willing to . . . act as the undercover." (*Id.*). According to

Plaintiff, Inv. Bruggman agreed but "became almost immediately confrontational and

argumentative with [her] as [she] tried to explain the details of this investigation." (*Id.*). Plaintiff

avers that Inv. Bruggman, "suddenly began running up and down the hallway into closed-door

meetings with Paul Kelly, Timothy Bour, and Martin McKee which Plaintiff was not allowed to

participate in," despite being the case agent for the investigation. (Dkt. No. 289, at 101). When

Inv. Bruggman left the meetings, "he would engage Plaintiff in some sort of confrontation," then

return to "another closed-door meeting." (*Id.*). Plaintiff observed that SI Bour looked at Plaintiff

"with an angry face" when she walked by the window of the office they were in. (Dkt. No. 256-

3, at 267). SI Davis was not returning Plaintiff's "phone calls at that point." (Dkt. No. 289, at

101). Plaintiff asserted that Inv. Bruggman "kept taking phone calls which he would immediately

get up and leave the room for," rather than placing "any incoming calls . . . on speaker phone

with me," which would have enabled them to "all be on the same page." (Dkt. No. 256-3, at

266). "Shortly thereafter," Plaintiff received a call from SI Davis, who told her that they "needed

to slow this thing down and that [they] were not going to do the operation" that day. (*Id*. at 267).

Plaintiff reminded SI Davis that the target was expecting them and that if they delayed the

investigation, it "might jeopardize the case." (*Id.*). Finally, Plaintiff offered to "give up the case

and just work as the Undercover," but SI Davis said "No" and that they would discuss "all of this

on Monday." (*Id.*). As Plaintiff grabbed her bag to leave, Inv. Bruggman asked "if the deal was

still on." (*Id.*). Plaintiff responded" "Why would it be?" and "rushed out of the office." (*Id.*).

Plaintiff texted SI Davis that she "was taking sick leave for the rest of the day," to which he

responded "OK." (*Id.*).

On May 13, 2014, per Lt. McKee's direction, Inv. Bruggman submitted a memorandum

to Major Olson concerning his interaction with Plaintiff that day. (Dkt. No. 256-3, at 254). Inv.

Bruggman stated that after he agreed to be the undercover on the operation, he asked for a

picture of the informant as well as the informant's criminal history. (*Id.* at 254–55). Plaintiff

"appeared agitated at this request." (*Id.* at 255). Inv. Bruggman reported that when he also asked

Plaintiff questions about the informant's criminal history, she did not know the answers to his

questions. (*Id.*). Inv. Bruggman stated that after discussing the case with the prior undercover

officer and discussing the plan for the operation, including the drug buy, he suggested to Plaintiff

that they reduce the amount of the drug buy and consult with SI Davis concerning the "best way

to proceed with the investigation." (*Id.* at 256). Inv. Bruggman wrote that Plaintiff "appeared

frustrated and angry at my question, comments, and suggestions." (*Id.*). Inv. Bruggman stated

that he contacted SI Davis "and advised him of the operation Investigator Oliver was attempting

to set up" and asked if they could meet with him to discuss the investigation. (*Id.*). He stated that

he also spoke to another investigator, as well as SIs Kelly and Bour. (*Id.*). Inv. Bruggman

reported that "[d]uring the conversations Investigator Oliver walked by several times down the

hallway," and he "heard a loud noise." (*Id.* at 257). When he looked, he "saw Investigator Oliver

stomping down the hall." (*Id.*). Inv. Bruggman stated that when he later asked Plaintiff if she had

gotten the buy money and "if the deal was still on," she responded "No, why would it still be

on?" in "an angry and sarcastic tone." (*Id.*). Inv. Bruggman stated that Plaintiff was visibly

angry, "shov[ed] things into her purse," "stomped across the room and out the door." (*Id.*).

Inv. Bruggman contacted SI Davis "and advised him what had happened at the office"

and learned that SI Davis had notified Plaintiff that he was postponing "the deal until [they]

could discuss the investigation on Monday." (*Id.*). Inv. Bruggman reported that he "felt

[Plaintiff] had a hostile attitude towards" him and that it "appeared to [him] that [he] was being

accused of sabotaging [Plaintiff's] investigation." (*Id.*). Inv. Bruggman wrote that "[d]ue to the

attitude, accusations and hostile environment" Plaintiff created, he would "no longer be able to

work with her in any capacity," that "[i]t was no longer safe or healthy for [him] to live with this

amount of undue stress in [his] life," and that he "would be contacting [the] E[mployee]

A[ssistance] P[rogram] and IAB regarding this matter." (*Id.*). Inv. Bruggman stated that he

contacted Investigator Richard Qualey, a contact person for EAP, to inquire about his "options"

for coping "with the now unbearable stress that [Plaintiff] was causing him." (*Id.*).

On May 15, 2014, Plaintiff was in the office and checked the CNET West share drive to

"stay in touch with what the unit was involved with," which she did on a daily basis, and was

"going through the files," when she found Inv. Bruggman's memorandum. (Dkt. No. 256-2, at

419). Plaintiff "immediately" contacted SI Bradley and told her what she had found. (*Id.*). After

contacting SI Bradley, she heard Lt. McKee "on the phone saying, 'She's stealing files and I

can't stop her.'" (*Id.* at 419–20). "Within 30 minutes," "Plaintiff received a telephone call from

Scott Gillman (who worked under Francis Christensen)," advising Plaintiff that Lt. McKee "was

accusing her of stealing files" and that "unless she requested a transfer to Troop 'A' CTIU, a

Personal Complaint would be lodged against her," but that "either way" "Plaintiff was leaving

CNET West and this was coming directly from Francis Christensen." (Dkt. No. 289, at 104).

"[L]ess than 30 minutes" after that, Plaintiff received a phone call from SI Meier, who "refused to provide [union] representation," and advised Plaintiff that he was preparing "Plaintiff's transfer request," and "insisting that this was coming down from the Superintendent." (*Id.*).

In an email sent on May 15, 2014 at 6:53 p.m. to McEvoy, Major Olson, and copying Matthew Renneman and Lt. McKee, Frank Koehler wrote that Plaintiff "will be submitting a memo requesting to transfer to Troop A which we will act on to be effective tomorrow." (Dkt. No. 290-13, at 6). Koehler directed the recipients to "ensure that the CNET West members are not in the office around 10 a.m. tomorrow" as Plaintiff would be there to "clear out her personal items at that time." (*Id.*). That evening, at 8:50 p.m., Meier wrote: "Jean, here's the memo. Feel free to change anything and note that I did not enter a reason for the request. You can either add one or leave it blank." (*Id.* at 10).

In an email to Captain Aquilina on May 16, 2014 regarding her "removal from CNET West," Plaintiff wrote that she was "just informed that [she] was officially transferred to Troop A CTIU – Buffalo," and attached a document "relative to [her] removal," for his review. (Dkt. No. 256-3, at 264). In the attached document, Plaintiff stated that she found "the memorandum of Inv. Michael Bruggman to Major Olson dated May 13, 2014," "on the share drive (where it is accessible to everyone) yesterday afternoon" and asked that he review it. (*Id.* at 265). Plaintiff also detailed the events on May 13, 2013 and her interactions with Inv. Bruggman and SI Davis concerning the undercover operation. (*Id.* at 265–70). Finally, Plaintiff wrote that she had been "forced to leave" and that she was: "now officially transferred out of my Unit because no one will tell the Supervisors in CNET West to stop and I cannot get an answer as to why this was ever allowed to happen" and stated that she assumed that Major Olson was "well aware of what

is going on and is perfectly fine with allowing them to continue to retaliate against me." (*Id.* at 269–70).

On May 16, 2014, Kevin Gagan issued a memorandum to Major Olson stating: "Effective 8:00 a.m., May 16, 2014, Investigator Jean C. Oliver is transferred . . . to Troop A, Batavia, New York" and had been directed to report to Troop A Commander, Defendant Major Michael Cerretto. (Dkt. No. 290-13, at 12).

That same day, at 10:01 a.m., Plaintiff sent an email to Scott Gillman, copied to Christensen, stating: "Per your guidance, I am attaching a copy of my transfer request to you and Col. Christensen." (*Id.* at 13). The transfer request is a memorandum to Major Olson dated May 15, 2014. (*Id.* at 14). In it, Plaintiff requested transfer to Troop A BCI/CTIU, and stated that the "Reason[] for Request" was "[t]o further [her] investigative skills." (Dkt. No. 256-3, at 259). Plaintiff explained that she added this reason to the transfer memorandum because she could not say that she was "being forced" to leave. (Dkt. No. 256-2, at 431). Major Olson states that although he received "request for transfers," he "was not responsible for adding or removing individuals from CNET" and that "Division HQ" made "[d]ecisions regarding the movement of personnel." (*Id.* at 657). Major Olson denies informing Plaintiff "or anyone else that a personnel complaint would be filed against her if she failed to transfer out of CNET." (*Id.*).

### O.    IAB Report on Plaintiff's Complaint of Retaliation

On May 28, 2014, Lt. Owens issued an investigative report finding that all eight of Plaintiff's allegations regarding retaliation were unfounded. (Dkt. No. 256-3, at 2–175). In the report, Lt. Owens noted that the "interview with [Plaintiff] showed that she was having difficulty grasping the distinct separation between the alleged retaliation stemming from her EEO complaint and the legitimate management decision by Major Olson which resulted from the" January 2, 2014 operation. (*Id.* at 4–5). Lt. Owens further noted that Plaintiff "would respond to

mild criticism with a strong rebuke." (*Id.* at 5). Lt. Owens explained that when interviewed, Plaintiff "spoke in broad and exaggerated terms and was unable to support any of her allegations with details." (*Id.*). Lt. Owens concluded that "all of Investigator Oliver's allegations are unfounded as she could not provide factual information" and closed the matter. (*Id.*). Regarding the allegation that Major Olson "involuntarily transferred" Plaintiff from the western area of CNET West to the eastern area "for no legitimate reason," Lt. Owens credited Major Olson's explanation that he moved Plaintiff "as a result of supervisory coverage"—the SIs assigned to the western region "were either targets or potential targets of [Plaintiff's] EEO complaint and keeping her with them would be a disservice to all involved parties and not in the best interest of the Division." (*Id.* at 22). For the same reason, Lt. Owens deemed "unfounded" Plaintiff's allegation that her "restriction from working for any of the geographic western supervisors of CNET Western" was "unwarranted." (*Id.* at 22–23).

### P.   Personnel Complaint against Plaintiff

#### 1.   First Meeting with CTIU Supervisors

On May 19, 2014, Defendant Captain Steven Nigrelli and Lieutenant Kevin Reyes "met with [Plaintiff] to welcome her to CTIU and discuss her job duties and expectations." (Dkt. No. 256-2, at 661). Captain Nigrelli told Plaintiff that Defendant SI Gary Kopacz would be her direct supervisor and Lt. Reyes her second line supervisor. (*Id.*). Captain Nigrelli directed Plaintiff to keep SI Kopacz "informed regarding which assignments she was working on." (*Id.*). He "further explained that because she was now a member of the CTIU team, CNET matters were no longer her responsibility and she was only to work on CTIU matters."[24] (*Id.* at 662).

---

[24] Plaintiff disputes that Captain Nigrelli issued any prohibition against working on CNET West matters during this meeting. As discussed *infra* Section V.A., the Court concludes that Plaintiff is precluded from contesting this issue.

### 2.      Plaintiff's Contact with CNET West CI

On May 28, 2014, Plaintiff received a call from Amherst Police Department Detective

and DEA drug task force member John Trabert, who told her that the United States Attorney's

office was working on a heroin and fentanyl case involving a certain individual and asked

Plaintiff if she had any information on him. (Dkt. No. 290-18, at 22). Plaintiff responded that

Detective Trabert "should talk to . . . [her] CI because he was just intimately involved in this . . .

whole heroin trafficking ring" and "had a great deal more knowledge of . . . what [the individual]

was doing with regard to the fentanyl." (*Id.*). Plaintiff told Detective Trabert that she would talk

to her CI and call him back. (*Id.*). Plaintiff then contacted SP Buffalo Trooper Michael Davis to

ask him to contact the CI and see if he was "willing to come in." (*Id.*). Once Trooper Davis

confirmed that the CI was willing to help, he and Plaintiff arranged to pick up the CI the next

morning, May 29, 2014, "and bring him back to SP Buffalo where he could sit down and talk

with DEA because they were planning on grand jury" on May 30, 2014. (*Id.*). Plaintiff provided

some information about her plans to her supervisor, SI Kopacz. (*Id.* at 24; Dkt. No. 256-3, at

1355). On May 29, 2014, Plaintiff "facilitated" the meeting with the CI "by utilizing a Division

vehicle to transport the [CI] with Trooper Michael Davis." (Dkt. No. 256-3, at 1355).

### 3.      Plaintiff's Circulation of Commendation Letter

On June 7, 2014, at Trooper Davis' request,[25] Plaintiff emailed Richard Landahl, a

lieutenant at SP Buffalo, "a commendation letter" "to pass along the details of a recent

investigation and some great work by the SP Buffalo Warrant Detail." (Dkt. No. 256-3, at 324;

Dkt. No. 256-2, at 468). Attached was a two-page narrative Plaintiff had written about the

arrangements she and Trooper Davis had made for the CI to meet with the DEA to provide

---

[25] Plaintiff explained that Lt. Landahl was in Trooper Davis' chain of command and that Trooper Davis asked her "to write a commendation letter." (Dkt. No. 256-2, at 465, 468).

information about a target in a federal narcotics investigation. (Dkt. No. 256-3, at 325–26). Plaintiff sent the same email and attachment to SI Kopacz, who, on June 8, 2014, responded: "Very nice." (Dkt. No. 290-22, at 4). SI Kopacz explained that he had assumed Plaintiff's May 29, 2014 involvement to have been a phone call. (Dkt. No. 256-3, at 994).

On June 8, 2014, Lt. Landahl emailed SI Kelly regarding Plaintiff's email and attachment and asked "for a little info/insight as to what our guy (Tpr Davis) did," as he was "not familiar with it." (*Id.* at 324). It appears that on June 11, 2014, SI Kelly forwarded the emails—Plaintiff's and Lt. Landahl's—to Lt. McKee,[26] who, on June 16, 2014, forwarded the emails to Captain Nigrelli, and requested that Captain Nigrelli call him "relative to the following e-mail and the attached request for a commendation from Inv. Oliver." (*Id.*). Lt. McKee wrote: "Based upon my review of this matter, it would appear as if Inv. Oliver has maintained contact with this informant, following her departure from CNET, despite the fact that she was instructed by S/I Michael Davis to deactivate him on 4/4/14." (*Id.*). Lt. McKee further wrote that he would ensure "CI is deactivated" once Plaintiff completed the requisite CI deposition and contact sheet forms. (*Id.*).

### 4.   Complaint to IAB Regarding Plaintiff's Work on CNET West Matters

Based on the email from Lt. McKee, Captain Nigrelli concluded that Plaintiff "had continued to work on CNET West related matters, even after [he] had instructed her not to do so." (Dkt. No. 256-2, at 663). When Captain Nigrelli contacted SI Kopacz "to ask why [Plaintiff]

---

[26] Lt. McKee testified that SI Kelly forwarded Lt. Landahl's email to him because the letter seemed "to be referencing a former CNET CI, who was supposed to have been deactivated, but . . . continued to work actively with Investigator Oliver." (Dkt. No. 290-16, at 40). Lt. McKee and SI Kelly checked "the CI folder" and found "no indication that the CI had been deactivated." (*Id.*). Lt. McKee "discussed the fact with Major Olson," who suggested Lt. McKee contact Captain Nigrelli, as Plaintiff's current supervisor. (*Id.*). Plaintiff acknowledged receiving an instruction to deactivate this CI and disputes any assertion that she failed to deactivate him; she states she completed the deactivation form and left it on SI Davis's desk. (Dkt. No. 256-3, at 828).

was still working on CNET related matters," SI Kopacz advised "that he did not know [Plaintiff]

was still working on CNET matters," (*id.*), and that it had looked to him, based on the document

she had sent to him, that Plaintiff's involvement could have entailed a phone call. (Dkt. No. 256-

3, at 994). Captain Nigrelli directed SI Kopacz to talk to Plaintiff to "see what the involvement

was." (*Id.*).

SI Kopacz testified that when he asked Plaintiff about it, she responded that she and

Trooper Davis had "set up an interview between her CI and the DEA" and that they had "picked

up the CI and took him" to Buffalo "for an interview with the DEA." (*Id.* at 995). Plaintiff also

told SI Kopacz that she had not passed any information on to CNET West and had not completed

any paperwork because "the CI was not really a CI as he is not active so no paperwork was

necessary." (*Id.*). On June 17, 2014, SI Kopacz told Plaintiff that he had not known what she was

doing and that she was not supposed to have contacts with confidential informants and was not at

CNET anymore. (*Id.* at 394).

On June 18, 2014, upon determining that Plaintiff "was still working on CNET related

matters, despite [his] instructions not to do so," Captain Nigrelli notified his superior, Major

Cerretto, that Plaintiff "had disobeyed a lawful order,"[27] (Dkt. No. 256-2, at 663), and "had been

in contact with an active CNET CI without prior authorization and in conflict with the direction

[he] had given her upon being transferred to Troop 'A.'" (Dkt. No. 256-3, at 328). The same day,

Major Cerretto contacted IAB "to make notification of a Personnel Complaint against" Plaintiff.

(*Id.* at 305). Major Cerretto alleged that "since transferring from CNET Western to Troop A, she

has continued to have contact with a confidential informant after being instructed to discontinue

---

[27] Captain Nigrelli "was generally aware that [Plaintiff] had made equal opportunity related complaints in the past," but he maintains that his "decisions were in no way influenced" by those complaints. (Dkt. No. 256-2, at 663).

contact with the unit," that Plaintiff "failed to notify her senior investigator of her actions," failed

to file required documentation of her actions," "falsified several CNET related documents

regarding a . . . [CI]." (*Id.*). The IAB commenced an investigation. (Dkt. No. 256-2, at 689).

### 5.   Memoranda Supporting Personnel Complaint

#### a.   Captain Nigrelli's Memorandum

In a memorandum dated June 19, 2014, to Major Cerretto, Captain Nigrelli recounted his

meeting with Plaintiff on May 19, 2014, "in connection to Investigator Oliver's first day in

Troop 'A' following her transfer from CNET Western." (Dkt. No. 256-3, at 327). Captain

Nigrelli stated that he instructed Plaintiff that SI Kopacz was her immediate supervisor and was

"to be kept informed of all her cases, meetings and assignments." (*Id.*). Captain Nigrelli stated

that he "advised her that all matters that she may have been investigating as a part of CNET, are

no longer her responsibility and she is to work only on Troop 'A'/CTIU cases."[28] (*Id.*).

#### b.   Memoranda from CNET West Members

As part of the "personnel complaint investigation," Lt. Owens and Major Olson collected

memoranda from SIs Kelly, Davis, and Bour, as well as Inv. Gallagher and Lt. McKee

concerning Plaintiff's interaction with the CI while at CNET West as well as her documentation

of those interactions. (Dkt. No. 290-16, at 9, 12, 14–17; Dkt. No. 256-3, at 334, 356).[29] In his

---

[28] Plaintiff cites to Captain Nigrelli's memorandum, dated July 30, 2014, which has additional details about this meeting, as evidence of fraud. (Dkt. No. 290-19, at 3). Captain Nigrelli testified that after he first wrote the June 19, 2014 memorandum, Captain Aquilina told him "to be as thorough as possible." (Dkt. No. 256-3, at 709). Captain Nigrelli then prepared a second memorandum (dated July 30, 2014) (Dkt. No. 290-19, at 12–14). Both memoranda state that Captain Nigrelli told Plaintiff she was to work only on Troop A/CTIU cases. (*Id.* at 14; Dkt. No. 256-3, at 327).

[29] In a memorandum to Major Olson dated June 19, 2014, Lt. McKee wrote:

> On June 11th, I received an e-mail along with an attached word document, which had been sent by Inv. Oliver, and was eventually forwarded to Senior Inv. Paul Kelly.  Upon reading the attached document it became apparent to me that Inv. Oliver had written it, and that she was making reference to [a CI she had worked with at CNET West], and the dealings that she had with him.  Furthermore, it appeared as if she had continued to have contact with him, following her transfer

memorandum, SI Bour reported that when he reviewed the CI's folder, he "learned that [Plaintiff] reactivated CI[] on March 5, 2014" and that she had "listed [SI Bour] as a backup member on the contact sheet." (Dkt. No. 256-2, at 704; Dkt. No. 256-3, at 335). SI Bour states that he "was not part of this contact, nor was [he] aware of it" and that had Plaintiff involved him "in the reactivation," he "would have made sure she had interviewed [the CI] to determine whether there were any continued reliability issues." (Dkt. No. 256-2, at 704).

### 6.      Notification of Personnel Complaint

On June 20, 2014, Captain Nigrelli and Major Cerretto met with Plaintiff and advised her that she was the subject of a personnel complaint and was "directed to not have any contact with CI's, not to work on any narcotics related cases and not to work on any matters without" SI Kopacz's approval. (Dkt. No. 290-19, at 2). The complaint alleged: (i) that Plaintiff failed to obey Captain Nigrelli's instructions that she no longer involve herself in CNET investigations or matters, (ii) that she failed to notify her SI of her actions on May 29, 2014, and (iii) that she failed to file required paperwork documenting her actions. (Dkt. No. 256-2, at 689–90).

### 7.      Plaintiff's Interrogation

On July 17, 2014, Lt. Owens interrogated Plaintiff regarding the allegations that she "maintained contact with confidential informants from [her] previous assignment at CNET Western," "failed to complete the required documentation" "[a]fter having these contacts," and that Plaintiff "failed to properly make notifications of [her] activities to [her] supervisors after

---

to the CTIU on May 16th.  However, when I check the CI folder, I noticed that no contact sheets had been placed within the folder since Inv. Oliver left CNET. Additionally, as Inv. Oliver's former immediate supervisor, I questioned Senior Inv. Davis, and learned that he had instructed her to deactivate that Informant in April.

(*Id.* at 332–33).

being instructed to do so." (Dkt. No. 290-18, at 3). SI Meier was present. (*Id.*). Plaintiff told Lt.

Owens that during the introductory meeting with Captain Nigrelli and Lt. Reyes, she was

informed of Captain Nigrelli's expectations, the responsibilities of her new CTIU position, that

her immediate supervisor would be SI Kopacz, and that she was to keep SI Kopacz "informed on

all matters," "including . . . criminal casework," "schedule changes," and "work assignments.

(*Id.* at 5–6). Lt. Owens asked Plaintiff if, during the meeting, Captain Nigrelli instructed her "that

[she was] no longer to participate in past investigations for [her] time at CNET Western?" (*Id.* at

6). Plaintiff responded: "No, it never came up." (*Id.*).

Lt. Owens asked Plaintiff about her listing of SI Bour as "the back up member" on the

contact sheet for her March 5, 2014 contact with the CI. (*Id.* at 12–13). Plaintiff responded that

when she completed the contact sheet for that call, she listed SI Bour as the backup member

"because he was in the office" with her when she was on the telephone, but that she did not recall

notifying SI Bour that she had listed him. (*Id.* at 13). Plaintiff further stated that she did not

believe she needed to list a backup member on the contact sheet because it was telephone contact

but that she was "err[ing] on the side of caution." (*Id.* at 13–14).

Regarding the alleged deactivation of the CI on April 7, 2014, Plaintiff told Lt. Owens

that she "was the one who informed [SI Davis] that she was deactivating the confidential

informant," "it wasn't him telling [Plaintiff] to deactivate him." (*Id.* at 18). Plaintiff further stated

that she deactivated the informant that day and prepared the paperwork, which she left on SI

Davis' desk. (*Id.* at 18–19).

### 8.   Personnel Complaint Investigative Report

Lt. Owens issued an investigative report on August 18, 2014, determining that the

following allegations against Plaintiff were founded: (i) Plaintiff disobeyed Captain Nigrelli's

"instructions that she was no longer to involve herself with CNET investigations or CNET

matters," (ii) Plaintiff "falsified an official business document by inserting and utilizing [SI] Bour's name, without his knowledge, as a back up contact on a Confidential Informant Contact Report dated March 5, 2014," (iii) Plaintiff "failed to file and subsequently ensure that [the confidential informant] was de-activated after being instructed to do so by [SI] Davis during the week of April 7, 2014," (iv) Plaintiff "failed to file" a contact report for an interaction with a confidential information that she had on May 29, 2104," (v) Plaintiff "utilized a member of the uniform force," Trooper Davis, "when coordinating contact [with the confidential informant] without properly documenting the interaction or activities performed by the trooper on a Confidential Informant Case Report," and (vi) Plaintiff "was not truthful in her statement to Internal Affairs where she emphatically denied being instructed by Captain Nigrelli to discontinue involving herself in CNET cases and/or matters."[30] (Dkt. No. 256-3, at 297–323).

### 9.    Recommendation of Suspension Without Pay, Censure, and Probation

On September 24, 2014, First Deputy Superintendent Kevin Gagan issued a memorandum to Plaintiff regarding the personnel investigation. (*Id.* at 418). First Deputy Superintendent Gagan advised Plaintiff that he had "reasonable cause to believe that" Plaintiff's behavior "violated Regulations of the State Police," and recommended suspension without pay for 30 days, formal censure, and probationary status for one year. (*Id.*). In a memorandum to

---

[30] The same day, August 18, 2014, Plaintiff sent a memorandum to Major Cerretto with a "request for hardship transfer" to CNET Hudson Valley. (Dkt. No. 290-9, at 93). Plaintiff stated that she was requesting the transfer because she wished to "return to working in a field which I have a great deal of experience, knowledge, and expertise in." (*Id.*). She explained that since she filed an EEO complaint in October 2013, she has "had a multitude of problems in trying to continue work both in CNET West and in [CTIU] which [she] was forced to transfer to." (*Id.*). Plaintiff further stated that her position in the Army Reserves as a Company Commander required her to travel to Connecticut "nearly seven hours several times a month in order to try to fulfill [her] military obligation." (*Id.*). On August 19, 2014, Major Cerretto notified First Deputy Superintendent Kevin Gagan that he "approved" an "[e]ndorsement" of Plaintiff's transfer request but noted that the "request does not appear to meet the criteria for a hardship transfer." (*Id.* at 92). On September 11, 2014, First Deputy Superintendent Gagan sent a memorandum to Major Cerretto denying Plaintiff's request for a hardship transfer on the ground that "the facts submitted do not meet the criteria set for determining hardship transfers." (*Id.* at 94).

Major Cerretto the same day, Plaintiff declined to accept the penalty and requested "that formal charges be prepared and served" and "that a hearing board be appointed and a hearing conducted." (*Id.* at 420). Plaintiff acknowledged that she understood "that the penalty imposed by the First Deputy Superintendent will be withdrawn and will not be binding on the hearing board, or the Superintendent, once charges are executed." (*Id.*).

### Q.   EEOC Charge of Discrimination

On September 25, 2014, Plaintiff filed an EEOC charge alleging gender discrimination and retaliation. (Dkt. No. 290-21, at 6–7). Plaintiff also sent a memorandum to Major Cerretto dated September 24, 2014, with a "notification" that she had been "discriminated against on the basis of": gender, retaliation, disability or perceived disability, and military status. (Dkt. No. 290-32, at 3).

### R.   Charges Against Plaintiff

On October 21, 2014, Superintendent Joseph D'Amico issued five charges against Plaintiff alleging that she: (i) failed to obey a lawful order in May 2014, (ii) failed to obey a lawful order on July 17, 2014, (iii) made a false entry on an official record, by being untruthful during her July 17, 2014, interrogation, (iv) failed to assume responsibility or to exercise diligence in the performance of official duties from March through May 2014, and (v) made a false entry in an official record on March 5, 2014. (Dkt. No. 256-3, 422–33). The notice advised Plaintiff that she was entitled to a hearing and that a request for a hearing must be made "by memorandum within eight days from when you are served these Charges" and that if a hearing was requested, "within twenty (20) days of receipt of the request the Superintendent shall set a date for the hearing." (*Id.* at 433).

In a memorandum to Superintendent D'Amico dated October 27, 2014, Plaintiff requested a hearing and filed an answer to the charges. (Dkt. No. 256-3, at 482–97). In her

answer, Plaintiff recounted the "ongoing harassment and discrimination" she believed she "was being repeatedly subjected to in retaliation for filing" the internal EEO complaint against "several Members in CNET West." (*Id.* at 484).

### S.      NYSP's Interaction with EEOC and Plaintiff's Filing of this Action

In a letter to the EEOC dated November 7, 2014, NYSP Deputy Counsel Lois Goland denied the allegations of gender discrimination and retaliation in Plaintiff's EEOC complaint. (Dkt. No. 290-4, at 30–51). On January 29, 2015, the EEOC issued a determination, finding reasonable cause to believe Plaintiff had been subject to gender discrimination and retaliation. (Dkt. No. 290-5, at 2–3). In a letter to the EEOC dated February 23, 2015, Thomas Capezza, counsel for the NYSP, requested that the EEOC reconsider its reasonable cause determination. (*Id.* at 4–16). On March 23, 2015, the EEOC denied the request for reconsideration. (*Id.* at 17). In a letter to the EEOC dated March 30, 2015, Capezza, on behalf of the NYSP, declined conciliation. (Dkt. No. 290-6, at 2).

On April 14, 2015, Plaintiff filed the Complaint, commencing this action. (Dkt. No. 1).

### T.      Attempted Mediation and Second EEOC Charge

In May 2015, Plaintiff directed her lawyer to engage in mediation with the NYSP, which proposed a resolution. (Dkt. No. 256-3, at 448–49). The NYSP's representative advised that if Plaintiff did not agree to the resolution "Amended Disciplinary Charges," with "ministerial changes only," would be served and a hearing scheduled "as soon as possible." (*Id.* at 449). Plaintiff rejected the offer.

On May 20, 2015, Plaintiff filed a second EEOC charge alleging continued retaliation. (Dkt. No. 290-21, at 11). On May 22, 2015, the EEOC closed its file on Plaintiff's charge of retaliation on the ground that the issues in the charge "are the same issues as those in the previous charge," and issued Plaintiff a Notice of Dismissal and Right to Sue. (*Id.* at 15–16).

U.     **Grievances**

Between October 27, 2014 and May 26, 2015, Plaintiff filed three grievances. In the first

grievance, filed on October 27, 2014, Plaintiff requested permission to return to CNET West to

be assigned to a task force in Buffalo, Rochester, or Niagara County. (Dkt. No. 256-3, at 436,

443–45). Plaintiff alleged a male investigator was transferred to CNET West on or about October

21, 2014, instead of Plaintiff although Plaintiff "was the senior-most member who had a transfer

on file for CNET West." (*Id.* at 436). Following a hearing on December 3, 2014, Col.

Christensen denied the grievance:

> It is accurate that a less senior Investigator was transferred into
> CNET West ahead of Investigator Oliver. However, a review of the
> circumstances surrounding the transfer provide context for the
> transfer. Investigator Oliver had just transferred out of CNET West
> six months prior to Investigator Kotin's transfer effective date. By
> all indications, she was upset with the way CNET was operating and
> had difficulty working with personnel in the unit. I reference
> Investigator Oliver's previous grievance . . . where she states in part
> her remedy sought "within a region I am very familiar with and have
> established many contacts with but ***would limit my day-to-day***
> ***contact with the current Supervision at CNET West***." . . . A
> specialized unit such as CNET cannot and should not, be operated
> with limited contact between supervisors and subordinates.
>
> Further, her previous actions while assigned to CNET West
> demonstrate her inability or unwillingness, to adhere to the safety
> protocols in effect for all CNET members.

(*Id.* at 437, 440–41). On March 19, 2015, the Division of the State Police issued a final

determination, denying the grievance for the same reasons. (*Id.* at 436–37).

On May 4, 2015, Plaintiff filed a second grievance regarding "Denial of Transfer" and

"requesting a hearing to defend myself against the disciplinary actions which I am being

subjected to." (Dkt. No. 290-9, at 121). According to the grievance form, a "Step 1 Hearing" was

held on May 12, 2015 by Captain Nigrelli, a "Step 2 Hearing" was held the same day by Major

Cerretto, and at both steps, the decision was "other." (*Id.*).

50

On or about May 26, 2015, Plaintiff filed a third grievance requesting that the "pending personnel complaint be returned for determination at the Troop Level and that [her] pending and approved transfer request be granted [she] [b]e permitted to return to CNET." (Dkt. No. 256-3, at 451, 453–55). Attached to her grievance is a 7-page narrative addressing the NYSP's violation of Plaintiff's rights and the "coordinated and collective plan between both these Division [of the New York State Police] and [New York State Police Investigators Association ("NYSPIA")] representative who continue to perpetuate the retaliation [she] ha[s] been subjected to for exercising [her] rights under Title VII." (*Id.* at 456–62). Plaintiff asserted that beginning in April 2015, she inquired into openings in CNET units and was told by the "secretary in CNET" that "'they' were not currently filling any openings within CNET." (*Id.* at 456). Plaintiff further asserted that on May 21, 2015, she learned that two troopers had recently been assigned to CNET, and asserted that the Division was violating the agreement between law enforcement agencies regarding the "temporary assignment" of troopers in CNET and "that current vacancies for Investigators within CNET Western are being filled with . . . Troopers which has resulted in [her] approved transfer request repeatedly being bypassed." (*Id.*). Plaintiff asserted that "since being forced to transfer" out of CNET Western "under the threat of a fabricated Personnel Complaint on May 16, 2014," she has repeatedly requested to return to CNET Western, and that her request is "on file" and "has been approved by the First Deputy Superintendent." [31] (*Id.* at 457).

---

[31] On July 3, 2015, a hearing on Plaintiff's grievances was scheduled for July 28, 2015. (Dkt. No. 290-26, at 18–19). On or about July 9, 2015, Plaintiff was advised that the grievance hearings were adjourned and tentatively rescheduled for the week of August 3, 2015. (*Id.* at 23). It appears the hearing was later cancelled. (*Id.* at 20).

### V.        Amended Charges, Disciplinary Hearing, and Termination

On May 28, 2015, Superintendent D'Amico filed amended charges against Plaintiff.

(Dkt. No. 256-3, at 464–75). It appears that the date in the third charge (making a false entry in

an official record) was changed from March 5, 2014 to July 17, 2014. (*Compare id.*, at 426, *with*

*id.*, at 468). On June 3, 2015, Plaintiff filed an answer to the amended charges and a request for a

hearing. (*Id.* at 478–80).

On June 30 and July 1, 2015, a hearing was held on the amended charges before officers

Scott Wilcox, Richard Allen, and Robin Benziger. (*Id.* at 499–1326). Plaintiff, Lt. Owens,

Captain Nigrelli, Trooper Davis, Lt. Kevin Rayes, SI Bour, SI Kopacz, Lt. McKee, SI Davis,

Detective John Trabert, and Inv. Gallagher testified. (*Id.* at 501).

On July 13, 2015, the hearing board found Plaintiff "violated NYSP Regulations on all

five charges" and recommended that she be dismissed from the NYSP:

> The evidence presented to the Hearing Board demonstrates that
> Investigator Oliver has engaged in an on-going and continuous
> pattern of conduct that adversely affects State Police operation and
> there is no reason to believe this behavior will cease.
>
> Investigator Oliver has failed to follow directives and orders given
> to her by competent authority and has demonstrated that she is
> capable of either bending the truth or utilizing vague comments and
> strategic omissions in notifying her supervisors about her activities.
>
> . . .
>
> This lack of discipline in a tenured Members, and especially one in
> a Detail where trust and confidence among Members is critically
> important, is unacceptable and amounts to a safety concern for other
> Members as well as herself. It is the Board's belief that retaining her
> as a Member of the New York State Police would needlessly expose
> the agency to the likelihood of similar episodes.

(*Id.* at 1353–59).

On July 14, 2015, Superintendent D'Amico issued a determination accepting the hearing board's findings and recommendations, finding Plaintiff "guilty of all Charges," and dismissing her from the NYSP. (*Id.* at 1361). Superintendent D'Amico testified that he did not recall when he became aware of Plaintiff's EEO complaint but stated that he made his "decision based solely on what occurred in the hearing and the new hearing findings." (*Id.* at 1370).

On or about November 13, 2015, Plaintiff petitioned for review of the termination decision under New York State Civil Practice Law and Rules Article 78 in state court. (*Id.* at 1380). On June 9, 2017, the Appellate Division, Fourth Department issued an order confirming Superintendent D'Amico's determination and dismissed Plaintiff's petition. *Oliver v. D'Amico*, 151 A.D.3d 1614 (4th Dep't 2017), *leave to appeal denied*, 30 N.Y.3d 913 (2018).

## IV.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where

the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## V.    DISCUSSION

### A.    Preclusive Effect of Article 78 Proceeding

Defendants argue that the reasons for Plaintiff's termination are entitled to preclusive effect because they were settled in the administrative and Article 78 proceedings. (Dkt. No. 256-5, at 24–25; Dkt. No. 259-21, at 25–27). Issue preclusion "bars litigation of an issue when '(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the

issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on

the merits.'" *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013) (quoting *Ball v. A.O. Smith*

*Corp.*, 451 F.3d 66, 69 (2d Cir. 2006)). "The burden of showing that the issues are identical and

were necessarily decided in the prior action rests with the party seeking to apply issue

preclusion," whereas "the burden of showing that the prior action did not afford a full and fair

opportunity to litigate the issues rests with . . . the party opposing the application of issue

preclusion." *Kulak v. City of New York*, 88 F.3d 63, 72 (2d Cir. 1996).

Here, Superintendent D'Amico adopted the hearing board's findings and

recommendations and terminated Plaintiff's employment. (Dkt. No. 256-3, at 1361). The

Appellate Division, Fourth Department confirmed Superintendent D'Amico determination,

concluding that "[t]he factual findings of the Hearing Board concerning petitioner's conduct are

supported by substantial evidence." *Oliver*, 151 A.D.3d at 1618. Thus, the reasons for Plaintiff's

termination were actually and finally resolved in the prior adjudication. There is no indication

that Plaintiff did not have a full and fair opportunity to litigate the issues before the hearing

board and Appellate Division.

Next, the Court must consider whether the issues decided are identical to issues Plaintiff

has raised in this case "and therefore preclusive of issues that must be decided in order to resolve

this dispute." *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 47 (2d Cir. 2014). The Appellate

Division noted that because Plaintiff failed to raise "the retaliatory motive of the disciplinary

charges" in her petition, it would not "consider the merits of that contention." *Oliver*, 151 A.D.3d

at 1616–17. Thus, the Appellate Division's factual determination is not identical to, and does not

preclude Plaintiff from litigating, the issues of retaliation and discrimination presented in this

motion for summary judgment. *See Goonewardena v. N. Y. State Workers Comp. Bd.*, No. 09-cv-

8244, 2016 WL 7439414, at *8, 2016 U.S. Dist. LEXIS 16552, at *20–21 (S.D.N.Y. Feb. 9,

2016) (rejecting application of collateral estoppel where Article 78 petition did not allege race

discrimination), *report and recommendation adopted*, 2016 WL 7441695, 2016 U.S. Dist.

LEXIS 177480 (S.D.N.Y. Dec. 22, 2016).

     The Appellate Division did, however, "confirm" the factual findings on other issues

contested in this case, including the hearing board's findings that:

- Plaintiff failed to obey a lawful order when she arranged a meeting with the CI on May 29, 2014 because the meeting was related to her previous CNET Western duties and was therefore "in direct violation of the order given to her by Captain Nigrelli on May 19, 2014 to refrain from any further CNET-related activities." (Dkt. No. 256-3, at 1355).

- Plaintiff failed to obey a lawful order because she "was not truthful" when she denied, in her statement to Lieutenant Owens, that she was "instructed to refrain from CNET related activities," in violation of Lieutenant Owens' order on July 17, 2014, to "be truthful in her answers to the questions provided." (*Id.*at 1356).

- Plaintiff caused a false entry to be made in official records when she was not truthful in her statement to Lieutenant Owens. (*Id.*).

- Plaintiff "failed to assume any responsibility or to exercise diligence in the performance of her official duties," when she "did not properly manage [the CI] and circumvented policies put in place to protect our Members" and "created an SJS entry that failed to properly document the actions she took on May 29, 2014 in relation to [the CI]" and "left out anything that would have indicated this was related to CNET matters rather than CTIU duties." (*Id.* at 1357).

- Plaintiff made a false entry on an official record when she placed SI Bour's name as "the back up Member relating to a phone call she received from [the CI]," without his knowledge. (*Id.* at 1358).

*See Oliver*, 151 A.D.3d at 1618.

     Accordingly, the Court must address "what the preclusive effects" of these findings are.

*Matusick*, 757 F.3d at 48. "Critical to the resolution of the question is the determination of

whether the 'issue' that is identical in the two proceedings involves a factual or legal

determination." *Id.* While the hearing board's factual findings—confirmed by the Appellate

Division—do not preclude determinations regarding discrimination or retaliation, the factual findings preclude Plaintiff from relitigating those facts at trial. *See id.*, 757 F.3d at 48 (holding that the plaintiff is precluded from relitigating the "factual findings supporting the . . . ultimate conclusion—that [plaintiff] had indeed committed the charged conduct, i.e., that he had failed to respond to calls and slept on duty" in an unlawful discrimination and retaliation case); *see also Snowden v. Solomon*, No. 17-cv-2631, 2020 WL 509057, at *6, 2020 U.S. Dist. LEXIS 17087, at *16 (S.D.N.Y. Jan. 31, 2020) (concluding that the "plaintiff's retaliation claim is not barred by collateral estoppel," but that the "the section 75 hearing officer's factual findings," upheld by the Appellate Division in an Article 78 proceeding, "are entitled to preclusive effect"). However, this does not preclude Plaintiff from arguing that she "was also" terminated "at least in part because" of discrimination or retaliation. *Matusick*, 757 F.3d at 47; *see also Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 472 (S.D.N.Y. 2011) ("[A] finding that Plaintiff was terminated for cause does not bar Plaintiff's Title VII claim. Even if Plaintiff cannot dispute the factual findings of the Hearing Officer's decision, Plaintiff can still prevail if he shows that Defendants acted with an improper motive in bringing charges against Plaintiff.").

## B.     Title VII – Timeliness

Plaintiff alleges that Defendant NYSP violated Title VII by permitting a hostile work environment and engaging in gender-based discrimination and retaliation. (Dkt. No. 37). The NYSP seeks summary judgment dismissing these claims. (Dkt. No. 256-4). The NYSP also asserts that claims stemming from events prior to November 29, 2013, including Plaintiff's hostile work environment claim in its entirety, are untimely. (*Id.* at 22–28).

### 1.     300-Day Statute of Limitations

"As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC." *Hardaway v.*

*Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) (quoting *Deravin v. Kerik*, 335

F.3d 195, 200 (2d Cir. 2003)); *see also* 42 U.S.C. § 2000e–5(e) and (f). "Title VII requires that

individuals aggrieved by acts of discrimination [in states like New York] file a charge with the

EEOC within . . . 300 days 'after the alleged unlawful employment practice occurred.'" *Vega v.*

*Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78–79 (2d Cir. 2015) (quoting 42 U.S.C.

§ 2000e–5(e)(1)). Failing to timely file a charge "acts as a bar to a plaintiff's ability to bring the

action." *Semper v. N. Y. Methodist Hosp.*, 786 F. Supp. 2d 566, 576 (E.D.N.Y. 2011) (citing

*Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)). Though time-barred, discrete

prior acts falling outside the limitations period may be used as "background evidence in support

of a timely claim." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

        The NYSP argues that because Plaintiff filed her EEOC Charge on September 25, 2014,

"any conduct that occurred before November 29, 2013 falls outside of the 300 day limitation."

(Dkt. No. 256-4, at 22). In her affirmation, Plaintiff asserts that she "filed her first complaint

through the U.S. EEOC on September 15, 2014." (Dkt. No. 289, at 133). The document Plaintiff

refers to is an EEOC "Intake Questionnaire." (Dkt. No. 290-21, at 2–5). On September 25, 2014,

Plaintiff filed a "Charge of Discrimination" with the EEOC and NYSDHR. (*Id.* at 6–7).

        Under the EEOC regulations "a charge is sufficient" when the EEOC receives "from the

person making the charge either a written statement or information reduced to writing by the"

EEOC that names the employer and "generally allege[s] the discriminatory act(s)." 29 C.F.R. §§

1626.8(b), 1626.6; *see Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 396–97 (2008). "In addition

to the information required by the regulations . . . if a filing is to be deemed a charge it must be

reasonably construed as a request for the agency to take remedial action to protect the

employee's rights or otherwise settle a dispute between the employer and the employee." *Id.* at

402. A charge must also be "signed and shall be verified." 29 C.F.R. § 1601.9. A verified

untimely charge, however, may "relate back" to an earlier unverified charge. *See* 29 C.F.R. §

1601.12(b); *Edelman v. Lynchburg College*, 535 U.S. 106, 122 (2002); *Morales v. NYS Dep't of

Labor*, 865 F. Supp. 2d 220, 239 (N.D.N.Y. 2012); *Fichera v. State Univ. of N. Y. at Oswego*,

No. 04-cv-0078, 2007 WL 2874450, at *5, 2007 U.S. Dist. LEXIS 72186, at *18–19 (N.D.N.Y.

Sept. 27, 2007).

Here, the four-page Intake Questionnaire contains Plaintiff's written allegations of sex

discrimination and retaliation against the NYSP. (Dkt. No. 290-21, at 2–5). Plaintiff asserts that

there has been "harassment/discrimination" "going on in my unit" involving SI Kelly and Inv.

Peterson and that she has been subjected to continuous retaliation since she "filed an EEO

complaint to ask for assistance" from the NYSP and that, despite her reports to IAB and Human

Resources, "nothing was done to stop the retaliation." (*Id.* at 3). On page four, the Intake

Questionnaire instructs the claimant to "check one of the boxes below to tell us what you would

like us to do with the information you are providing." (*Id.* at 5). "Box 1" states: "I want to talk to

an EEOC employee before deciding whether to file a charge. I understand that by checking this

box, I have not filed a charge with the EEOC." (*Id.*). "Box 2" states: "I want to file a charge of

discrimination, and I authorize the EEOC to look into the discrimination I described above."

(*Id.*). By providing these two options, the Intake Questionnaire "forces claimants to decide

whether their questionnaire is a request for the agency to take remedial action, such that courts

can objectively determine whether each questionnaire is a charge of discrimination or merely a

request for further information." *Lugo-Young v. Courier Network, Inc.*, No. 10-cv-3197, 2012

WL 847381, at *6, 2012 U.S. Dist. LEXIS 33562, at *18–19 (E.D.N.Y. Mar. 13, 2012)

(alteration omitted) (quoting *Hawthorne v. Vatterott Educ. Ctrs., Inc.*, No. 09–cv–442, 2010 WL

3258560, at *4, 2010 U.S. Dist. LEXIS 85340, at *14 (N.D. Okla. Aug. 17, 2010)). Plaintiff did

not check either box. (Dkt. No. 290-21, at 5). Courts have found that a claimant's failure to

check either box "cannot 'reasonably [ ] be construed to request agency action and appropriate

relief on [Plaintiff's] behalf,' and therefore cannot be deemed part of the EEOC Charge of

Discrimination." *Rasheed v. D.C. Pub. Sch.*, No. 16-cv-00665, 2019 WL 3598638, at *6, 2019

U.S. Dist. LEXIS 131293, at *17 (D.D.C. Aug. 6, 2019) (quoting *Holowecki*, 552 U.S. at 404);

*see also Craig v. D.C.*, 74 F. Supp. 3d 349, 359 & n.6 (D.D.C. 2014) (declining to treat "Intake

Questionnaire as the equivalent of filing a charge of discrimination with the EEOC" where the

plaintiff did not check either box and therefore "failed to complete the portion of the

questionnaire that requests agency action"); *Squire v. FedEx Freight, Inc.*, No. 17-cv-3597, 2018

WL 3036474, at *4, 2018 U.S. Dist. LEXIS 101923, at *8 (D. Md. June 19, 2018) (finding the

Intake Questionnaire could not be construed as a charge where "Plaintiff failed to check either

box, and did not indicate that he would like the EEOC to take any action anywhere on the

remainder of the questionnaire"). In view of Plaintiff's failure to check Box 2, requesting to file a

charge of discrimination and authorizing the EEOC to take action, or any indication elsewhere in

the Intake Questionnaire that could reasonably be construed as a request for agency action, the

Court finds no basis to treat the Intake Questionnaire as a charge of discrimination.[32]

Accordingly, because Plaintiff filed her EEOC charge on September 25, 2014, (Dkt. No.

290-21, at 6), unless the continuing violation doctrine applies, any alleged discriminatory actions

or retaliation that occurred before November 29, 2013 (300 days prior) are time-barred for

Plaintiff's Title VII claims. Any discrete acts of alleged discrimination or retaliation that

occurred prior to November 29, 2013, including Plaintiff's November 19, 2013, reassignment to

---

[32] As Defendants note, Plaintiff has not asserted that equitable tolling applies in this case. (Dkt. No. 302, at 16–17).

SI Bour's team and preclusion from engaging in operations with SI Kelly and Inv. Peterson, are

barred for purposes of Plaintiff's Title VII claims,[33] *see Benjamin v. Brookhaven Sci. Assocs.,*

*LLC*, 387 F. Supp. 2d 146, 153 (E.D.N.Y. 2005) ("[E]mployment practices such as failure to

promote, failure to compensate adequately, undesirable work transfers, and denial of preferred

job assignments are considered discrete acts."); *see also Birch v. City of New York*, 675 F. App'x

43, 44 (2d Cir. 2017) (characterizing as discrete acts allegations of "punitive transfers,

undesirable assignments, and poor performance review"), but "may constitute relevant

background evidence" in connection with Plaintiff's Title VII claims. *Morgan*, 536 U.S. at 112.

### 2.      Continuing Violation Doctrine

Under the continuing violation doctrine, "if a Title VII plaintiff files an EEOC charge

that is timely as to any incident of discrimination in furtherance of an ongoing policy of

discrimination, all claims of acts of discrimination under that policy will be timely even if they

would be untimely standing alone." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 155 (2d Cir.

2012) (quoting *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993), *abrogated on other*

*grounds by Kasten v. Saint–Gobain Performance Plastics Corp.*, 563 U.S. 1 (2011)). To bring a

hostile work environment claim "within the continuing violation exception, a plaintiff must at the

very least allege that one act of discrimination in furtherance of the ongoing policy occurred

within the limitations period." *Patterson v. Cty. of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004).

Importantly, the continuing violation doctrine does not apply to discrete unlawful acts, even if

the discrete acts were undertaken "pursuant to a general policy that results in other discrete acts

occurring within the limitations period." *Chin*, 685 F.3d at 157. Courts must "make an

---

[33] Unlike Plaintiff's Title VII claims, her § 1983 and NYSHRL claims have a three-year statute of limitations. *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) ("Section 1983 actions filed in New York are . . . subject to a three-year statute of limitations."); N.Y. C.P.L.R. § 214(2).

individualized assessment of whether incidents and episodes are related." *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 76 (2d Cir. 2010). "Incidents that involve different perpetrators, actions, or targets, or are temporally distant from one another, may be insufficiently related." *Bright v. Coca Cola Refreshments USA, Inc.*, No. 12-cv-234, 2014 WL 5587349, at *4, 2014 U.S. Dist. LEXIS 155565, at *9 (E.D.N.Y. Nov. 3, 2014). A plaintiff may not "'resurrect stale claims by stating that dissimilar acts are related,' for to do so would transform the continuing violation doctrine into 'a boundless exception to the statute of limitations.'" *Maxton v. Underwriter Labs., Inc.*, 4 F. Supp. 3d 534, 544 (E.D.N.Y. 2014) (quoting *Crosland v. City of New York*, 140 F. Supp. 2d 300, 308 (S.D.N.Y. 2001)).

Here, Plaintiff has identified evidence of harassment during the limitations period, i.e, that after November 29, 2013, Inv. Peterson stuck his tongue out at Plaintiff as "part of the same actionable hostile work environment practice' as the untimely incidents." *Bright*, 2014 WL 5587349, at *4, 2014 U.S. Dist. LEXIS 155565, at *9 (quoting *McGullam*, 609 F.3d at 76). Indeed, it was by the same actor, directed at the same target, and an alleged continuation of Inv. Peterson's harassing conduct toward her over the course of years. The NYSP argues that because this was not "sexual harassment," it is irrelevant. Second Circuit case law is clear, however, "that when the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim." *Rasmy v. Marriott Int'l, Inc.*, No. 18-cv-3260, 2020 WL 1069441, at *5 & n.34, 2020 U.S. App. LEXIS 7023, at *14 (2d Cir. Mar. 6, 2020) (citing, inter alia, *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547–48 (2d Cir. 2010) ("Circumstantial evidence that facially sex-neutral incidents were part of a pattern of discrimination on the basis of gender may consist of evidence that the same individual engaged in multiple acts of harassment, some overtly sexual and some not." (citation and internal

quotation marks omitted)). Moreover, according to Plaintiff, on December 3, 2013, after Plaintiff

"broke down" and told SI Bour what Inv. Peterson "was doing," SI Bour responded "that some

people are too timid to be on this job." (Dkt. No. 256-2, at 1350). Thus, Plaintiff has raised issues

of fact as to whether there was a pattern of sexual harassment and hostile work environment that

continued beyond November 29, 2013.

C.       **Title VII – Hostile Work Environment**

The NYSP seeks summary judgment dismissing Plaintiff's hostile work environment

claim. To establish a hostile work environment claim under Title VII, Plaintiff must demonstrate

harassment on the basis of her sex. 42 U.S.C. § 2000e-2(a). The hostile work environment

standard "includes both objective and subjective components: the conduct complained of must be

severe or pervasive enough that a reasonable person would find it hostile or abusive, and the

victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*,

770 F.3d 97, 114 (2d Cir. 2014). "To decide whether the threshold has been reached, courts

examine the case-specific circumstances in their totality and evaluate the severity, frequency, and

degree of the abuse." *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 203 (2d Cir. 2014)

(quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)). Thus, the factors courts consider

in evaluating whether a hostile work environment exists include "the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work

performance." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006) (quoting

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). To survive summary judgment on a hostile

work environment claim, a plaintiff "must demonstrate either that a single incident was

extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted'

to have altered the conditions of her working environment." *Alfano*, 294 F.3d at 374 (quoting

*Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)). Additionally, the plaintiff must show "a specific basis for imputing the hostile work environment to the employer." *Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2d Cir. 2001).

### 1. Severe or Pervasive

Here, Plaintiff has alleged incidents of discriminatory harassment involving SI Kelly and Inv. Peterson beginning in 2008, when she joined CNET West and continuing until December 2013, that, when viewed as whole and in the light most favorable to Plaintiff, could allow a reasonable factfinder to conclude that the environment was objectively and subjectively hostile and abusive.

On a weekly basis, and sometimes more often, SI Kelly demanded that Plaintiff report directly to him, without her supervisor or teammates, to go over files and while going over files, he would stand so close as to be touching her. (Dkt. No. 289, at 9–11; Dkt. No. 256-2, at 187). The NYSP argues that SI Kelly was equally harsh in his supervision of all employees, and that his conduct was not based on gender. "It is axiomatic that to prevail on a claim of hostile work environment based on gender discrimination, the plaintiff must establish that the abuse was based on her gender." *Kaytor*, 609 F.3d at 547. Here, there is evidence that SI Kelly's requirement that Plaintiff work in close physical proximity to him was gender based; Inv. KR, also female, testified that SI Kelly required her to work closely with him, but did not impose this requirement on male investigators. (Dkt. No. 289-13, at 88; *id.* at 85, 92–93 (Inv. KR also experienced SI Kelly's "wrath"— she alleges that he transferred her to his team after she failed to answer his phone call and relegated her to answering phones while the male investigators his team were "out in the field")). *See Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 190 (2d Cir. 2001) ("[W]e recognize that evidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment discrimination."). There is

also is evidence that SI Kelly used intimidation to ensure Plaintiff would report to him by subjecting her to counseling memoranda or harsh verbal reprimands if she failed to report. (Dkt. No. 289, at 11).

At the same time, Plaintiff asserts that Inv. Peterson sexually harassed Plaintiff "every single time" they worked at the office together, (Dkt. No. 256-2, at 233), hugging her closely whenever he saw her, poking her, grabbing and slapping her buttocks, kissing her neck, and making lewd gestures with his tongue. (*Id.* at 220–22). Plaintiff states that Inv. Peterson did this "openly" in the office. (*Id.* at 221). Together, the alleged conduct by SI Kelly and Inv. Peterson is sufficiently intimidating and humiliating, severe and pervasive, to have altered the conditions of Plaintiff's working environment.

In addition, Plaintiff has identified genuine issues of material fact as to whether the conduct was subjectively and objectively abusive. Plaintiff testified that she felt "embarrassed" when male colleagues walked by and saw her in the office with SI Kelly. (*Id.* at 570–71). Further, there is evidence from which a factfinder could conclude that the work environment caused Plaintiff psychological harm, (*see, e.g.*, Dkt. No. 289-13, at 11 (Lt. Owens stating in IAB report that during the interview regarding Plaintiff's complaint against SI Kelly that "it was difficult at times to keep her focused on a topic and she spoke at length, becoming more emotional as she talked")). *See Leibovitz*, 252 F.3d at 189 (explaining that "a plaintiff is not required to demonstrate a tangible psychological injury" but that "psychological trauma is a consideration"). Moreover, there is evidence that SI Kelly's conduct was noticeable enough in the office to prompt Plaintiff's immediate supervisors to warn her "to watch out" because he was "out to get" her, and coworkers to tease Plaintiff by suggesting she should "just have sex" with him or referring to him as "her boyfriend." (Dkt. No. 256-2, at 155; Dkt. No. 289-9, at 2). The

Court therefore concludes that Plaintiff has raised material issues of fact as to whether she

suffered a gender-based hostile-work environment.

### 2.    Imputing Conduct to the NYSP

The NYSP argues that it cannot be held liable because neither Inv. Peterson nor SI Kelly

were supervisors within the meaning of Title VII. (Dkt. No. 256-4, at 27).

> [A]n employer may be vicariously liable for an employee's unlawful
> harassment only when the employer has empowered that employee
> to take tangible employment actions against the victim, i.e., to effect
> a "significant change in employment status, such as hiring, firing,
> failing to promote, reassignment with significantly different
> responsibilities, or a decision causing a significant change in
> benefits."

*Vance v. Ball St. Univ.*, 570 U.S. 421, 431 (2013) (quoting *Burlington Indus., Inc. v. Ellerth*, 524

U.S. 742, 761 (1981)). Plaintiff does not dispute that Inv. Peterson was a co-worker, and not a

supervisor, but she asserts that because SI Kelly had the authority to, and did, transfer members

to different teams, he is a supervisor. (Dkt. No. 293-10, ¶ 29). Plaintiff, however, fails to cite

anything in the record in support of this assertion; the record reflects that SIs do not have the

authority to transfer. (Dkt. No. 256-2, at 658).

"Where a hostile work environment is created by a co-worker who is not a supervisor, the

employer can still be liable, but 'only for its own negligence.'" *Bentley v. AutoZoners, LLC*, 935

F.3d 76, 92 (2d Cir. 2019) (quoting *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013));

*see also Vance*, 570 U.S. at 424 (holding employer is liable for harassment by co-worker if the

employer was "negligent in controlling working conditions"). "To demonstrate such negligence,

a plaintiff must adduce evidence 'that the employer failed to provide a reasonable avenue for

complaint or that it knew, or in the exercise of reasonable care should have known, about the

harassment yet failed to take appropriate remedial action.'" *Id.* (quoting *Summa*, 708 F.3d at

124).

Here, there is no dispute that the NYSP provided a reasonable avenue for complaint and that the IAB conducted a prompt and extensive investigation into Plaintiff's allegations of sexual harassment by both SI Kelly and Inv. Peterson. (Dkt. No. 256-2, at 821–1229, 1231). There is evidence that the IAB disregarded Inv. KR's corroborating testimony that SI Kelly had acted in a gender discriminatory manner. (Dkt. No. 289-13, at 88). However, the NYSP appears to have remedied the situation with SI Kelly. On November 18, 2013, Lt. McKee directed SI Kelly to have no further supervisory contact with Plaintiff, and she has not alleged any harassment by SI Kelly after that date.

With respect to Inv. Peterson, despite the IAB's conclusion that Inv. Peterson's "physical conduct of sexual nature created an offensive work environment" for Plaintiff, (Dkt. No. 289-31, at 8), this conduct was not referenced in the "Letter of Censure"; he was "censured" for acting "unprofessionally toward another member assigned to your unit when [he] stuck [his] tongue out at her." (Dkt. No. 256-2, at 1269). Plaintiff was assigned to the same team as Inv. Peterson following her complaint, (Dkt. No. 289, at 68), but there is no evidence that Inv. Peterson engaged in any harassment after December 3, 2013. (Dkt. No. 302, at 18). Upon learning of Peterson's conduct on December 3, 2013, Lt. McKee "immediately contacted" Internal Affairs; thereafter directed Peterson not to work with Plaintiff; and instructed Inv. Peterson "that any future behavior that could be deemed harassment would be subject to disciplinary action." (Dkt. No 264, at 6). These remedial steps apparently worked. Plaintiff testified, "I reported it and then it ended." (Dkt. No. 256-2, at 562). Thus, Plaintiff has failed to adduce evidence from which a jury could find that the New York State Police was negligent in remedying the harassment. *See, e.g., Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014) ("No reasonable jury could say that her employer was negligent for failing to correct her co-workers' behavior when it apparently

corrected all of the behavior she reported"); *Faulkner v. Niagara Mohawk Power Corp.*, No. 05-cv-0974, 2006 WL 3207815, at *7, 2006 U.S. Dist. LEXIS 80670, at *21–22 (N.D.N.Y. Nov. 3, 2006) (finding insufficient evidence to create a triable issue of fact as to whether harassment could be imputed to employer when there were no further incidents after company meeting reinforcing policies against harassment and discrimination). Accordingly, the NYSP's motion for summary judgment dismissing the hostile work environment claim is granted.

### D.    Title VII – Gender Discrimination

The NYSP seeks summary judgment dismissing Plaintiff's claim that she was terminated based on gender. (Dkt. No. 256-4, at 32–39). Plaintiff opposes the NYSP's motion. (Dkt. No. 293, 48–51).

Title VII, in relevant part, provides that it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's . . . gender." 42 U.S.C. § 2000e-2(a)(1). "Title VII . . . discrimination claims are governed at the summary judgment stage by the burden-shifting analysis first established in *McDonnell Douglas Corp. v. Green*."[34] *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015).

First, the plaintiff must establish, by a preponderance of the evidence, a prima facie case of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). "The requirements to establish a prima facie case are 'minimal,' and a plaintiff's burden is therefore 'not onerous.'" *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (citation omitted) (first quoting *St. Mary's*, 509 U.S. at 506 (1993), then quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The establishment of a prima facie case creates a presumption that the employer unlawfully discriminated against the employee. *St. Mary's*, 509

---

[34] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

U.S. at 506. The burden then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions. *Id*. at 507. If the defendant carries that burden, the presumption of discrimination "drops from the picture," and the burden shifts back to the plaintiff, who must "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *see also Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013). "The plaintiff must produce . . . sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Weinstock*, 224 F.3d at 42 (alterations in original) (internal quotation marks omitted).

### 1. Prima Facie Case

To establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination." *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010). The fourth factor of this test may be satisfied "through direct evidence of intent to discriminate, or by indirectly showing circumstances giving rise to an inference of discrimination." *Vega*, 801 F.3d at 87 (citation omitted). Plaintiff has satisfied the first and second prongs of the prima facie case because it is undisputed that as a woman, she is a member of a protected class and she was qualified to be an investigator with the NYSP. The NYSP, however, disputes that any action other than Plaintiff's termination was an adverse action. (Dkt. No. 256-4, at 33–35). It also disputes that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination. (Dkt. No. 256-4, at 35–36).

### a.     Adverse Action

The NYSP argues that Plaintiff's claims of "intimidation," "criticism," counseling by

supervisors, and imposition of limitations on work duties do not rise to the level of adverse

actions. (Dkt. No. 256-4, at 34–35). Although the NYSP did not specify further, its argument

appears to refer to the December 20, 2013 counseling memorandum, (Dkt. No. 256-2, at 1082–

83), and Major Olson's January 16, 2014 restriction of Plaintiff's undercover duties.[35]

The Second Circuit has held that:

> A plaintiff sustains an adverse employment action if he or she
> endures a materially adverse change in the terms and conditions of
> employment. To be materially adverse a change in working
> conditions must be more disruptive than a mere inconvenience or an
> alteration of job responsibilities. A materially adverse change might
> be indicated by a termination of employment, a demotion evidenced
> by a decrease in wage or salary, a less distinguished title, a material
> loss of benefits, significantly diminished material responsibilities,
> or other indices . . . unique to a particular situation.

*Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298, 304 (2d Cir. 2017)

(quoting *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).

### i.     Counseling Memorandum

The December 20, 2013, counseling memorandum, without evidence that it resulted in

further discipline, does not constitute an adverse action. *See St. Juste v. Metro Plus Health Plan*,

8 F. Supp. 3d 287, 307 (E.D.N.Y. 2014) ("[E]ven if Plaintiff is correct that the counseling

memorandum was unjustified, such a counseling memorandum, standing alone, does not

constitute an adverse employment action."); *see also Risco v. McHugh*, 868 F. Supp. 2d 75, 113

---

[35] As Defendants fail to identify the instances of "criticism" and "intimidation" to which they refer, the Court has no basis for evaluating whether they constitute adverse actions. The Court has limited its consideration to the adverse actions addressed by Defendants.

(S.D.N.Y. 2012) ("The preparation of two counseling memoranda . . . is insufficient to establish a materially adverse action as a matter of law.").

### ii.       Removal of Duties

The temporary removal of undercover duties is likewise insufficient to constitute an adverse action. Plaintiff asserts that after Major Olson removed her undercover duties on January 16, 2014, she was "left alone with no assignment, sitting [in the] office watching movies," (Dkt. No. 289-23, at 5), "while these daily undercover investigations [and] operations were being conducted without Plaintiff having any knowledge of what investigations her team or her teammates were conducting." (Dkt. No. 289, at 93). Plaintiff further stated that during this time she was directed "to check for license plates and vehicles at various residence which were the subject of a previous wiretap investigation." (*Id.* at 95). Major Olson lifted the undercover duty restriction on April 2, 2014. (Dkt. No. 289, at 96; Dkt. No. 256-2, at 657). Even viewed in the light most favorable to Plaintiff, because it was temporary, and there is no evidence that this restriction significantly diminished her material responsibilities or that the duties she was assigned were outside the scope of her position, it fails to constitute an adverse action.[36] "[A]ssignments that are part of an employee's normal responsibilities are not 'adverse employment actions' where . . . the rate of pay and benefits remains the same." *Rodriguez v. Coca Cola Refreshments USA, Inc.*, No. 12–cv–234, 2013 WL 5230037, at *3, 2013 U.S. Dist. LEXIS 131860, at *11 (E.D.N.Y. Sept. 16, 2013) (collecting cases). "Courts in this circuit have regularly held that temporary reassignments which do not impact an employee's salary or benefits do not constitute an adverse employment action." *Freeman v. Dep't of Envtl. Prot.*, No.

---

[36] For these reasons, even if the Court were to consider Plaintiff's November 19, 2013, reassignment to SI Bour's team and the alleged prohibition on participating in operations with SI Kelly or Inv. Peterson, it would conclude that Plaintiff failed to show this was an adverse action.

10-cv-1555, 2013 WL 817221, at *5, 2013 U.S. Dist. LEXIS 31079, at *17–18 (E.D.N.Y. Feb. 5, 2013) (citing *Formilien v. Beau Dietl & Assocs.*, No. 10-cv-3077, 2012 WL 2359819, at *12, 2012 U.S. Dist. LEXIS 86523, at *37–38 (S.D.N.Y. June 21, 2012) (finding a roughly twenty-five day transfer without a reduction in compensation or work duties insufficient to constitute an adverse employment action)), *report and recommendation adopted*, 2013 WL 801684, 2013 U.S. Dist. LEXIS 31077 (E.D.N.Y. Mar. 5, 2013). Indeed, there is evidence that Plaintiff returned to undercover work after the restriction was lifted.[37] (Dkt. No. 298, at 98). Thus, because they do not constitute adverse employment actions, Plaintiff has failed to establish a prima facie case with respect to the counseling memorandum or reassignment and removal of duties. Accordingly, the Court proceeds only with respect to Plaintiff's termination.

### b.      Inference of Discriminatory Intent

Plaintiff relies on alleged disparate treatment to show an inference of discriminatory intent based on gender. (Dkt. No. 293, at 50). "A showing of disparate treatment—that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case." *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). To be similarly situated in "all material respects," "a plaintiff must show that [his] co-employees were subject to the same performance evaluation and discipline standards" and "engaged in comparable conduct." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000). While "[o]rdinarily the question of whether two employees are similarly situated is a question of

---

[37] Even when these actions are considered in the aggregate they do not amount to a materially adverse change in the terms and conditions of Plaintiff's employment. *See Cunningham v. New York State Dep't of Labor*, 326 F. App'x 617, 619 (2d Cir. 2009) (concluding the plaintiff failed to present evidence of adverse action even when "litany of actions" including "unfounded charges of time abuse," office reassignment, "discontinuing a training conference organized by plaintiff," and "excluding plaintiff from a . . . conference and" hiring decision, were "considered in their totality")

fact for the jury," a court can determine whether a plaintiff has "adduced enough evidence to support a finding" that the plaintiff and the comparators were sufficiently similarly situated to support an inference of discrimination. *Mandell*, 316 F.3d at 379.

In support of her claim of disparate treatment, Plaintiff asserts that punishment of male officers allows an inference of gender discrimination. Plaintiff also claims that disparities in salary, tuition reimbursement, undercover school teaching opportunities, designation of SAFETNET coordinators, and texting capabilities allow an inference of gender discrimination.

### i. Disciplinary Proceedings of Male Colleagues

Plaintiff cites the disciplinary proceedings against seven male colleagues, none of whom were terminated, in support of her disparate treatment claim. (Dkt. Nos. 293-4, 293-6, 293-7, 293-8; Dkt. No. 303-3, ¶¶ 5, 7). The Court briefly summarizes those proceedings.

In 2010, Trooper MC was charged with making a false entry and providing false information in his administrative memorandum. (Dkt. No. 293-7, at 1). He pled guilty, was censured, and received a 60-day suspension without pay and probation. (Dkt. No. 293-8, at 3; Dkt. No. 303-3, ¶ 11).

On October 5, 2011, Trooper CM received a letter of censure and a 3-day suspension without pay after allegedly assaulting a woman while off duty. (Dkt. No. 293-6, at 6, 46). Trooper CM was found to have engaged in misconduct, acting in a manner tending to bring discredit on the Division, knowingly make a false entry in his administrative statement, and failing "to notify his supervisor was the alleged perpetrator of an assault being investigated" by law enforcement. (*Id.* at 46–47). CM waived a hearing and accepted the penalty. (Dkt. No. 303-3, ¶ 10).

In 2014, Sergeant JR allegedly engaged in a verbal and physical domestic dispute "and was charged with Assault . . . after he physically assaulted his girlfriend in the presence of their

teenage daughter." (Dkt. No. 293-4, at 4; Dkt. No. 293-1, ¶ 80). According to Plaintiff, a 30-day suspension was proposed[38] but that following a hearing, he was found guilty of the charge of subjecting another person to brutality, in violation of NYSP regulation 8D1-2, but not guilty of the charges alleging that he violated NYSP regulations prohibiting members from violating state law, engaging in misconduct, and acting in a manner to bring discredit on the Division. (Dkt. No. 293-4, at 4–5; Dkt. No. 303-3, ¶ 6). Superintendent D'Amico accepted the hearing board's findings and recommendations, censured Sergeant JR, and imposed a 3 day-suspension without pay and 6 months of probation. (Dkt. No. 293-4, at 1).

Plaintiff also provides disciplinary records regarding Inv. JO, who was charged in 2016 with failing to conduct a sufficient investigation. (Dkt. No. 293-8, at 1). Inv. JO pled guilty and received formal censure, 20 days suspension without pay, and probation. (*Id.* at 3).

On November 15, 2017, Trooper EH was censured and suspended without pay for 20 days, following a determination that he had engaged in sexual relations while on duty, showing the individual a photo of a Division member involved in undercover operations, disconnecting the Automated Vehicle Locator in his vehicle, and been "less than forthcoming" in his sworn statement. (Dkt. No. 293-6, at 3). Trooper EH waived a hearing and accepted the penalty imposed. (*Id.* at 4; Dkt. No. 303-3, ¶ 9).

Defendants have also provided evidence regarding NYSP members MM and RT, whom Plaintiff refers to in her memorandum of law. (Dkt. No. 293, at 39). MM was subject to a personnel complaint for making an offensive post on his Facebook page, and, after a disciplinary hearing, was found guilty of engaging in misconduct and acting in a manner tending to bring discredit upon the NYSP. (Dkt. No. 303-3, ¶ 5). A formal censure and 30-days suspension

---

[38] Plaintiff has not cited evidence in the record in support of this assertion. (Dkt. No. 293-1, ¶ 80).

without pay was recommended. (*Id.*). "The Superintendent subsequently imposed a penalty consisting of a formal censure, a 15 day suspension without pay," and probation. (*Id.*). RT was subject to a personnel complaint "[f]or the off-duty conduct of driving while intoxicated, refusing to take a chemical test, and acting unprofessionally during the arrest procedures." (*Id.* ¶ 7). RT pled guilty, waived a hearing, and received a formal censure, 60 days suspension without pay, and probation. (*Id.*).

Trooper MC, Inv. JO, and Trooper EH were not disciplined by Superintendent D'Amico, who left the position on June 1, 2016, (Dkt. No. 290-29, at 7), and Trooper CM and RT accepted the penalty imposed and waived a hearing, (Dkt. No. 303-3, ¶¶ 7, 10), thus they are not similarly situated. *See Testagrose v. New York City Hous. Auth.*, No. 06-cv-0614, 2009 WL 935722, at *5, 2009 U.S. Dist. LEXIS 30326, at *19–20 (E.D.N.Y. Mar. 31, 2009) (concluding that alleged comparator could not be "deemed similarly situated" where comparator's "discipline was meted out in connection with a voluntary guilty plea, not based upon the outcome of a General Trial" and the comparator had a "cleaner" employment history), *aff'd*, 369 F. App'x 231 (2d Cir. 2010).

Only Sgt. JR and MM proceeded to a hearing. In both cases, Superintendent D'Amico reduced the recommended penalties. Sergeant JR was found guilty of the charge of subjecting another person to brutality, in violation of NYSP regulation 8D1-2, but not guilty of the charges alleging that he violated NYSP regulations prohibiting members from violating state law, engaging in misconduct, and acting in a manner to bring discredit on the Division. (Dkt. No. 293-4, at 4–5; Dkt. No. 303-3, ¶ 6). Superintendent D'Amico reduced the recommended 30-day suspension without pay to 3 days. (Dkt. No. 303-3, ¶ 6). MM was found guilty of engaging in misconduct and acting in a manner tending to bring discredit upon the NYSP after making an

offensive post on his Facebook page. (*Id.* ¶ 5). Superintendent D'Amico reduced MM's penalty

from 30 days suspension without pay to 15 days. (*Id.*).

Plaintiff was found guilty of two charges of failure to obey a lawful order, two charges of

making false entries, and one charge of failing to assume responsibility in the performance of

official duties. (Dkt. No. 256-3, at 1354–59). JR and MM were found guilty for conduct arising

from single events while Plaintiff was found guilty for conduct arising from multiple events on

different dates. In addition, there is no evidence that JR or MM had engaged in "an on-going and

continuous pattern of conduct that adversely affected State Police operation [without any] reason

to believe this behavior will cease," one of the conclusions that the hearing board relied on in

recommending termination. (*Id.* at 1358). Given that JR and MM engaged in off-duty

misconduct that, while very serious, was a very different form of police misconduct from

Plaintiff's on-duty misconduct of failing to obey orders, making false entries, and failing to

assume responsibility in the performance of her official duties. Further, here, the hearing board

made troubling findings against Plaintiff, including that she "accepted no responsibility for any

of her own actions relating to this investigation" "was adamant about her own infallibility," and

that her conduct demonstrated an unacceptable "lack of discipline" that "would needlessly

expose" the NYSP "to the likelihood of similar episodes." (*Id.* at 1358-59). Thus, the difference

in treatment does not allow an inference of gender-based discrimination by Superintendent

D'Amico. *See Bridgeport Guardians, Inc., v. Delmonte*, No. 78-cv-175, 2010 WL 5625647, at

*3, 2010 U.S. Dist. LEXIS 137518, at *14–15 (D. Conn. Dec. 30, 2010) (finding proposed

comparators, who were charged with, inter alia, prescription forgery and improper firearm sale

procedures, were charged with "a very different form of police misconduct" than Pierce, who

was charged with importuning a small business owner, exploiting his position for personal gain,

intimidation, and concealment, and that "the differences in the circumstances and types of conduct of the three officers are too substantial to provide the necessary comparability" to allow an inference of discriminatory decision making). Thus, Plaintiff has failed to raise an inference of gender discrimination via a theory of disparate treatment.

### ii.    Salary

Plaintiff provided information for the 2008 to 2014 earnings of nineteen CNET West investigators, including herself and three other females: JB, KR, and DJ.[39] (Dkt. No. 289-15, at 8, 42–43, 46–47). The earnings for 2013 and 2014 are provided as representative examples.[40] In 2013, the earnings ranged from $118,069 to $141,547. (*Id.*). Plaintiff's earnings were the lowest. (*Id.*). Ivs, JB and DJ's earnings were among the top five—both earned $136,625, and KR received the sixth lowest amount, $128,591. (*Id.*). In 2014, earnings ranged from $115,319 to $138,337. (*Id.*). Again, Plaintiff received the lowest amount. (*Id.*). Invs. JB and DJ's earnings were among the top ten—$124,128 and $125,189 respectively, and KR received the seventh lowest amount, $122,456. (*Id.*). Given the presence of half the female CNET members in the top half of the salaries paid, the Court concludes that this data does not allow for an inference of gender discrimination.

### iii.    Tuition

In 2009, Plaintiff filed a memorandum with the CNET West Detail Commander requesting approval for tuition reimbursement for courses she took at Niagara University. (Dkt. No. 289-16, at 3). On February 24, 2014, Plaintiff received an email from Captain Aquilina,

---

[39] Plaintiff submitted a graph of overtime earnings, but it omits the information for Invs. KR and DJ. (Dkt. No. 289-15, at 7). It appears to show that Plaintiff regularly earned less in overtime than the other members included in the graph. (*Id.*). It is not clear, however, where the data regarding overtime came from. The Court therefore does not consider it in connection with the present motion.

[40] The Court omits the salary information for 2011 and 2012 because Plaintiff was on military deployment during significant portions of both years.

copied to Lt. McKee, indicating that Division Finance had "nothing in their files" regarding her 2009 tuition reimbursement request, but that Plaintiff could re-submit her paperwork and request reimbursement. (*Id.* at 7). Captain Aquilina wrote that "[a]lthough there is currently no money being paid, your request will be entered into a database for future disbursements." (*Id.*). According to Plaintiff, Lt. McKee told her that she "wasn't allowed to submit" her request for tuition reimbursement but that when she was asked whether she thought that had to do with gender, she responded that she did not "know what it had to do with." (Dkt. No. 256-2, at 177–78). No factfinder could reasonably infer gender discrimination from these facts.

### iv.   Undercover School

Plaintiff asserts that neither she nor any other female member of CNET West was invited to teach at the NYSP's undercover school. (Dkt. No. 289, at 19–20). SI Kelly acknowledged that only male CNET West members have taught at the school but stated that neither Plaintiff nor any other female CNET West members told him "that they wanted to be considered for that school." (Dkt. No. 289-13, at 56). Defendants presented evidence showing that on September 4, 2013, Lt. McKee sent an email to all members of CNET West regarding expected openings for instructors at the undercover school and requesting anyone with interest to contact SI Kelly or himself. (Dkt. No. 256-2, at 1201). There is no evidence that Plaintiff expressed interest in teaching. No factfinder could reasonably infer gender discrimination from these facts.

### v.   SAFETNET Coordinator Assignment and Vacation Selections

On November 6, 2013, SI Kelly directed one investigator from each CNET West group to apply to be the group's SAFETNET coordinator, which "will allow for quick entry of targets, locations, etc." (Dkt. No. 289-22, at 2). All five investigators SI Kelly designated were male. (*Id.*).

According to Plaintiff, SI Kelly failed to include her "in the unit's yearly vacation selections" for 2013-2014, and that when she discovered this, she requested the week of October 21, 2013, as her son, who she had not seen for "more than a year due to her deployment . . . was returning home." (Dkt. No. 289, at 30–31; Dkt. No. 256-2, at 1005). Plaintiff stated that she made this request "at least several weeks beforehand." (Dkt. No. 256-2, at 1005). That week fell "during the week of the annual CNET awards ceremony," and SI Kelly "denied Plaintiff's request, insisting that everyone in the unit was required to attend." (Dkt. No. 289, at 30). Plaintiff avers that SI Kelly had granted a male investigator's vacation request for that week and then granted a second male investigator's "last minute request to take vacation during" that week. (*Id.* at 30–31).[41]

Even assuming this evidence allows an inference of gender discrimination, because it occurred more than a year before Plaintiff's termination, and SI Kelly had no role in deciding Plaintiff's punishment following the disciplinary hearing, nor did he participate in the disciplinary hearing, no reasonable factfinder could infer discriminatory animus from this evidence in connection with Plaintiff's termination. *Cf. Holcomb v. Iona Coll.*, 521 F.3d 130, 143 (2d Cir. 2008) (explaining that a jury could find termination decision motivated by discrimination "even absent evidence of illegitimate bias on the part of the ultimate decision maker," if the individual "shown to have the impermissible bias" "played a meaningful role in the decision to terminate" (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999)).

---

[41] SI Kelly acknowledged that Plaintiff "slipped through the cracks" with respect to the leave requests but asserted that his failure to include her when soliciting leave requests was not "an attempt to . . . be punitive." (Dkt. No. 256-2, at 1143). SI Kelly recalled their discussion of Plaintiff's request for leave during the CNET awards ceremony differently. (*See id.* at 1145–46).

### vi.     Texting

Plaintiff asserts that she was "the only member in CNET West who was not allowed to have texting capabilities on her Division-issued cellphone," (Dkt. No. 289, at 20), and that "the leadership in CNET" granted her request for texting capabilities in April 2014, "after Plaintiff filed her EEO complaint." (*Id.* at 21). There is no evidence that the withholding of texting capabilities was gender-based.

### 2.     Legitimate Nondiscriminatory Reasons

Even assuming Plaintiff could raise an inference of discriminatory intent and shift the burden to the NYSP to demonstrate some legitimate, nondiscriminatory reason for the adverse actions, *McDonnell Douglas*, 411 U.S. at 802; *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011), the NYSP easily satisfies that burden. The NYSP has presented evidence that it terminated Plaintiff because she made a false statement, failed to obey Captain Nigrelli's order, and made a false entry when she listed SI Bour's name as the back-up member on a CI contact form. *See supra* Section V.A. Therefore, the burden shifts back to Plaintiff to establish that this reason was a pretext for gender discrimination. *Weinstock*, 224 F.3d at 42.

### 3.     Pretext

A plaintiff's burden at the third stage of the *McDonnell Douglas* burden-shifting analysis is to produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Weinstock*, 224 F.3d at 42 (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)). In other words, the Court must "now ask whether, without the aid of the presumption" of discrimination raised by the prima face case, the plaintiff "has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision to [take an

adverse action] was based, at least in part," on her gender. *Holcomb*, 521 F.3d at 141. "[A] plaintiff may rely on evidence comprising her prima facie case . . . together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Kwan*, 737 F.3d at 847. Pretext may be shown, inter alia, "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate" nondiscriminatory reasons for its action. *Id.* at 846.

Here, Plaintiff has not shown that the NYSP's reasons for terminating her employment were a pretext for discrimination. She is precluded from challenging the factual reasons for her termination. *See supra* Section V.A., Plaintiff has presented evidence of a delay in the scheduling of her hearing. When the charges that led to her termination were issued on October 21, 2014, Plaintiff was advised that a hearing date would be set within 20 days of any request. (Dkt. No. 256-3, at 433). Plaintiff requested a hearing on October 27, 2014, (*id.* at 482–97), but there is no evidence that the hearing was scheduled within 20 days, and was not held until June 30, 2015. (*Id.* at 499).[42] "Departures from procedural regularity . . . *can* raise a question as to the good faith of the process where the departure may reasonably affect the decision." *Weinstock*, 224 F.3d at 45 (quoting *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997)). However, even if this were a procedural irregularity, there is no evidence that Plaintiff complained about the delay. Furthermore, during the time period between her request for a hearing and the hearing, Plaintiff was engaged in efforts to dismiss and mediate the charges. (Dkt. No. 256-3, at 460–61).

---

[42] There was additional activity between the parties throughout that time period: On January 29, 2015, two of the three members of the hearing board were named and Plaintiff was advised that "hearing will be scheduled in the near future." (Dkt. No. 290-24, at 3). The parties engaged in mediation and, on May 19, 2015, the NYSP offered to settle all matters, in exchange for Plaintiff's agreement to transfer to a backroom position and an unspecified term of suspension without pay. (Dkt. No. 256-3, at 448–49). Plaintiff refused and amended charges were filed on May 28, 2015, Plaintiff requested a hearing on June 3, 2015, (*id.* at 464–75, 479–80), and the hearing commenced on June 30, 2015. (*Id.* at 499).

More importantly, there is no evidence that the delay affected the hearing board or Superintendent D'Amico's final decision. *See id.* (finding that where "delay in explaining . . . recommendation [regarding tenure] did not affect that decision itself" "any possible procedural irregularities in the denial of Weinstock's tenure were not enough to suggest gender bias").[43] Thus, Plaintiff has failed to raise a triable issue of fact that the NYSP's reasons for terminating her employment were motivated by gender discrimination, as required at the third step of the *McDonnell Douglas* framework. The NYSP is therefore entitled to summary judgment dismissing Plaintiff's Title VII gender discrimination claim.

### E.      Title VII – Retaliation

Plaintiff alleges that the NYSP retaliated against her for complaining about sexual harassment and discrimination. The NYSP moves for summary judgment on the grounds that it had legitimate reasons for its actions and that Plaintiff cannot establish her protected activity was the but-for cause of the alleged adverse actions. (Dkt. No. 256-4, at 40). Title VII retaliation claims are also analyzed under the *McDonnell Douglas* burden-shifting framework. *See Chen v. City Univ. of N.Y.*, 74 (2d Cir. 2015); *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 681 (S.D.N.Y. 2012). If Plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that a legitimate, nonretaliatory reason existed for its action. *Summa*, 708 F.3d at 129. If the employer demonstrates a legitimate, nonretaliatory reason for the adverse employment action, the burden shifts back to the employee to establish that the employer's

---

[43] Plaintiff also points out that in terminating her employment, Superintendent D'Amico indicated that the transcript of the hearing held before the Hearing Board on June 30 and July 1, 2015 had been "made available" to him but that Superintendent D'Amico testified that he "reviewed the decision of the hearing board," and acknowledged that he did not review the transcript. (Dkt. No. 293, at 39; Dkt. No. 290-29, at 41, 46). He further testified that his understanding of his obligations in reviewing the Hearing Board's determination was that the transcript was to be "available to" him if he "wish[ed] to review it." (Dkt. No. 290-29, at 44). There is no evidence that the transcript was not available to Superintendent D'Amico. Nor has Plaintiff introduced evidence that such an irregularity, if any, affected Superintendent D'Amico's decision.

action was caused by a retaliatory motive. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

## 1.    Prima Facie Case

The four prongs of a prima facie case of retaliation are that: (1) the plaintiff engaged in protected activity; (2) the defendant was aware of the activity; (3) the defendant took adverse employment action against the plaintiff; and (4) there is a causal connection between the protected activity and the adverse employment action. *Summa*, 708 F.3d at 125.

### a.    Protected Activity

The NYSP acknowledges that Plaintiff's discrimination and harassment complaints against SI Kelly and Inv. Peterson in October and November 2013, and her January 17, 2014, complaint of retaliation following the suspension of her undercover duties are protected activities.[44] (Dkt. No. 256-4, at 40). "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz*, 202 F.3d at 566. Further, "opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection." *Id.*  Instead, "'opposition' includes activities such as 'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.'" *Id.* (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).

Thus defined, the Court notes that Plaintiff has persistently complained about discrimination and retaliation. The record is replete with instances that may qualify as protected

---

[44] It argues, however, that to the extent her complaints were "disruptive and confrontational," or "involved name calling," they "do not constitute protected activity." (Dkt. No. 256-4, at 40–41). The Court agrees. *See Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000) (acknowledging that "the way in which an employee presses complaints of discrimination can be so disruptive or insubordinate that it strips away protections against retaliation . . . even when a complaint of discrimination is involved").

activities, including Plaintiff's: March 9, 2014 report of ongoing retaliation to IAB, (Dkt. No.

289-23, at 3–5); March 28, 2014 complaint to Major Olson of ongoing retaliation after filing an

EEO complaint, (Dkt. No. 256-3, at 77–78); April 25, 2014 participation in an interview

regarding her complaints of retaliation, (Dkt. No. 256-2, at 689); May 13, 2014 report of a

perceived instance of retaliation, (*id.* at 419; Dkt. No. 256-3, at 268–69); May 16, 2014 update to

Captain Aquilina on her "removal from CNET West" as part of the ongoing retaliation against

her, (Dkt. No. 256-3, at 264–70); July 16, 2014 complaint to Captain Aquilina of ongoing

retaliation, (Dkt. No. 289-23, at 22–23); September 24, 2013 memorandum to Major Cerretto

notifying him that she had been discriminated against based on gender and subject to retaliation,

(Dkt. No. 290-32, at 2); September 25, 2014, EEOC charge of discrimination against the NYSP,

(Dkt. No. 290-21, at 6–7); October 27, 2014, answer to the charges against her asserted in which

she asserted she was being subjected to repeated acts of retaliation for filing the EEO complaint,

(Dkt. No. 256-3, at 482–97); April 14, 2015 filing of this employment discrimination action,

(Dkt. No. 1); May 20, 2015 filing of a second EEOC charge alleging continued retaliation, (Dkt.

No. 290-21, at 11); May 26, 2015 filing of a grievance alleging continued retaliation, (Dkt. No.

256-3, at 456); June 30, 2015 assertion at the disciplinary hearing of the complaints of sexual

harassment and discrimination and retaliation, (Dkt. No. 256-3, at 522); and July 16, 2015

complaint of discrimination and retaliation filed with the NYSDHR. (Dkt. No. 37, at 61, 71).

### b.    Adverse Action

The NYSP argues that other than her termination, Plaintiff has failed to adduce evidence

of suffering any adverse action. (Dkt. No. 256-4, at 41). Specifically, the NYSP asserts that the

counseling memoranda Plaintiff received, the removal of her undercover duties, and her transfer

to CTIU do not constitute adverse actions. (*Id.* at 43).

The definition of "adverse employment action" in the retaliation context is "not limited to discriminatory actions that affect the terms and conditions of employment," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006), but also covers harms that might well have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 68 (quoting *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005)). Under this standard, "[m]aterial adversity is to be determined objectively based on the reactions of a reasonable employee." *Rivera v. Rochester Genesee Reg'l Transp. Auth*., 743 F.3d 11, 25 (2d Cir. 2014). The requirement that the employer's action be materially adverse is meant to separate significant from trivial harms. *Burlington N*., 548 U.S. at 68 ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."). The perspective is that of a reasonable employee because the harm must be assessed objectively. *Id*. Additionally, "alleged acts of retaliation must be evaluated separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." *Tepperwien v. Entergy Nuclear Operations, Inc*., 663 F.3d 556, 568 (2d Cir. 2011); *see also Baines*, 593 F.3d at 165 ("[I]n determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable.").

### i.     Removal of Duties

The NYSP argues that the removal of Plaintiff's undercover duties does not constitute an adverse action because it did not hinder her "ability to otherwise perform her duties as a CNET investigator." (Dkt. No. 256-4, at 44–45). Viewed in the light most favorable to Plaintiff, the removal of her undercover duties, as a result of which, she claims she was "left alone with no assignment, sitting [in the] office watching movies," (Dkt. No. 289-23, at 5), is sufficient to

show adverse action in the retaliation context. *See, e.g.*, *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 209 (2d Cir. 2006) (finding the plaintiff "presented evidence sufficient to create a genuine triable issue as to whether the reassignment to which he was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination" where the plaintiff was transferred to another location, and "although he retained the title of Assistant Commissioner, he was stripped of those [Assistant Commissioner] responsibilities and not allowed to perform those functions.").

### ii.     Counseling Memorandum

The counseling memorandum like the one Plaintiff received on December 20, 2013, from Lt. McKee, in which he admonished Plaintiff for "disparage[ing] the reputation" of SI Kelly and bringing "discredit to our organization" might well dissuade a reasonable employee from making a charge of discrimination. (Dkt. No. 256-2, at 1082–83). *See Millea v. Metro-N. R. Co.*, 658 F.3d 154, 165 (2d Cir. 2011) ("A formal reprimand issued by an employer is not a 'petty slight,' 'minor annoyance,' or 'trivial' punishment; it can reduce an employee's likelihood of receiving future bonuses, raises, and promotions, and it may lead the employee to believe (correctly or not) that [her] job is in jeopardy."). It thus may constitute adverse action.

### iii.     Transfer to CTIU

Plaintiff has sustained her burden of demonstrating material issues of fact with respect to whether her transfer to CTIU was involuntary and an adverse action. (Dkt. No. 256-4, at 45). Plaintiff avers that on May 15, 2014, the day before the transfer, she was told by her union representative that unless she requested a transfer, a personnel complaint would be filed against her, and that Christensen had decided that "either way" Plaintiff was leaving CNET West. (Dkt. No. 289, at 104). Further, there is evidence that unlike CNET work, which involved undercover narcotics operations, at CTIU officers "often work[] from their desks reviewing various forms of

intelligence." (Dkt. No. 289-23, at 37). *See Flynn v. New York State Div. of Parole*, 620 F. Supp. 2d 463, 491 (S.D.N.Y. 2009) (transfer to a position where plaintiff "was no longer responsible for supervising the cases that were of particularly high interest and of a sensitive nature" could be an adverse action for retaliation claim). The Court therefore concludes that there is an issue of fact as to whether Plaintiff's responsibilities at CTIU changed to a such a degree that a reasonable employee in Plaintiff's position would be dissuaded from complaining about gender discrimination.

### c.      Causal Connection

As for the causal connection required under Title VII, the plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 570 U.S. at 362. "A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (internal quotation marks omitted).

### i.      Removal of Duties and Counseling Memorandum

Plaintiff has presented evidence of temporal proximity between her complaints of discrimination, on the one hand, and the restrictions placed on her duties and the counseling memorandum on the other hand. Plaintiff received the December 20, 2013 counseling memorandum from Lt. McKee approximately two months after her complaint of discrimination by SI Kelly, and Major Olson restricted her undercover duties in January 2014, approximately three months after that complaint. Thus, temporal proximity is sufficient to establish a causal connection. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("Though

this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship."). Moreover, the reason Lt. McKee gave Plaintiff on November 19, 2013 for prohibiting her from participating in investigations involving SI Kelly or Inv. Peterson, was her complaint against them. (Dkt. No. 289, at 68–69). Thus, there is direct evidence of retaliatory animus. While the NYSP argues that separation of staff to avoid disputes is not retaliatory, it went beyond mere separation and allowed Inv. Peterson to continue to participate in the team operations while restricting Plaintiff's participation. The November 19, 2013 transfer is outside the actionable time period for a retaliation claim under Title VII, but the Court may consider it as background evidence.

The NYSP argues that because SI Kelly's verbal and written counseling of Plaintiff preceded her protected activity, and discipline, including the counseling memorandum and change in her duties continued after, there is no inference of causation. (Dkt. No. 256-4, at 47). The Second Circuit has held that "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001). Here, however, viewed in the light most favorable to Plaintiff, a reasonable factfinder could conclude that SI Kelly's pre-protected activity reprimands for, principally, paperwork deficiencies differed significantly in nature from Lt. McKee and Major Olson's post-protected activity discipline for Plaintiff's alleged disparagement of SI Kelly, failure to follow the chain of command, and unsafe conduct during an undercover operation and were not part of "an extensive period of progressive discipline" or "gradual adverse job actions." *Slatterly*, 248 F.3d at 95; *see also Phillip v. City of New York*, No. 09-cv-442, 2012 WL

1356604, at *16, 2012 U.S. Dist. LEXIS 55335, at *47 (E.D.N.Y. Apr. 19, 2012) (concluding

that the plaintiff was not subject to a "period of progressive discipline" where, prior to his

complaint, he had received two warnings in three years, and after his complaint "both the

quantity and tenor of warnings and disciplinary letters changed significantly" and involved

repeated reprimands that were "considerably more critical and serious"). Even if Plaintiff's

colleagues had longstanding concerns about her actions during narcotics operations, they did not

voice them until after she began complaining of gender discrimination and retaliation. (*See, e.g.*,

Dkt. No. 256-2, at 1327 (January 8, 2014 memorandum from Inv. Thurman regarding Plaintiff

stating "she continuously takes far too many risks")). Accordingly, the Court concludes that

Plaintiff has established a prima facie case of retaliation with respect to these adverse actions.

### ii.      Transfer to CTIU

Plaintiff was transferred to CTIU on May 15, 2014, (Dkt. No. 290-13, at 6), less than one

month after participating in the on April 25, 2014, interview with Lt. Owens and SI Bradley

regarding her claims of retaliation against CNET members. (Dkt. No. 256-2, at 689). This

temporal proximity is sufficient to establish a causal connection. *Gorzynski*, 596 F.3d at 110.

### iii.     Termination

The NYSP argues that Plaintiff has failed to show a causal connection between her

protected activity and July 2015 termination. (Dkt. No. 256-4, at 48). The NYSP's June 2014

initiation of the personnel complaint that led to Plaintiff's termination was less than two months

after Plaintiff's April 25, 2014 participation in an interview regarding her complaints of

retaliation, (Dkt. No. 256-2, at 689), May 13, 2014 report of a perceived instance of retaliation,

(*Id.* at 419; Dkt. No. 256-3, at 268–69), and May 16, 2014 update to Captain Aquilina on her

"removal from CNET West" as part of the ongoing retaliation against her, (Dkt. No. 256-3, at

264–70). Further, the filing of amended charges and disciplinary hearing were less than three

months after Plaintiff's April 14, 2015 filing of this employment discrimination action, (Dkt. No.

1), May 20, 2015 filing of a second EEOC charge alleging continued retaliation, (Dkt. No. 290-

21, at 11), and May 26, 2015 filing of a grievance alleging continued retaliation, (Dkt. No. 256-

3, at 456). Thus, Plaintiff has adduced evidence of a causal connection for purposes of

establishing a prima facie case of retaliatory termination.

### 2.   Legitimate Nonretaliatory Reasons

#### a.   Counseling Memorandum

In support of the December 20, 2013 counseling memorandum, the NYSP cites

Plaintiff's disregard for the chain of the command, when, after being told by SI Kelly that they

were not going to utilize the CI and going to "slow this train down," she attempted to contact a

trooper who was familiar with the CI and wrote that it "sounds like Paul's not in a hurry to do

anything with this guy" and asked if he could "get a hold" of the CI "and see if we can arrange

for a meeting." (Dkt. No. 256-2, at 258–60). Disparaging a supervisor and circumventing the

chain of command are legitimate nonretaliatory reasons for a counseling memorandum. *Ponniah

Das v. Our Lady of Mercy Med. Ctr.*, No. 00–cv–2574, 2002 WL 826877, at *9, 2002 U.S. Dist.

LEXIS 7771, at *28 (S.D.N.Y. Apr. 30, 2002) ("Unwillingness to follow a supervisor's orders is

a legitimate nondiscriminatory reason for terminating an employee's employment."); *see also

Henry v. Metro. Transp. Auth.*, No. 07-cv-3561, 2014 WL 4783014, at *13, 2014 U.S. Dist.

LEXIS 136461, at *38 (S.D.N.Y. Sept. 25, 2014) (finding that breaking the chain of command

was a legitimate nondiscriminatory reason for adverse action).

#### b.   Removal of Duties

Major Olson stated that he removed Plaintiff's undercover duties because he "had serious

concerns about" her conduct during the January 2, 2014 operation, and had determined that her

"failure to acknowledge the risks involved with a potentially violent target and cancel the

operation after the target made it clear . . . that he thought Ms. Oliver was a law enforcement

officer, had risked her safety and the safety of her team members." (Dkt. No. 256-2, at 655).

Major Olson was also concerned because during their meeting on January 16, 2014, Plaintiff

"seemed confused and was unable to elaborate on several specific incidents that occurred during

the . . . operation." (*Id.* at 656). He advised Plaintiff that "she was temporarily restricted from

serving as an undercover operative until [he] was able to conduct a thorough review of the

incident." (*Id.*). Concerns for officer safety constitute legitimate, nonretaliatory reasons.

### c.    Transfer to CTIU

The NYSP contends that Plaintiff's transfer from CNET West to the CTIU was

voluntary. (Dkt. No. 256-4, at 45). It has therefore provided a legitimate nonretaliatory reason for

her transfer.

### d.    Termination

The NYSP has presented legitimate nonretaliatory reasons for Plaintiff's termination. *See*

*supra* Section V.A.

### 3.    Pretext

If the plaintiff establishes a prima facie case, the burden shifts to the employer to

demonstrate that a legitimate, nonretaliatory reason existed for its action. *Summa*, 708 F.3d at

129. If the employer demonstrates a legitimate reason for the adverse employment action, the

burden shifts back to the employee, and the employee must come forward with evidence that

"the non-retaliatory reason is a mere pretext for retaliation." *Kwan*, 737 F.3d at 845. To satisfy

that burden, "the plaintiff must demonstrate that there is sufficient evidence for a reasonable

juror to find that the reason offered by the defendant is pretext for retaliation." *Flores v. Entergy*

*Nuclear Operations, Inc*., 313 F. Supp. 3d 511, 525 (S.D.N.Y. 2018), *aff'd*, 768 F. App'x 139

(2d Cir. 2019). "The temporal proximity of events may give rise to an inference of retaliation for

the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy [the plaintiff's] burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010). Pretext may be shown "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate" nondiscriminatory reasons for its action. *Kwan*, 737 F.3d at 846. "[A] plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action." *Id.*

### a.     Counseling Memorandum

Although Plaintiff maintains that she only wanted to speak to the potential CI, and was not "asking to utilize this individual" as a CI, (Dkt. No. 256-2, at 270), she admitted that she did not view SI Kelly's denial of her request regarding the CI as a final answer and that she pursued alternative avenues of setting up a meeting with the CI. (*Id.* at 258–60). In addition, Plaintiff concedes that she sent an email to another law enforcement officer stating that SI Kelly "did not appear to be in any hurry to do anything with this guy." (*Id.* at 258). Thus, there is no basis for finding the basis for the counseling memorandum, including Plaintiff's disparagement of her supervisor, to be false and Plaintiff has failed to adduce evidence from which a reasonable jury could find that these reasons were pretextual.

### b.     Removal of Duties

Major Olson cited Plaintiff's failure to acknowledge the risks involved with a potentially violent target and cancel the operation and his need to conduct a thorough review of the incident as the reason for removing her undercover duties. (*Id.* at 655–56). While Plaintiff disputes several of the facts regarding the operation itself, including whether she had time to alert the other investigators of the presence of a second individual, or when the target exited her vehicle, she has not disputed the high-threat events that made her decision to continue the transaction,

even after Inv. Palmer pounded on her window, risky for all of the officers involved: the target opened her glove box, asked her to smoke crack, and said he knew the CI was a snitch. (Dkt. No. 256-1, ¶¶ 109–12, 116–17; Dkt. No. 293-10, ¶¶ 109–12, 116–17; Dkt. No. 289, at 82). However, in addition to these well-documented safety concerns, there is evidence that part of Major Olson's "review of th[e] incident" leading to the removal of Plaintiff's undercover duties "include[d] the completion of the case being conducted by the Internal Affairs Bureau to determine if there is any nexus between them." (Dkt. No. 256-3, at 75–76). Major Olson denied her request to return to undercover work on March 27, 2014, citing to, inter alia, the fact that "the IAB case has not been finalized at this point." (*Id.*). And, according to Plaintiff, Major Olson did not restore Plaintiff's undercover duties until April 2, 2014, when Plaintiff and Major Olson received a report on the initial portion of the IAB investigation into Plaintiff's EEO complaint. (Dkt. No. 289, at 96). Viewed together with the background evidence of retaliation—including Lt. McKee's prohibition on Plaintiff's participation in investigations involving SI Kelly or Inv. Peterson, because of her complaint against them, when she was assigned to a team with Inv. Peterson, (*id.* at 68–69), and construing this evidence in the light most favorable to Plaintiff, there is a genuine issue of material fact regarding whether Major Olson would not have restricted her undercover duties but for her complaints to IAB.

### c.      Transfer to CTIU

Although Defendants contend Plaintiff's transfer to CTIU was voluntary, Plaintiff has presented evidence that it was not voluntary and that, following Lt. McKee's report that she was "stealing files," after she had printed out a copy of a memorandum from the shared drive, an individual working for Col. Christensen forced her to transfer under threat of a personnel complaint. (Dkt. No. 289, at 104). Thus, Plaintiff has presented evidence that Defendants' reason for her transfer to CTIU was false. That evidence, combined with the temporal proximity of her

complaints of retaliation is sufficient to raise a material issue of fact as to whether but-for her

complaints of retaliation, she would not have been transferred.

### d.    Termination

Plaintiff has not shown that the NYSP's reasons for terminating her were false. *See supra*

Section V.A. Although there was a delay in scheduling the disciplinary hearing, for the same

reasons the delay did not suggest discriminatory intent, the delay does not suggest retaliatory

intent. *See supra* Section V.D.3. Nor has Plaintiff adduced evidence from which a jury could find

that the NYSP had an improper retaliatory motive in pursuing the personnel complaint that

resulted in her termination. Lt. McKee notified Captain Nigrelli of Plaintiff's contact with a

CNET West informant following her departure from CNET West. (Dkt. No. 256-3, at 324).

However, even assuming that Lt. McKee possessed retaliatory animus toward Plaintiff, no

reasonable factfinder could conclude that he played "a 'meaningful role'" in her termination.

*Vasquez v. Empress Ambulance Serv.*, 835 F.3d 267, at 275 (2d Cir. 2016) (explaining that the

"negligence-based approach to 'cat's paw' liability" requires "that a biased non-decision maker

play a 'meaningful role' in an adverse employment decision for the unbiased decisionmaker to

be culpable" under Title VII); *see also Natofsky v. City of New York*, 921 F.3d 337, 350 (2d Cir.

2019) ("Under a Cat's Paw theory of liability, a discriminatory motive may be imputed to a final

decision-maker if the decision-maker's adverse employment action was proximately caused by a

subordinate who had a discriminatory motive and intended to bring about the adverse

employment action."). Although Captain Nigrelli's decision was based, in part, on information

provided by Lt. McKee, namely that Plaintiff had transported a CNET West CI, it was her failure

to follow Captain Nigrelli's order to refrain from working on CNET West matters, that prompted

Captain Nigrelli to report Plaintiff's conduct to Major Cerretto. (Dkt. No. 256-2, at 663). Captain

Nigrelli and Major Cerretto had some knowledge of Plaintiff's EEO complaints, (*id.* at 1117,

663), but there is no evidence from which a factfinder could infer that they acted with retaliatory intent.

Moreover, even assuming Lt. McKee's retaliatory intent could be imputed to Captain Nigrelli, or Major Cerretto, who reported the personnel complaint to the IAB, Plaintiff has failed to present evidence from which a reasonable factfinder could conclude that but-for her protected activity, she would not have been terminated. In recommending termination, the hearing board found that in addition to failing to follow Captain Nigrelli's order by working on CNET related matters—the conduct Lt. McKee reported—Plaintiff had "failed to disclose" to SI Kopacz that she was meeting a CI "she developed while in CNET Western" or that it was "in relation to a case she had been working on while" assigned to CNET West. (Dkt. No. 256-3, at 1357). The Board further found that she attempted "to hide the fact" that she used a CI and listed his "full name as a witness," an "egregious" activity that, it explained, "puts the safety of the informant at risk and could have jeopardized any on-going CNET work being done using this informant," (*id.* at 1358), and that she "failed to answer honestly about being directed to refrain from CNET related matters" in her statement to Lt. Owens. (*Id.* at 1356). The hearing board was also troubled by Plaintiff's "omissions of fact," which, it found "extended to her relationships with her colleagues" in the CI transport matter, who "had no idea" Plaintiff "no longer worked in CNET," as well as her failure to accept "responsibility for any of her own actions relating this investigation or other incidents discussed in the course of the Hearing." (*Id.* at 1358–59). Thus, the Court concludes that Plaintiff has failed to raise a triable issue of fact regarding whether her termination was retaliatory.

Accordingly, the NYSP's motion for summary judgment on Plaintiff's Title VII

retaliation claim is granted with respect to her termination[45] but denied as to the removal of her

undercover duties and transfer to the CTIU.

### F.    Rehabilitation Act – Disability Discrimination

The NYSP argues that Plaintiff's Rehabilitation Act disability discrimination claim fails

because even assuming there is evidence that Major Olson regarded her as having a disability

due to PTSD, the temporary removal of Plaintiff's undercover duties does not constitute an

adverse action. (Dkt. No. 256-4, at 29–32). The Court agrees. The Rehabilitation Act[46] protects

any "qualified individual with a disability ... [from] be[ing] excluded from the participation

in, . . .   [or] denied the benefits of," any federally funded program "solely by reason of his or her

disability." 29 U.S.C. § 794(a). To establish a prima facie violation of § 504 of the Rehabilitation

Act, a plaintiff must show "(1) the employior is subject to the [Rehabilitation Act]; (2) the

plaintiff is disabled within the meaning of the [Rehabilitation Act] or perceived to be so by her

employer; (3) she was otherwise qualified to perform the essential functions of the job with or

without reasonable accommodation; (4) she suffered an adverse employment action; and (5) the

adverse action was imposed because of her disability." *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d

231, 235 (2d Cir. 2015) (per curiam) (setting forth elements of prima facie ADA case); *see also*

---

[45] In any event, the Court notes that to the extent the disciplinary hearing that led to Plaintiff's termination is judicial in nature, *see, e.g.*, *Wynder v. McMahon*, No. 99-cv-772, 2013 WL 1759968, at *6, 2013 U.S. Dist. LEXIS 59131, at *19–20 (E.D.N.Y. Apr. 24, 2013) (finding NYSP disciplinary proceeding to be "judicial in nature"); *Bohmer v. New York*, 684 F. Supp. 2d 357, 364 (S.D.N.Y. 2010) (same), any defendants would be entitled to absolute immunity for their conduct as witnesses, *Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985), and Superintendent D'Amico would be entitled to absolute immunity for his role in the disciplinary process and final decision as to Plaintiff's termination, *see Wynder*, 2013 WL 1759968, at *5, 2013 U.S. Dist. LEXIS 59131, at *15 ("Absolute immunity from civil liability is accorded to judges and prosecutors for actions taken in their official capacities, as well as to government officials performing analogous functions." (citing *DiBlasio v. Novello*, 344 F.3d 292, 296–97 (2d Cir. 2003)).

[46] In evaluating an employment discrimination claim under the Rehabilitation Act, courts utilize the relevant standards set forth in the Americans with Disabilities Act of 1990 ("ADA"). 29 U.S.C. §§ 791(f), 794(d) (stating that, in employment discrimination cases, the standards for determining whether these sections of the Rehabilitation Act have been violated are "the standards applied under title I" and "sections 501 through 504, and 510" of the ADA).

*Clarkson v. Coughlin*, 898 F. Supp. 1019, 1037–38 (S.D.N.Y. 1995) ("The requirements for stating a claim under the ADA are virtually identical to those under § 504 of the Rehabilitation Act.").

"[T]he meaning of an adverse employment action in Rehabilitation Act . . . discrimination actions is the same as in Title VII discrimination actions." *Kelly v. New York State Office of Mental Health*, 200 F. Supp. 3d 378, 396 (E.D.N.Y. 2016) (citing *Medcalf v. Thompson Hine LLP*, 84 F. Supp. 3d 313, 329 n.14 (S.D.N.Y. 2015) ("An adverse employment action has the same meaning in ADA discrimination claims as it does in the Title VII context." (citing *Adams v. Festival Fun Parks, LLC*, 560 F. App'x 47, 49 (2d Cir. 2014))). Thus, for the reasons stated *supra* Section V.D.1.a.ii., the temporary removal of Plaintiff's undercover duties does not constitute an adverse action. Accordingly, the NYSP is entitled to summary judgment dismissing Plaintiff's disability discrimination claim in connection with the removal of her undercover duties.[47]

## G.    Sovereign Immunity

Defendant Lt. McKee moves for summary judgment dismissing all claims against him in his official capacity, including Plaintiff's claim for reinstatement. "The Eleventh Amendment generally bars suits in federal court by private individuals against non-consenting states," *Leitner v. Westchester Community College*, 779 F.3d 130, 134 (2d Cir. 2015), and damages claims against state agencies and individual state defendants in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). Thus, to the extent Plaintiff asserts a damages claim against Lt. McKee in his official capacity, it is dismissed.

---

[47] The Court's decision with respect to the Rehabilitation Act is confined to the argument briefed by the NYSP.

Next, the Court considers Plaintiff's claim for reinstatement. "Under the well-known exception to [the sovereign immunity bar] first set forth in *Ex parte Young*, 209 U.S. 123 (1908), 'a plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective, injunctive relief from violations of federal law.'" *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007) (quoting *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007)). "Reinstatement is purely prospective injunctive relief that orders the state official to return the former employee to the state's payroll, and . . . an order that reinstatement be granted or that a reinstatement hearing be conducted is the sort of prospective relief that is not barred by the Eleventh Amendment." *Russell v. Dunston*, 896 F.2d 664, 668 (2d Cir. 1990) (internal quotation marks omitted). Thus, Plaintiff's claim for reinstatement is not barred by the Eleventh Amendment.

That does not end the inquiry, however, because the authority for appointing state police positions resides with the Superintendent of the NYSP. *See* N.Y. Exec. Law § 215(3) ("The sworn members of the New York state police shall be appointed by the superintendent."). As there is no evidence that Lt. McKee has the authority to reinstate Plaintiff, the claim for injunctive relief against him is dismissed. *See, e.g.*, *Perciballi v. New York*, No. 09-cv-6933, 2010 WL 3958731, at *4, 2010 U.S. Dist. LEXIS 107835, at *12 (S.D.N.Y. Sept. 28, 2010) ("However, [the plaintiff] fails to allege that any Individual Defendant has the authority to reinstate him. Accordingly, [the plaintiff's] claim for injunctive relief against the Individual Defendants cannot proceed.").

## H.     Section 1983 – Equal Protection – Personal Involvement

"[S]tate and local officials can be held individually liable under 42 U.S.C. § 1983 for violating the Equal Protection Clause of the Fourteenth Amendment by discriminatory acts against those who work under them." *Raspardo*, 770 F.3d at 113–14. "[T]he Equal Protection

Clause protects such employees from sex-based workplace discrimination, including hostile

work environments and disparate treatment," and retaliation. *Id.* at 114 (citing *Demoret v.*

*Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)); *Vega*, 801 F.3d at 81 (retaliation).

Unlike her Title VII claims against the NYSP, here, Plaintiff sues Superintendent

D'Amico, Col. Christensen, Cerretto, Major Olson, Captain Nigrelli, Lt. McKee, Lt. Owens, SI

Kelly, SI Bour, and SI Kopacz in their individual capacities. "[A] defendant in a § 1983 action

may not be held liable for damages for constitutional violations merely because he held a high

position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). "Rather, the 'personal

involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of

damages under § 1983.'" *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (quoting *Farrell v.*

*Burke*, 449 F.3d 470, 484 (2d Cir. 2006)); *see also Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir.

2016); *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015). "[S]upervisor liability in

a § 1983 action depends on a showing of some personal responsibility, and cannot rest on

respondeat superior." *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).[48] These principles

apply to the analysis of Plaintiff's equal protection claims against the individual defendants.

## I.      Section 1983 – Equal Protection – Hostile Work Environment

While "[h]ostile work environment claims under Title VII . . . look to the circumstances

of the plaintiff's employment, and hold the employer liable when the misconduct in the

workplace is so severe as to alter the terms and conditions of the plaintiff's employment,"

*Raspardo*, 770 F.3d at 114 (citing *Harris*, 510 U.S. at 21), "[s]ection 1983 . . . applies by its

terms only to individual 'persons' responsible for violating plaintiffs' rights." *Id.* Thus, "[i]n

---

[48] Plaintiff alleges liability based on direct participation. The parties have not raised the issue of supervisor liability and thus the Court does not discuss it here.

order to . . . 'establish individual liability under § 1983, a plaintiff must show . . . that the

defendant caused the plaintiff to be deprived of a federal right.'" *Id.* (citing *Back*, 365 F.3d at

122). "If a defendant has not personally violated a plaintiff's constitutional rights, the plaintiff

cannot succeed on a § 1983 action against the defendant." *Id.* at 114–15.

Plaintiff has adduced no evidence of personal involvement by Col. Christensen, Major

Cerretto, Captain Nigrelli, or SI Kopacz in allegedly creating a hostile work environment.[49]

Accordingly, they are entitled to summary judgment dismissing Plaintiff's Section 1983 hostile

work environment claims against them. Next, the Court addresses the evidence regarding Major

Olson, SI Bour, Lt. McKee, and SI Kelly.

Plaintiff alleges that Major Olson assigned her to SI Bour's team—a team with Inv.

Peterson—and that Lt. McKee informed her she could not work on operations involving SI Kelly

or Peterson, thereby limiting work available to her. (Dkt. No. 290-4, at 2; Dkt. No. 256-2, at 696,

703). There is no evidence, however, that either of these decisions contributed to a hostile work

environment.

Plaintiff alleges that on at least two occasions SI Bour compared her to a female officer

who committed suicide. (Dkt. No. 256-2, at 255, 281, 616, 1351). Plaintiff further alleges that Lt.

McKee was present on one of those occasions, (*id.* at 281, 616), and that during a CNET West

meeting, Lt. McKee gave "a speech on how personnel complaints were up" and that one member

had "reported on another for taking a photo of his 'pe-pe' and sending it over the internet" and

"made some joke relative to instructing Members of CNET to avoid taking pictures of their 'pe-

---

[49] The Court previously dismissed Plaintiff's hostile work environment claims and gender discrimination claims against Superintendent D'Amico and Lt. Owens. *Oliver v. New York State Police*, No. 15-cv-444, 2017 WL 11509465, at *16, 2017 U.S. Dist. LEXIS 228116, at *48–49 (N.D.N.Y. Mar. 24, 2017).

pes.'"[50] (*Id.* at 806). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *See Alfano*, 294 F.3d at 374 (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). Even viewed in the light most favorable to Plaintiff, these episodic incidents do not rise to the level of severity necessary to establish a hostile work environment. Indeed, "[i]solated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id.*; *see also Beale v. Mount Vernon Police Dep't*, 895 F. Supp. 2d 576, 588 (S.D.N.Y. 2012) (finding conduct at issue—none of which involved physical harassment— including supervisor's remarks that "[w]omen are useless," "a female officer was a 'fucking bobblehead,'" "that a female attorney was a 'bitch,'" and that "[w]omen should not be on this job" "was not sufficiently severe or pervasive to alter the conditions of Plaintiff's employment"). Plaintiff has therefore failed to show the personal involvement of SI Bour, Lt. McKee or Major Olson in the alleged hostile work environment.

According to Plaintiff, SI Kelly was the principal perpetrator of the gender-based hostile work environment. Plaintiff has presented evidence that SI Kelly required Plaintiff, because she was female, to report to him on a weekly basis over a 5-year period so he could stand close to, sometimes touching, her "for extended periods of time," while going over paperwork, or have her sit in the massage chair in his office, which he would attempt to "fix" and "lay[] down on the floor" with his head next to Plaintiff's "rear end while he [was] playing with the components of the [massage] chair." (Dkt. No. 289, at 9; Dkt. No. 256-2, at 570–71). This made Plaintiff feel "as though she was going to jump out of her skin but [she] was too afraid to move." (Dkt. No. 289, at 9). If Plaintiff failed to report for their weekly one-on-one meetings, SI Kelly would order

---

[50] Plaintiff asserts that Lt. McKee "was aware" of SI Kelly's conduct, (Dkt. No. 37, ¶ 51), but has not cited any evidence in the record that would support this assertion, or that would support a finding that Lt. McKee saw Inv. Peterson's conduct. (Dkt. No. 256-2, at 604–06; Dkt. No. 259-7, at 11–12).

her to return to the office, where he would subject her to a "a harsh verbal reprimand or some formal counseling session." (*Id.* at 10–11). It also affected her ability to do her job because she "had to learn how to balance her investigative duties . . .with her team in the Buffalo area, around the time she would have to take out each week to . . . Batavia in order to spend time at the office . . . with Mr. Kelly." (*Id.* at 11).

While Plaintiff does not allege physical threats or assaults, given that SI Kelly—who was not Plaintiff's direct supervisor—allegedly subjected Plaintiff to weekly meetings over a period of years that involved him sitting so close to her as to be touching and subjecting her to sharp verbal reprimands if she failed to report to him, a reasonable factfinder could conclude that SI Kelly subjected Plaintiff to pervasive and humiliating gender-based conduct that interfered with Plaintiff's work performance. *See Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013) ("If a plaintiff relies on a series of incidents, they must be 'more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'") (quoting *Perry*, 115 F.3d at 149); *see also Byra-Grzegorczyk v. Bristol-Myers Squibb Co.*, 572 F. Supp. 2d 233, 247 (D. Conn. 2008) (finding genuine issue regarding hostile work environment claim where the plaintiff was subjected to "weekly meetings with Gao, in which she claims Gao yelled at her, belittled her, pounded on her chest, and made statements such as "woman, I'm talking to you," "harassed her by writing falsehoods into her performance reviews" and "belittled and insulted her in front of her colleagues").

Accordingly, Defendants are entitled to summary judgment dismissing Plaintiff's Equal Protection hostile work environment claim against all but SI Kelly.[51]

---

[51] Other than their argument that they are entitled to qualified immunity for all equal protection retaliation claims, Defendants do not address qualified immunity with any specificity regarding the individual Defendants or claims. (*See* Dkt. No. 256-5, at 18–20). The Court therefore does not address it here.

**J.       Section 1983 – Equal Protection – Discrimination**

A violation of the Equal Protection Clause of the U.S. Constitution is analyzed under the same burden shifting analysis as Title VII claims. *Back v. Hastings on Hudson Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004). However, a recent Second Circuit decision (issued after briefing in this case was complete) clarified that, while "§ 1983 discrimination claims parallel Title VII discrimination claims in many respects," a "crucial distinction between" them is "the required degree of causation." *Naumovski v. Norris*, 934 F.3d 200, 213 (2d Cir. 2019). Title VII has a "lessened causation standard" because litigants "may succeed simply be establishing that sex (or another protected characteristic) was a 'motivating factor for any employment practice, even though other factors also motivated the practice.'" *Id.* (quoting *Nassar*, 570 U.S. at 349). However, "a plaintiff pursuing a claim for employment discrimination under § 1983 rather than Title VII must establish that the defendant's discriminatory intent was a 'but-for' cause of the adverse employment action." *Id.* at 214.

As discussed *supra* Section V.D., Plaintiff has failed to raise a genuine issue of material fact with respect to her claim of gender discrimination in connection with the reassignment and removal of her duties, the December 20, 2013 counseling memorandum, or her termination.[52] There is, therefore no basis for individual liability under Section 1983's more stringent standard.

**K.       Section 1983 – Equal Protection – Retaliation**

In the Second Circuit, "a claim for retaliation for a complaint that alleged discrimination is actionable under § 1983" because "retaliation is a form of discrimination." *Vega*, 801 F.3d at

---

[52] The Court notes that its analysis pertaining to pretext was subject to a "lessened causation standard," *Naumovski*, 934 F.3d at 213, under which the Plaintiff only needed to show that sex was a motivating factor. Plaintiff failed to do so, and thus similarly fails under the heightened causation standard articulated in *Naumovski*. *Id.* at 214.

81. Plaintiff alleges that the individual Defendants retaliated against her for her complaints of gender discrimination and retaliation.

"[T]he elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII." *Id.* Thus, Plaintiff has raised material issues of fact with respect to her retaliation claim under Section 1983. Defendants contend that even assuming Plaintiff has adduced evidence of retaliation as well as evidence of their personal involvement, they are entitled to qualified immunity because "the right to be free from unlawful retaliation was not a clearly established right until September 2, 2015." (Dkt. No. 256-5, at 19).

At the summary judgment stage, claims of qualified immunity are evaluated "using a two-part inquiry: (1) whether the facts, taken in the light most favorable to the party asserting the injury show that the officer's conduct violated a federal right" and (2) whether the right in question was clearly established at the time of the violation." *Sloley v. Vanbramer*, 945 F.3d 30, 36 (2d Cir. 2019) (quoting *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam)). The Court has discretion to decide which of the two prongs to address first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Defendants are entitled to qualified immunity with respect to Plaintiff's equal protection retaliation claim. "[T]he right to be free from retaliation under the Equal Protection Clause of the Fourteenth Amendment was not clearly established in the Second Circuit until September 2015," *Anderson v. City of New York, Health & Hosp. Corp.*, No. 16-cv-1051, 2017 WL 9538862, at *16, 2017 U.S. Dist. LEXIS 8358, at *49 (S.D.N.Y. Jan. 19, 2017), *report and recommendation adopted*, 2017 WL 3251603, 2017 U.S. Dist. LEXIS 119645 (S.D.N.Y. July 31, 2017), two months after Plaintiff's termination. In *Vega*, the Second Circuit acknowledged "that there has been considerable confusion surrounding the viability of retaliation claims under § 1983" and

clarified "that retaliation claims alleging an adverse action because of a complaint of discrimination are actionable under § 1983." 801 F.3d at 80. Because the last alleged retaliatory act occurred in July 2015, "before the law was clearly defined, the Individual Defendants are entitled to qualified immunity with respect to Plaintiff's equal protection retaliation claims." *Anderson*, 2017 WL 9538862, at \*16, 2017 U.S. Dist. LEXIS 119645, at \*50; *see Johnson v. Connecticut Dep't of Admin. Servs. Bureau of Enter. Sys. & Tech.*, No. 17-cv-00901, 2018 WL 306697, at \*7, 2018 U.S. Dist. LEXIS 2558, at \*19 (D. Conn. Jan. 5, 2018) ("Because the law was not clearly established, Wells and Ruiz enjoy qualified immunity against plaintiff's § 1983 retaliation claims, which all arise from alleged acts before September 2015."). Accordingly, Plaintiff's Section 1983 retaliation claims against the individual Defendants are dismissed.

### L.      Sections 1983, 1985, 1986 – Conspiracy and Failure to Prevent Conspiracy

Plaintiff alleges Defendants conspired to subject her to a hostile work environment, gender discrimination, and retaliation, in violation of 42 U.S.C. §§ 1983, 1985. (Dkt. No. 37, at 24–30). She further alleges that Defendants failed to prevent this conspiracy, in violation of 42 U.S.C. § 1986. (*Id.* at 32–36). Defendants argue they are entitled to summary judgment dismissing these claims under the intracorporate conspiracy doctrine. (Dkt. No. 256-5, at 28–31; Dkt. No. 259-21, at 27–28).

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). To establish a § 1985(3) conspiracy, a plaintiff must show "(1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person

or property, or a deprivation of a right or privilege of a citizen of the United States." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). "Furthermore, the conspiracy must also be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'" *Id.* (quoting *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993)).

"Under the intracorporate conspiracy doctrine, employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring together." *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 210 (S.D.N.Y. 2013); *see also Hermann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) ("[T]here is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment.").

Although the Second Circuit has not specifically addressed the applicability of the intracorporate conspiracy doctrine to a § 1983 conspiracy claim, district courts within the Circuit have applied the doctrine to such claims. *See Green v. Martin*, 224 F. Supp. 3d 154, 179 (D. Conn. Dec. 14, 2016) (finding that where the complaint alleged only "that the prison officials have been acting in the normal course of their corporate duties," and there were "no allegations that such officials have been acting pursuant to any personal interests 'wholly separate and apart' from CCI by denying grievances of the inmates," the intracorporate conspiracy doctrine barred § 1983 conspiracy claim); *White v. Cty. of Dutchess*, No. 15-cv-8744, 2016 WL 4449720, at *9, 2016 U.S. Dist. LEXIS 112431, at *25 (S.D.N.Y. Aug. 23, 2016) (dismissing § 1983 conspiracy claim because, inter alia, there "can be no conspiracy between any of the officer defendants because they are all employed by the City of Poughkeepsie"); *Harrison v. Cty. of Nassau*, No.

15-cv-2712, 2016 WL 4083381, at *3, 2016 U.S. Dist. LEXIS 100394, at *9 (E.D.N.Y. Aug. 1,

2016) (finding "that the intracorporate conspiracy doctrine prevents a finding of liability of

defendants for participation in a conspiracy to deny plaintiff his constitutional rights"); *Richard*

*v. Dignean*, 126 F. Supp. 3d 334, 338–39 (W.D.N.Y. 2015) (applying intracorporate conspiracy

doctrine to § 1983 conspiracy claim).

There is an exception to the intracorporate conspiracy doctrine: it does not apply when

the individuals are "pursuing personal interests wholly separate and apart from the entity." *Ali v.*

*Connick*, 136 F. Supp. 3d 270, 282–83 (E.D.N.Y. 2015). For this "personal stake" exception to

apply, a plaintiff must allege that the defendants "acted other than in the normal course of

corporate duties.'" *Green*, 224 F .Supp. 3d at 179 (quoting *Girard v. 94th St. & Fifth Ave. Corp.*,

530 F.2d 66, 72 (2d Cir. 1976)); *Chillemi v. Town of Southampton*, 943 F. Supp. 2d 365, 381

(E.D.N.Y. 2013) ("An exception to this doctrine exists, however, where a plaintiff alleges facts

that tend to show the defendants were pursuing personal interests wholly separate and apart from

the entity.") (internal quotation marks omitted); *Alvarez v. City of N.Y.*, No. 11-cv-5464, 2012

WL 6212612, at *3, 2012 U.S. Dist. LEXIS 176840, at *9 (S.D.N.Y. Dec. 12, 2012) ("[C]ourts

have recognized an exception to this doctrine when the defendants were motivated by an

independent personal stake in achieving the corporation's objective.") (internal quotation marks

and alteration omitted). Personal bias "does not constitute personal interest and is not sufficient

to defeat the intracorporate conspiracy doctrine." *Bond v. Board. of Educ. of City of New York*,

No. 97-cv-1337, 1999 WL 151702, at *2, 1999 U.S. Dist. LEXIS 3164, at *7 (E.D.N.Y. Mar. 17,

1999). "[T]he caselaw in this circuit is clear that allegations of conspiracy to retaliate or

discriminate against an inmate, motivated by personal bias alone, cannot overcome the

intracorporate conspiracy doctrine when asserted against employees of a single entity." *Povoski*

*v. Lacy*, No. 14-cv-97, 2016 WL 908899, at *7, 2016 U.S. Dist. LEXIS 15722, at *20 (N.D.N.Y.

Feb. 8, 2016) (citing *Toliver v. Fischer*, No. 12-cv-77, 2015 WL 403133, at *22, 2014 U.S. Dist.

LEXIS 181684, at *31 (Nov. 17, 2014)), *report and recommendation adopted*, 2016 WL

913254, 2016 U.S. Dist. LEXIS 29807 (N.D.N.Y. Mar. 9, 2016).

Plaintiff brings the conspiracy claims against the individual Defendants, who are all

members, in different ranks, of the NYSP. As employees of the same state entity, they cannot

"conspire" against Plaintiff within the meaning of Sections 1983 or 1985. *McCrain v. Metro.*

*Transp. Auth.*, No. 17-cv-2520, 2020 WL 1285634, at *19, 2020 U.S. Dist. LEXIS 47363, at *57

(S.D.N.Y. Mar. 18, 2020) ("Plaintiff brings this claim against Defendant MTA and the individual

Defendants, who are all members, in different ranks, of the MTA Police Department. Because

the individual Defendants are all employees of the same municipal entity the MTA, they thus

cannot 'conspire' against Plaintiff as understood by § 1985.").

To the extent Plaintiff seeks to invoke the personal stake exception to the intracorporate

conspiracy doctrine, she cites no evidence showing that Defendants were "pursuing personal

interests wholly separate and apart from the entity." *Chillemi*, 943 F. Supp. 2d at 381. Every

issue in this case centers on CNET or CTIU issues within the scope of each individual

Defendant's employment, including paperwork, chain of command, undercover operations and

investigations, and work assignments. Although Plaintiff asserts that Defendants engaged in an

extensive conspiracy "for the purpose of discrediting Plaintiff and to defame her and destroy her

career through the falsified memoranda, statements, and investigative reports" and because

"Plaintiff had too much evidence in defense of the false accusations McKee used to initiate the

Personnel Complaint" that led to her termination, she presents no evidence in support of these

assertions.[53] (Dkt. No. 293, at 55–57). These assertions and other similar assertions by Plaintiff regarding concerted efforts by the Defendants to discredit her claims in order to protect their own misconduct are no more than speculation. *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment.").

Plaintiff has failed to adduce evidence from which a reasonable jury could find that Defendants were pursuing personal interests wholly separate and apart from the entity. Thus, Defendants are entitled to summary judgment dismissing Plaintiff's conspiracy claims based on the intracorporate conspiracy doctrine. In the absence of a viable conspiracy claim, Defendants are entitled to dismissal of Plaintiff's Section 1986 failure to prevent a conspiracy claim. *See Abdi v. Brookhaven Sci. Assocs., LLC*, 447 F. Supp. 2d 221, 227 (E.D.N.Y. 2006) ("As for the § 1986 claim, no such claim lies unless there is a viable conspiracy claim under § 1985." (citing *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994) (upholding dismissal of § 1986 claim based on dismissal of § 1985(3) claim))). Accordingly, Plaintiff's conspiracy and failure to prevent conspiracy claims are dismissed.

## M.      Liability of Individual Defendants under NYSHRL

The individual Defendants argue that because "none of the defendants implicated in plaintiff's NYSHRL claims may be deemed her 'employer' under Section 296(1) of the statute," they cannot be held liable as aiders or abettors under Section 296(6). (Dkt. No. 256-5, at 15–18; Dkt. No. 259-1, at 34–35). In the Second Amended Complaint, Plaintiff sues only the individual

---

[53] Plaintiff argued extensively during discovery and in connection with this motion that memoranda drafted by CNET members regarding her conduct were fabrications or falsified by various supervisors or superior officers. (Dkt. No. 293, at 56). While there is evidence of multiple drafts of memoranda and incorrect dates on documents, none of those variances allow an inference of fraud. (*See, e.g.,* Dkt. Nos. 244, 311; *see also* Dkt No. 290-9, at 23 (appearing to correct typographical errors in Dkt. No. 290-9 at 22)).

Defendants under the NYSHRL; she has not asserted a NYSHRL claim against the NYSP. (Dkt. No. 37, at ¶¶ 262–93). This does not, however, preclude Plaintiff from bringing a NYSHRL claim against an employee: "an action against an employee under Section 296(6) may continue when a plaintiff" has not brought or is barred from bringing "a claim under the NYSHRL against the employer." *Johnson v. Cty. of Nassau*, 82 F. Supp. 3d 533, 537 (E.D.N.Y. 2015). This is because "a plaintiff can still prove involvement by the employer even if the employer is procedurally dismissed from the case (or is not brought as a defendant at all)." *Id.* Thus, Defendants' argument is without merit.

The absence of the employer as a party, however, "does not relieve plaintiff of its obligation, as part of its Section 296(6) claim against the individual employee, of first proving the liability of the employer." *Id*. Because Plaintiff has not done so with respect to her gender discrimination claim or her claim of disability discrimination based on the removal of her undercover duties, there is no basis for holding the individual Defendants liable for those claims under the NYSHRL. Accordingly, the Court considers only Plaintiff's hostile work environment and retaliation claims against the individual Defendants.

A supervisor may be liable under the NYSHRL if that supervisor "actually participates in the conduct giving rise to [the] discrimination." *Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995)). Non-supervisors, or co-workers, may be liable for discrimination, even if they lack the authority to hire or fire the plaintiff, if they "aid[s], abet[s], incite[s], compel[s] or coerce[s] the doing of any of the acts forbidden under this article, or attempt to do so." *Id.* at 158 (citing N.Y. Exec. Law § 296(6)).

### 1.  NYSHRL – Hostile Work Environment

As discussed, there is no evidence that Defendants Christensen, Cerretto, Olson, Nigrelli, Bour, Kopacz, or McKee participated in the conduct giving rise to Plaintiff's hostile work

environment claim. *See Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 398 (S.D.N.Y. 2019) ("[I]f BLHC is indeed liable for subjecting Plaintiff to a hostile work environment, then Defendant Wilson could also only be liable as an aider and abettor under the NYSHRL and individually or as an aider abettor under the NYCHRL if she actually participated in the conduct giving rise to Plaintiff's claim."). There is evidence, in contrast, that SI Kelly participated in the creation of the alleged hostile work environment. SI Kelly, however, cannot be held liable under the NYSHRL because Plaintiff has failed to establish a basis for imputing the hostile work environment to the NYSP. *See Conklin v. Cty. of Suffolk*, 859 F. Supp. 2d 415, 437 (E.D.N.Y. 2012) (granting summary judgment on NYSHRL aiding and abetting hostile work environment claim because the plaintiff failed to establish "predicate employer liability"). Accordingly, Defendants are entitled to summary judgment dismissing the NYSHRL hostile work environment claim.

### 2.   NYSHRL – Retaliation

The individual Defendants move for summary judgment dismissing Plaintiff's NYSHRL retaliation claims. A plaintiff seeking to bring an aiding and abetting claim for retaliation must demonstrate that individual defendants were involved, or participated in, retaliation following a plaintiff's complaint of discrimination. *Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 662 (E.D.N.Y. 2015). As there is no retaliatory termination claim remaining, and there is no evidence that SI Bour, SI Kelly, Major Cerretto, Captain Nigrelli, or SI Kopacz participated in the remaining allegedly adverse actions—the restriction on Plaintiff's ability to participate in operations involving SI Kelly or Inv. Peterson while she was assigned to a team with Inv.

Peterson,[54] the removal of her undercover duties, and her transfer to the CTIU—they are entitled to summary judgment dismissing the NYSHRL retaliation claims against them.

As to the remaining individual Defendants, Plaintiff has adduced evidence that Major Olson was involved in the reassignment of Plaintiff to SI Bour's team, where she was restricted in her ability to participate in that team's operations involving SI Kelly or Inv. Peterson based on her discrimination complaint. (Dkt. No. 290-4, at 2; Dkt. No. 289, at 68-69). Plaintiff has also adduced evidence that Major Olson considered the IAB investigation in removing Plaintiff's undercover duties. (Dkt. No. 256-3, at 75–76). There is, therefore, evidence from which a fact finder could conclude that Major Olson aided and abetted retaliation in connection with Plaintiff's reassignment and the removal of her undercover duties.[55]

There is also evidence that Col. Christensen was involved in transferring Plaintiff from CNET West to the CTIU: in her affidavit, Plaintiff states that she received a telephone call from "Scott Gillman (who worked under Francis Christensen) and who advised Plaintiff that Martin McKee was accusing her of stealing files . . . and that unless Plaintiff immediately submitted a transfer request . . . a Personnel Complaint would be lodged against" her and that Plaintiff "was leaving CNET West as this was coming directly from Francis Christensen." (Dkt. No. 289, at 104). However, even assuming this evidence is sufficient to show Col. Christensen's involvement, Plaintiff has failed to cite anything in the record from which a reasonable factfinder could infer that Col. Christensen acted with retaliatory intent. *See Long v. Marubeni Am. Corp.*, No. 05-cv-0639, 2006 WL 547555, at *4, 2006 U.S. Dist. LEXIS 8932, at *16 (S.D.N.Y. Mar. 6,

---

[54] Although this allegedly adverse action was time-barred for purposes of Plaintiff's Title VII claim, it is timely under the NYSHRL. Further, for the reasons stated *supra* Sections V.E.1.b.iii and c.i., the Court finds Plaintiff has raised material issues of fact with respect to whether her reassignment was an adverse action and retaliatory.

[55] Although he was notified of the transfer, there is no evidence Major Olson was involved in the events leading to or the decision to transfer Plaintiff to the CTIU. (*See* Dkt. No. 290-13, at 12; Dkt. No. 256-2, at 431, 657).

2006) (explaining that a defendant can only "be liable for aiding and abetting the retaliatory commission of adverse employment actions" if he acts "with the retaliatory animus required for liability").

Lt. McKee argues that he cannot be held liable under Section 296(7) for retaliation because there is no evidence he "personally engaged in retaliation for any of plaintiff's prior discrimination or retaliation complaints." (Dkt. No. 259-21, at 35). The only evidence of Lt. McKee's involvement in the removal of Plaintiff's undercover duties is his gathering of memoranda regarding the January 2, 2014 operation. (Dkt. No. 290-8, at 91–92). There is no evidence that he played any role in Major Olson's determination and thus no basis for liability in connection with this alleged adverse action. There is evidence in the record, however, that Lt. McKee was personally involved in the reassignment of Plaintiff's duties and restricting her from operations involving SI Kelly and Inv. Peterson, (Dkt. No. 289, at 68–69), and that his report that Plaintiff was "stealing files" from a shared drive led to her forced transfer to the CTIU, (*id.* at 104). Thus, Plaintiff has raised material issues of fact regarding whether Lt. McKee was personally involved in these allegedly retaliatory adverse actions. *See Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 367–68 (S.D.N.Y. 2012) (denying summary judgment against individual defendant who had authority to reassign employees, as defendant may have potentially "aid[ed], abet[ted], [or] incite[d]" discrimination and retaliation).

Lt. McKee further argues that Plaintiff has failed to adduce evidence showing that "any actions or omissions by McKee resulted from some retaliatory animus." (Dkt. No. 259-21, at 22). In her affirmation, Plaintiff states that on November 19, 2013, Lt. McKee informed her that she could no longer participate in any of her newly-assigned team's operations involving SI Kelly or Inv. Peterson, because she had filed a complaint against them and "there was no way . . . to

keep" either officer "from showing up." (Dkt. No. 289, at 68–69). Although it was Major Olson who assigned Plaintiff to a team with Inv. Peterson, a reasonable factfinder could infer retaliatory animus from Lt. McKee's restriction of Plaintiff, and not Inv. Peterson, from team operations because she filed a discrimination complaint. This evidence, in combination with the temporal proximity between Plaintiff's complaints and Lt. McKee's actions, is sufficient to raise material issues of fact regarding Lt. McKee's liability under Section 296(7).

### 3.   NYSHRL – Official Immunity

Lt. McKee argues that official immunity shields him from Plaintiff's NYSHRL claims. "The common-law doctrine of official immunity shields public employees 'from liability for discretionary actions taken during the performance of governmental functions" and "is intended to ensure that public servants are free to exercise their decision-making authority without interference from the courts.'" *United States v. City of New York*, 717 F.3d 72, 94 (2d Cir. 2013) (quoting *Valdez v. City of New York*, 18 N.Y.3d 69, 75–76 (2011)). "New York courts recognize the defense of qualified immunity to shield the government official from liability unless that action is taken in bad faith or without a reasonable basis." *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 364 (2d Cir. 2004). As Plaintiff has raised factual issues regarding Lt. McKee's retaliatory intent, qualified immunity under New York law is not appropriate at this time. *Cf. Russell v. Westchester Cmty. Coll.*, No. 16-cv-1712, 2017 WL 4326545, at *14, 2017 U.S. Dist. LEXIS 159540, at *35 (S.D.N.Y. Sept. 27, 2017) ("Plaintiff has sufficiently alleged that this decision was taken with discriminatory intent and in bad faith."); *see also Bermudez v. City of New York*, 783 F. Supp. 2d 560, 587–88 (S.D.N.Y. 2011) ("[I]t is clearly established that New York state law prohibits sexual harassment and discrimination in the workplace. Thus, Stroman is not entitled to qualified immunity under New York law.") (internal citation omitted).

## VI.     CONCLUSION

For these reasons, it is

**ORDERED** that Defendants' motions for summary judgment (Dkt. No. 256, 259) are

**GRANTED in part** and **DENIED in part** as follows:

- Plaintiff's Title VII gender discrimination and hostile work environment claims are dismissed with prejudice

- Plaintiff's Title VII retaliatory counseling memorandum and termination claims are dismissed with prejudice

- Plaintiff's Rehabilitation Act disability discrimination claim as to the removal of her undercover duties is dismissed with prejudice

- Plaintiff's § 1983 gender discrimination claim under the Equal Protection Clause is dismissed with prejudice

- Plaintiff's § 1983 hostile work environment claim under the Equal Protection Clause, as against Defendants Christensen, Cerretto, Olson, Nigrelli, McKee, Bour, and Kopacz, is dismissed with prejudice

- Plaintiff's § 1983 retaliation claim under the Equal Protection Clause is dismissed with prejudice

- Plaintiff's §§ 1983, 1985, and 1986 conspiracy and failure to prevent conspiracy claims are dismissed with prejudice

- Plaintiff's NYSHRL gender discrimination and hostile work environment claims are dismissed with prejudice

- Plaintiff's NYSHRL disability discrimination claim as to the removal of her undercover duties is dismissed with prejudice

- Plaintiff's NYSHRL retaliatory counseling memorandum and termination claims, and all retaliation claims alleged against Defendants Christensen, Cerretto, Nigrelli, Bour, and Kopacz, are dismissed with prejudice

It is further **ORDERED** that the Clerk is directed to terminate D'Amico, Christensen,

Cerretto, Nigrelli, Owens, Bour, and Kopacz as Defendants in this case.

**IT IS SO ORDERED.**

Brenda K. Sannes
U.S. District Judge